UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CHRISTOPHER FREEMAN,

                Plaintiff,

    -against-

STAKE.COM, PRIMEDICE, EDWARD CRAVEN, and BIJAN TEHRANI.

                Defendants.

Civil Action

22-cv-7002

**Complaint**

Jury Trial Demanded

---

## COMPLAINT

Plaintiff Christopher Freeman ("Freeman") by his attorneys Gage Spencer & Fleming LLP, in its complaint against defendants Stake.com ("Stake" or "Stake.com"), Primedice ("Primedice" or "Primedice.com"), Edward Craven a/k/a Edward Miroslav ("Craven") and Bijan Tehrani a/k/a/ Stunna ("Tehrani") (collectively, "Defendants") alleges as follows:

## INTRODUCTION

1.        Christopher Freeman founded Primedice, a common law partnership, with two partners, Bijan Tehrani and Edward Craven.

2.        Primedice, which launched in 2013, is an online cryptocurrency-funded dice game that allows global users to gamble via bitcoins, or percentages thereof, on a game of chance.

3.          After the site's initial success, in 2016, Freeman suggested and pushed the partnership towards expansion into other online cryptocurrency gambling games.

4.          Cryptocurrency, or "coin-based" systems rely on cryptocurrency as a means of exchange for winnings and losings, as compared to fiat-based systems which rely on traditional government issued currencies (enabled to be used online by credit card or other electronic means of currency payments) for winnings and losings.

5.          In 2016, Tehrani and Craven unilaterally hypothecated Primedice's commercial opportunities by enlarging the Primedice concept into a broader online cryptocurrency, coin-based, casino called Stake.com, which now offers numerous online gambling options (in the nature of an online, virtual "casino"), including a dice game which directly competes with, and siphons value away from, Primedice.

6.          Earlier, however, when Freeman had advocated the idea for a cryptocurrency, coin-based casino, Tehrani and Craven, claiming that such a virtual casino was too expensive to build, announced falsely to Freeman, in August 2016, that they were devoting their energies to building a fiat money casino, and that this would be done out of Australia (so that unless he relocated to Australia and gave up the idea of a crypto-based game, he would be unilaterally excluded).

7.          Freeman, who was committed to and comfortable with online gambling concepts, believed a fiat money casino was the wrong direction to go (online gaming facilitated by fiat is a widespread, big business).  He reasoned it was highly competitive and presented personal risks which he was not prepared to accept, and he did not want to be forced to move to Australia to pursue a fiat-based gambling business.  Freeman was additionally

concerned that the history of record-keeping and accounting at Primedice would serve as a poor starting point for a more highly regulated fiat money casino.  Freeman declined to join them.

8.        Later, when Stake.com launched as a virtual casino which included a competing online dice game and many other features Freeman had proposed and helped design, Tehrani and Craven affirmatively tried to assuage Freeman's dismay at having been misled by affirming that he still retained his stake in Primedice.

9.        Eventually, Freeman's access to the Primedice account was blocked and never returned.

10.        On information and belief, Tehrani and Craven caused the denial of access to Freeman, freezing him out of the partnership entirely.

11.        As a result, Freeman has been blocked from any payments owed to him as a partner in Primedice, as well as deprived of any interest in the Stake.com enterprise which was based on his own idea for a cryptocurrency-based casino, which incorporated a version of the Primedice game.

12.        The Defendant partners Tehrani and Craven violated their duties to Freeman by (i) making material misstatements and omitting disclosures of facts to Freeman, beginning in 2016 and continuing through the present, concerning the nature of the Stake.com concept in a successful effort to conceal his rights in its central technology; (ii) on information and belief, hiding from Freeman their efforts to execute an upcoming initial public offering, or similar major financing or liquidity event of Stake.com which would both increase its enterprise value above $1 billion USD and substantially change the investor/shareholder

capital table, without disclosing Freeman's rights and/or his partnership share, as part of an ongoing scheme to extinguish those rights; and (iii) concealing from Freeman information about profits generated by Primedice, Stake.com, and other ventures, and compensation owed to him as a partner, beginning in August of 2016 and continuing through this date.

13.     Accordingly, Freeman seeks a judgment compensating for the damages caused to him by Defendants' (i) trade secret misappropriation under the Defend Trade Secrets Act (18 U.S.C. § 1836 *et seq.*), (ii) multiple instances of fraud, (iii) repeated breaches of their fiduciary duties and duties of loyalty, (iv) unfair competition using proprietary technology and confidential trade secret information, (v) idea misappropriation of Freeman's novel and concrete plans for a cryptocurrency casino, (vi) tortious interference with prospective economic advantage, as well as (vii) disgorgement of sums by which Defendants have been unjustly enriched, (viii) conversion of Freeman's equity interest in Primedice and its successors, (ix) conversion of various alternative cryptocurrencies to which Freeman is due, and (ix) an accounting of partnership and corporate assets.

## PARTIES AND PARTICIPANTS

14.     Christopher Freeman was a resident of Connecticut until 2015, and a founding partner in Primedice during that time. He was a resident of Washington D.C. from 2015 until 2017, and a resident of New York from 2017 until 2021. Freeman is currently a resident of the State of Florida.

15.     Bijan Tehrani was a resident of Connecticut through at least 2015. He was a founding partner in Primedice during that time. Tehrani was a resident of New York from 2015 until 2017 through the growth of Primedice and the development, launch, and

4

early operation of Stake.com.  Upon information and belief, he is currently a resident of Australia.

16.          Edward Craven is a resident of Southbank, Victoria, Australia and, upon information and belief, was a resident of Australia through the founding of Primedice and Stake.com.

17.          Primedice is a partnership that avails itself of business in New York State. The partnership operated out of New York from at least 2015 through 2017 (via Tehrani) and from 2017 through 2021 (via Freeman).  Primedice currently avails itself of New York.  As of August 17, 2022, the website https://www.primedice.com is accessible in the state of New York.  Upon accessing the site, New York users are prompted to register for an account.  Primedice describes itself to New York users as "Provably Fair," that it has the "Lowest House Edge, 1%," that it offers "Instant Deposits & Withdrawals," and that it is the "Longest Running Crypto Casino."

18.          Stake.com is a company incorporated in Curacao that avails itself of business in New York State through its Stake.us subsidiary website. Despite a prohibition on cryptocurrency gaming in the United States absent specific regulation, United States consumers are encouraged both via Stake.com and social media platforms such as Reddit and Twitter to participate in games on Stake.us.  As of August 17, 2022, the website https://www.stake.us is accessible in the state of New York.   Upon information and belief, Stake.com partners are aware of, and attempt to cultivate, engagement by United States citizens with the site. Finally, founding partner Bijan Tehrani was a New York resident during the creation, development, and early operation of Stake.com.

## JURISDICTION AND VENUE

19.     This court has jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity between the plaintiff and all defendants and the amount in controversy is over $75,000 USD.

20.     Venue is proper pursuant to 28 U.S.C. § 1391 (b) (2) because a substantial part of the events or omissions giving rise to the claims herein occurred within the Southern District of New York.  To wit, Tehrani owned and helped to operate Primedice and Stake.com from his apartment in New York, New York from 2015 to 2017.  Tehrani resided in New York, New York in August 2016 when he and Craven communicated to Freeman their materially false "decision" not to proceed with plans to construct and operate a virtual casino discussed at length *infra*.  Freeman owned and helped to operate Primedice from his apartment in New York, New York from 2017 to 2021.

## STATEMENT OF FACTS

**Primedice Formation**

21.     Freeman and Tehrani have known one another most of their lives, including attending grade and high school together in Connecticut.

22.     In or around 2012, as a freshman in college, Freeman conceived of an idea for a Bitcoin gambling website which would improve upon and compete with "Satoshi Dice," a blockchain-based gambling concept inspired by the founder of Bitcoin.

23.          At that time, Tehrani was participating in an endeavor arising from the sale of monetized in-game exclusive electronic currency and in-game content in the online video game *RuneScape*.

24.          Freeman introduced the idea of a Bitcoin gambling website to Tehrani in 2012, prior to Tehrani's ceasing his efforts to monetize the video game *RuneScape*.

25.          Tehrani expressed enthusiasm for the idea, and Freeman and Tehrani agreed to form a partnership to develop the website that would become Primedice.

26.          At the time of the initial discussions to form the partnership, Freeman was a student at Southern Methodist University in Dallas Texas, and Tehrani was a student at Babson College in Wellesley, Massachusetts. At the time that Primedice was launched and as the business was being developed and operated, Tehrani and Freeman each held permanent residences at their parents' homes in New Canaan, Connecticut.

**Primedice Launches**

27.          Primedice began formal operation in 2013.

28.          The website URL https://www.primedice.com was registered by Freeman on or about February 14, 2013.

29.          Primedice launched for public access and play on or about May 18, 2013.

30.          In reliance upon the site's early success, and his established role in the enterprise, Freeman dropped out of Southern Methodist University during the 2013-14 Winter Break to focus his energies full time on the growth of the site.

31.       Presented with that same option at that time, Tehrani elected not to devote his full energies to Primedice and returned to college.

32.       Primedice initially operated through the use of a "hot wallet," an online account which was and is used to hold and trade cryptocurrency.  The "hot wallet" would allow each partner to access the site's funds to facilitate paying winners or resolving site expenses.  At the time that Primedice was launched, the entire cryptocurrency space was far less developed than it is today.

33.       At the time of the formation and launch of Primedice, there was a great deal of concern, widely-expressed, about the legality of cryptocurrency, its dependability as a form of currency, the taxability of cryptocurrency transactions, using cryptocurrency as a means of exchange, and the legality of online gambling that crossed various geopolitical borders (where the various enterprises running such "games" should be considered domiciled, how and if they could actually control in an effective manner those who were able to "play" on these online cites).  Many regulators in the US and around the world were in a state of development and evolution in their reactions to the oversight and regulation of both cryptocurrency and online gaming. For these reasons, it was the widespread, standard, and accepted practice (among those engaged in these businesses) to minimize structure, recordkeeping, accounting, written documentation, etc., and to depend upon informal means of organization and control.  At the time, as well, the plaintiff and the individual defendants were all around 20 years old, without significant business experience.

34.       In 2015, after graduating from college, Tehrani helped run the site from his residence in New York.

35.        Also in or about 2015, Tehrani met with a New York law firm on behalf of the partnership to discuss potential regulatory issues arising from the site and the "Wild West" nature of the early cryptocurrency era.

36.        The partners each had access to the Primedice hot wallet and had the authority to make deposits and withdrawals.

37.        Primedice's net profits were – theoretically – determined after the withdrawals and expenses were deducted from the gross profits, with the remaining profits distributed to the partners based on their equity share. While this was the theory of "accounting", there were no books and records or ledgers of any sort maintained concurrently with the early years of the operation.

38.        Primedice never utilized a professional or independent accountant.

39.        There were no capitalization tables and no operating agreements.

40.        All agreements were verbal "handshake agreements."

41.        Further, due to coding issues owing to Craven's failures in that regard, the Primedice wallet experienced "leaking" in the form of frequent post-transaction miscalculations and occasional double-counting of withdrawals which depleted the partnership's funds.

**Tehrani Begins a Campaign of Bullying Freeman**

42.        Immediately upon entering the partnership, Tehrani began to exhibit the bullying behavior towards Freeman that had colored their relationship since childhood.

43.          Tehrani brought into Primedice his associate in the *RuneScape* venture, Ed Craven.

44.          Both Tehrani and Craven told Freeman that Craven had expertise and would code the new site.

45.          The three partners discussed a division of responsibility according to their different skill sets.

46.          As a result, Freeman brought his expertise in cryptocurrency, his history designing micro blogs for affiliate marketing endeavors, experience setting up DNS records and domains and in dealing with site encryption, and his work as a web designer for, among others, a restaurateur and a music group to the partnership. These were all areas with which Tehrani and Craven had had no prior experience. Tehrani contributed his knowledge in online gaming and business development in the sphere from his exposure to *RuneScape*. Craven was supposed to bring his purported programming and coding acumen to the partnership to code the site.

47.          This distribution reflected the bullying relationship between Tehrani and Freeman.  Since childhood, Tehrani had shown an ability to push and compel Freeman to acquiesce to his demands.  Though Freeman brought talent, skills, and industry knowledge to that table that was equal to or better than his partners, Tehrani believed that he could take advantage of Freeman's abilities without treating him as an equal.

48.          In reality, Craven had insufficient programming skill to build out the site.

49.          When Craven proved unable to program Primedice.com, Craven hired

an individual named Samuel Bort Coldridge (a/k/a "Lacrimas") to code the site.

50.         Neither Tehrani nor Freeman approved Craven's choice to hire Lacrimas.

51.         Freeman had entered into the partnership with Craven based on a false understanding, based upon Tehrani's and Craven's false representations, that Craven would bring substantial technical skill to the project.

52.         Craven had no such technical skill.

53.         In fact, it has come to light, that Craven was struggling with serious substance abuse problems which periodically impacted the partnership's operations and necessitated long distance interventions by the partners.

54.         In an effort to address Craven's failures, the partnership would eventually keep Craven's authorized signature on file in case any unexpected site issues arose and Craven was indisposed.

55.         With Lacrimas providing the coding, the Primedice website was constructed.

56.         At the time of its launch, Freeman made a capital investment into the partnership, but was told by Tehrani and Craven that it was less than their own and that his partnership share would therefore be lower than their own.

57.         Tehrani and Craven insisted that ownership be based on financial contribution only, and that there be no "sweat" equity offered.

58.         Based on their purported investments, the partnership shares of each

11

were divided into 40% for Tehrani, 40% for Craven, and 20% for Freeman.

59.     Freeman invested thousands of coins into the early days of the site and was responsible for helping to "fill" the site's reserves to cover player wins in the early days of the site.

60.     Neither Tehrani nor Craven ever disclosed to Freeman the actual amounts they invested or otherwise verified that their investments were each twice his own. Once again, Tehrani took advantage of Freeman's fundamental decency and trust.

**An Unlawful Breach of the Partnership Agreement**

61.     In early 2014, approximately nine months into the lifespan of the site, during a phone call between the partners, Craven unilaterally stated he was redistributing 6% from Freeman's equity, taking 1% for himself and giving 5% to Lacrimas as a reward for Lacrimas' programming work.

62.     Craven had no authority to do this:  Freeman never agreed to this usurpation of his equity interest and the parties never signed any written agreement to allow for this sort of conveyance. There was never any partnership documentation, decision, vote, payment, transfer, deed, or recordation of a change in Freeman's partnership interest.

63.     Thus, pursuant to the original unverified share allocation, Freeman's partnership share remains at least 20%, the minimum equity stake he rightfully acquired and paid for in 2013, as all parties agreed.

64.     The purported unilateral redistribution of Freeman's equity stake by the other partners is illegal, and a breach of the partners' fiduciary duties to Freeman.

65.     Tehrani and Craven began to behave as though Freeman had merely a 14% share in the company. This was a continuation of Tehrani's bullying behavior towards Freeman which had been ongoing for years. The bullying had taken on the dimension as an intentional interference with Freeman's economic advantages, both existent and future, and was joined in by Craven, who used Tehrani as his role model in bullying Freeman.

66.     The distribution in early 2014, according to Craven's impermissible calculation, was 40% Craven, 40% Tehrani, 14% Freeman, 5% Coolridge, and 1% to yet another individual who Craven had sold a partnership interest without permission or consent of Freeman, and who later ended up stealing money from the partnership. As with the purported change of Freeman's stake, this second Craven transfer was totally undocumented and without partnership process or recordation.

**The Genesis of Stake.com and the Defrauding of Freeman**

67.     As Primedice grew in stability and success, Freeman pressed his partners Tehrani and Craven to direct the partnership towards the development of expanded online cryptocurrency, coin-based, gambling games.

68.     Critically, on numerous occasions prior to the formation of Stake, Freeman had been a leader of specific planning discussions about such an expansion of Primedice, helping design a form of an online slot machine and poker game, evaluating artist mock-ups of a new site, and suggesting and discussing potential names for a successor entity, among them "Whale Day," "All-In.com," and "FreemanSports.com."

69.     In fact, the "FreemanSports.com" concept was Craven's idea as he liked the sound of the name.

70.         Freeman specifically designed mock-ups for potential future games for evaluation by the partnership.

71.         For example, in or about March 2015, at the behest of and with the support of his partners Freeman created a mock-up for "Primeslots."

72.         Primeslots would have served as a simple online cryptocurrency slot game either added to Primedice or launches as a separate, related entity on a site such as https://www.primeslots.com.  Primeslots would have allowed users to gamble on web-based slot machines using cryptocurrency.

73.         Primeslots was never launched.

74.         However, Stake.com currently has numerous cryptocurrency slot games.

75.         In fact, Freeman also worked on the pitch, design, and development of a potential poker game for deployment under the Primedice umbrella, similar to his work on Primeslots.

76.         The proposed poker game would have allowed users to play online poker with cryptocurrency.

77.         A Primedice version of poker was never launched.

78.         However, Stake.com currently has numerous cryptocurrency poker games.

79.         On November 11, 2015, Tehrani and Craven even announced on a public forum that Primedice was indeed headed in this direction.

80.        Using his username "Stunna" in a public online bitcoin.com forum, Tehrani confirmed that "the [Primedice] site runs super smoothly and requires minimum work on mine or Ed's part. Our effort has been shifted to the development of our new website."

81.        Further, other users in the same public online bitcoin.com forum clearly were already aware of Tehrani's future plans, including one user asking Tehrani for updates about his new "project."

82.        Tehrani went on to describe the new "project/game" as "a lot more impressive than Primedice or any other gambling offering I've seen. I'm extremely excited for it. It isn't coming out in the near future though."

83.        Again, on November 11, 2015, and again using his "Stunna" username in a public online bitcoin.com forum, Tehrani verified to users of Primedice that Primedice is "working on various games" noting further that building a "provably fair poker game from scratch is an incredibly ambitious project but hopefully we can get around to it at some point."

84.        Craven, likewise, on November 11, 2015, using his "Edward Miroslav" username in a public online bitcoin.com forum, confirmed that Primedice has "a massive project in the pipeline at the moment which we're going to be releasing fairly soon. It pretty much covers all aspects of gambling."

85.        Craven concluded "I can't really discuss much about this though."

86.        Furthermore, upon information and belief, Tehrani and Craven used Primedice funds to pay for third-party and other costs associated with the development and design of the online Bitcoin casino which would become Stake.com.

87.     Those designs, moreover, confirmed that Stake.com was formed and intended to be a Bitcoin casino, not a fiat money casino.

88.     On August 20, 2016, Tehrani affirmatively reached out to Freeman to explain that he and Craven had decided to direct their focus on creating a fiat money casino, and specifically not a cryptocurrency-based on-line gaming business, in Australia, and that, to participate, Freeman would have to agree to move to Australia.

89.      When Freeman expressed dismay and asked why Tehrani and Craven were abandoning the idea of creating the cryptocurrency casino which the three partners had all been working towards, Tehrani explained that "[t]here has been no Bitcoin casino" for six months, that the project was "wayyyy to expensive," and that he "want[ed] to exit the Bitcoin space."

90.     Freeman was upset that his partners were leaving "the Bitcoin space" because the partnership had gained experience and had developed a know-how with respect to crypto-based online gaming and he wanted to continue in that vein.

91.     Faced by Tehrani's unequivocal representation that he and Craven had pivoted their energies out of "the Bitcoin space" in favor of fiat-based gaming business, Freeman was forced to evaluate whether he wished to uproot himself from New York to move to Australia, as demanded, to engage in a fiat money venture.  Concluding that the fiat money concept introduced heightened competition and other risks, Freeman evaluated that, in consideration of those issues, he would choose not to leave his home and begin a new life halfway around the world.

92.     A short while later, however, Tehrani and Craven launched Stake.com

as an online cryptocurrency-based Bitcoin casino, contrary to Tehrani's specific representations to Freeman.

93.     In truth and in fact, Tehrani and Craven always intended to launch a Bitcoin casino and had no intention of establishing a fiat money casino.

94.     Tehrani's representation to Freeman was false and designed further to exclude him from the partnership.

95.     Tehrani and Craven yet again attempted to bully Freeman and to take advantage of his decency and perceived passivity to exclude him from the next iteration of the Primedice partnership.

96.     Though both partners and fiduciaries, Tehrani and Craven took this Primedice commercial opportunity to establish a competing business using Primedice funds, promoted it as a superior product by reference to Primedice, and made affirmative steps contrary to the economic interests of Freeman.

97.     By way of example, on a private message among various site partners using the app Telegram in or about October 2017, Tehrani explained "[we] just need to get every1 onto stakedice 2% edge."

98.     The phrase "2% edge" refers to the percentage the weight the game's odds give to the "house" – in this case, Stake.com

99.     Primedice was run with a 1% edge, making the site less profitable and more volatile than the new endeavor at Stake.com.

100.    Essentially, Tehrani and Craven copied the business template of

Primedice and manipulated it into something potentially more personally profitable than Primedice.

101.     Here, Tehrani and Craven have breached their fiduciary duty to Freeman and have continued to act in a manner adverse to his interests and to Primedice's interests and value.  Each action Tehrani and Craven have taken to improve Stake.com's position vis-à-vis Primedice's position or their own position relative to Freeman's constitutes an individual act in a series of continuing wrongs and/or undiscovered conduct against Freeman's interests and in violation of their fiduciary duties.

102.     After the launch of Stake as a Bitcoin casino, Freeman voiced his objection to his partners about having been lied to by Tehrani and sought to establish his rights as a partner to share in the performance of Stake.

103.     Tehrani and Craven disputed Freeman's partnership rights and told him that his rights were limited to Primedice.

104.     However, since on or about that date, Tehrani and Craven have caused Freeman's access to the Primedice hot wallet, from which are withdrawn all partner profits, to be blocked.

105.     Further, the launch of Stake.com included a dozen games including its own dice game, Stakedice, which immediately began to siphon business, revenues, and profits from Primedice and value from Freeman's share of the Primedice business.

106.     Slots and poker were also included on Stake.com at launch.

107.     In fact, Tehrani and Craven paid third-party coders, or website

programmers, to complete and introduce a "fifth generation" of dice game which it used on Stake.com for a full year before permitting it to be used on Primedice.

108.        Ultimately, both Stake and Primedice used the same "fifth generation" technology, derived from the original Primedice technology.

109.        Upon information and belief, Tehrani and Craven used Primedice funds to pay those programmers.

110.        Numerous further functions on both Stake and Primedice were programmed in unison in the early days of Stake including a new chat function that was deployed for both sites.

111.        Tehrani and Craven have commingled Primedice's assets for Stake's benefit in this manner.

112.        Even so, Tehrani and Craven have denied each of Freeman's claims to his partnership share in Stake.com and have even denied Freeman any profit share from Stake's dice game which competes with Primedice using Primedice-derived technology.

113.        Stake.com has evolved since launch into a massive online gambling presence that operates overwhelmingly based on cryptocurrency gambling through various online casino games and sports betting.

114.        Upon information and belief, Tehrani and Craven regularly failed to keep the financials of the companies separate.

115.        On numerous occasions, customers were granted credits when moving from one site to the other.

116.    Tehrani, Craven, and other Stake employees or agents have regularly utilized online forums to steer Primedice users to Stake.

117.    Upon information and belief, Tehrani and Craven have also created an entity called "EasyGo" using Primedice assets. EasyGo is purportedly a company involved in Stake.com and Primedice which, according to its website, is a "global company" that is "looking to revolutionize the online gaming industry by introducing well-designed casino games and platforms based on our 'provably fair' algorithms."

118.    Stake.com also has a small fiat currency business done exclusively in the UK through an entity called TGP Europe.

119.    On information and belief, TGP Europe has been the beneficiary of Stake assets and revenue to which Freeman may have been entitled.

120.    Stake.com has become a common sponsor of major events ranging from top domestic UFC MMA fights and Formula 1 racers to English Premiere League Teams and major e-sports competitions in the online gaming sphere.

121.    Upon information and belief, Stake.com is currently worth over $1 billion USD.

122.    The *Sydney Morning Herald* reported on December 10, 2021, that "[i]ndustry observers conservatively value the [Stake.com] operation at $1 billion."

123.    The Australian Financial Review reported on August 15, 2022 that Craven spent nearly $40 million Australian dollars on a mansion in an affluent Melbourne suburb called Toorak in March 2022 and $80,000,088 Australian dollars on a second mansion

in the Toorak suburbs of Melbourne in August 2022.

124.     Upon information and belief, Stake knowingly avails itself to the United States market, including in the State of New York and the County of New York, through sponsorship efforts including branding on UFC Octagons (i.e., fight cages) utilized during events broadcast in the city and state of New York.

125.     Additionally, numerous players have admitted in online forums that they have been readily able to gamble in New York State on Stake.com by using a Virtual Private Network ("VPN"). A VPN is a private network that allows users to mask their geographic identity and appear to websites as though they are located in a different state or country from where they are actually located.

126.     To give just two recent examples, in July 2021 Reddit user respcare89 noted in the r/onlinegambling Reddit group that he was attempting to figure out how to get his winnings from Stake.com earned in New York released to him "without moving to Canada" and another New York based user, potatoshark43, commented in the same forum in October 2021 that he was "occasionally VPNing to Canada with Stake."

127.     Tehrani and Craven were aware that United States players made efforts to access the games.  In fact, the first time any effort was made to block US players from accessing Primedice, the site lost half its daily revenue.

128.     Soon, a cottage industry developed – with Tehrani and Craven's knowledge – for Stake.com to continue accessing the US market. Numerous explanations for how to use VPNs to access Stake.com are available on Reddit and other cryptocurrency or gambling focused online sites and forums. Additionally, numerous YouTube videos – many

with tens of thousands of views – describe specifically how to access Stake.com from inside the US market and from the state of New York. One video by user Danny Oleksy titled "How to GAMBLE ONLINE in the US (Gamble online safely in the United States on STAKE or ROOBET!)" has over 80,000 views since October 2021 and another by user Comparatif VPN titled "PLAY STAKE LEGALLY IN THE UNITED STATES: Here's How to Play Stake in the US [LEGALLY]" has over 65,000 views since October 2021.

129.     In fact, Stake.com has recently launched Stake.us, an effort to further establish itself in the US market and in the state of New York.

130.     Despite a prohibition on cryptocurrency gaming in the United States, United States consumers are encouraged both via Stake.com itself and social media platforms such as Reddit and Twitter to participate in games on Stake.us.

131.     Stake.com partners are aware of, and attempt to cultivate, engagement by United States citizens with the site.

132.     Stake.com has a verified Twitter account. A Twitter account can be "verified" by Twitter when the account is able to (1) prove its identity, whether professional or individual, and (2) show that it has a sufficient social media engagement to merit verification. Verification is denoted by a white check mark in a blue seal next to the user's Twitter handle.

133.     On August 4, 2022, Stake.com's verified Twitter account (@Stake) tweeted:



134.    The Tweet reads:

"American Friends *:smirking emoji:*

In case you missed it…

stake.us is live *:American Flag emoji:*"

135.        The tweet is accompanied by a meme of cartoon character SpongeBob SquarePants burning a piece of paper that says "STAKE.COM IS NOT AVAILABLE IN THE US" and warming himself with the subsequent flames with the site address "STAKE.US" above him.

136.        Not only is Stake.com availing itself to the markets in the U.S. and New York, but in its effort to penetrate those markets, it is apparently unconcerned with taunting regulators who want to prevent illegal online gambling in the United States.

**Primedice's Accounting Failures**

137.     In or around September 2016, the partners agreed to institute a more formal accounting system.  As the parties could not track past withdrawals, they each agreed to a "baseline" figure representing the total amount of Bitcoins each of them had withdrawn from Primedice up to that point.

138.     Yet, Tehrani and Craven continued to fail to provide sufficiently reliable data to the accounting exercise in abrogation of their partnership duties.  Each acted with their demonstrated history of assuming they could continue to take advantage of Freeman.

139.     Tehrani and Craven have failed to show even their initial investments of capital into Primedice, let alone a proper tracking of the coins they took from the site for personal use especially in the pre-2016 period.

**Calculating Freeman's Value and Equity in Primedice, Stake, and Other Entities**

140.     In the time since the Stake.com breach, Freeman has been a net depositor, not withdrawer, of Bitcoins according to Primedice's own accounting records.

141.     By contrast, Tehrani withdrew approximately 1,500 Bitcoins not including 1,000 sent to him by Freeman from the Cold Storage Wallet.

142.     Similarly, Craven withdrew approximately 2,500 (on top of approximately 3,200 he had previously withdrawn).

143.     In August 2020, moreover, Craven and Tehrani provided Freeman with an accounting spreadsheet listing alternative cryptocurrencies (i.e., cryptocurrencies other

than Bitcoin) that they conceded were owed to Freeman.  Specifically, in that spreadsheet, Tehrani admits that Freeman is owed the following:

- 1451.18900920651 Ethereum

- 2405.6168321878 Litecoin

-  121166148.734008 Dogecoin

- 33.7237144899342 Bitcoin Cash

- 108993.752100078 Ripple

-  25940.8679331054 Tron

144.      To date, neither Tehrani nor Craven have paid Freeman any of these amounts.

145.      Considering the rapid fluctuations in cryptocurrency value, Tehrani's and Craven's refusal to timely convey crypto assets belonging to Freeman has caused many millions of dollars in damage to Freeman.

146.      Efforts by Freeman to ascertain precisely how many Bitcoins are currently owed to him from the partnership and from Primedice revenues have been stymied by Tehrani.

147.      Freeman has not received *any* revenue for his stake in Primedice since in or about August 2020.

148.      In fact, Tehrani has on numerous occasions and on behalf of both Primedice and Stake attempted to engage in dishonest double counting to minimize the amounts due Freeman. By way of example, Tehrani has chosen to count appropriate site

25

expenses incurred by Freeman and reimbursed via bitcoin such as a substantial payment made to a programmer by Freeman  as personal gains.

149.        Accordingly, Freeman will petition this Court for an accounting needed to understand the financial picture of Primedice, Stake, EasyGo, Provably Fair, Medium Rare NV, TGP Europe and precisely what amounts and equities are now due to Freeman.

150.        Finally, upon information and belief, Stake.com is currently worth more than $1 billion USD.  Stake.com has arisen from the Primedice partnership and Freeman has been improperly, and dishonestly, excluded from the chance to participate in Stake.com. Accordingly, Freeman is entitled to no less than a 20% share in Stake.com in addition to the amounts past due to him from Primedice and in various alternative cryptocurrencies, which total an amount not less than $200 million USD.

151.        Further, if Tehrani and Craven are unable to account for the sums they have represented they made into the partnership, Freeman should be declared to possess a share of the partnership in Primedice and all successor entities, including Stake.com, of not less than one-third, and should be made whole after nearly a decade of backhanded and injurious dealing by Tehrani and Craven.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

Trade Secret Misappropriation Under the Defend Trade Secrets Act

(18 U.S.C. § 1836 *et seq.*)

152.        Freeman realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 151 above.

153.       Freeman owns and possesses certain confidential and trade secret documents and information as alleged above that relates to the Primedice proprietary technology and information.

154.       Freeman's confidential and trade secret documents and information relates to products and services used, sold, shipped and ordered in, or intended to be used, sold, shipped and/or ordered in, interstate or foreign commerce.

155.       Freeman has taken reasonable steps to protect the secrecy of its confidential and trade secret documents and information, including the secrecy of the Primedice proprietary technology and information Defendants have misappropriated.

156.       Defendants have misappropriated the Primedice proprietary technology and information in the improper and unlawful manner as alleged herein.

157.       Defendants have unlawfully misappropriated the Primedice proprietary technology and information for use in another commercial endeavor, and have attempted to conceal their theft and misappropriation of such technology and information.

158.       Defendants' misappropriation of the Primedice proprietary technology and information for use in another commercial endeavor has caused and will continue to cause Freeman substantial injury, including, but not limited to actual damages, lost profits, harm to its reputation, the diminution in value of its trade secrets, and a reduction in Primedice's profits and in the value of Freeman's partnership share in Primedice.  Defendants have been unjustly enriched by their misappropriation of Defendant's confidential information and trade secrets.

159.      Defendants' misappropriation of the Primedice proprietary technology and information was intentional, knowing, willful, malicious, fraudulent, and oppressive. Freeman is entitled to an award of exemplary damages and reasonable attorneys' fees.

## SECOND CLAIM FOR RELIEF

Fraud

160.      Freeman realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 159 above.

161.      In August 2016, Defendants Tehrani and Craven, among others, concealed from Freeman the material fact that Stake was intended to be a virtual cryptocurrency casino.

162.      Defendants Tehrani and Craven further affirmatively misrepresented to Freeman that "EasyGo" – an entity which would go on to become Stake.com – was going to operate exclusively as a fiat money casino and that it would *not* operate as a virtual cryptocurrency casino.

163.      When Freeman further specifically inquired about the appearance of cryptocurrency markers on a website mock-up, Tehrani again misrepresented the nature of the site.

164.      In these and other ways, directly or indirectly, Defendants Tehrani and Craven, acting with scienter, thus made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

165.      Defendants Tehrani and Craven knew the statements were material and false.

28

166.     Among their other objectives, Defendants Tehrani and Craven made these false statements and material omissions with the intent of convincing Freeman not to participate in the next iteration of Primedice and, thus, deprive him of his equity interest and partnership rights in Stake.com, Stakedice, and other entities derived from the success of Primedice.

167.     Trusting in the integrity of his partners, Freeman reasonably relied on Defendants' misrepresentations and fraudulent omissions.

168.      As a direct and proximate result of Defendants' conduct, Freeman has been and continues to be substantially damaged, including by being deprived of his rightful opportunity to participate in the success of State.com., but overall in an amount to be determined at trial, plus interest, attorneys' fees, and costs.

169.     Defendants' purposeful and wanton deceit further warrants the imposition of exemplary or punitive damages against them in an amount to be determined at trial.

## THIRD CLAIM FOR RELIEF

Breach of Fiduciary Duty and Duty of Loyalty

170.     Freeman realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 169 above.

171.     Defendants Tehrani and Craven were partners of Freeman in Primedice.

172.     As partners in Primedice, Defendants Tehrani and Craven owed Freeman fiduciary duties including a duty of loyalty, and were obligated to act with the utmost good faith towards, and with regard to the best interests of, Freeman.

173.     Freeman was entitled to place his trust and confidence in his partners Tehrani and Craven and fairly expected them to act with the utmost good faith towards him in carrying out the business of Primedice.

174.     Freeman relied on their loyalty, integrity, and faithful performance of their responsibilities.

175.     Defendants Tehrani and Craven breached their fiduciary duties owed to Freeman by failing to comply with their obligations to him, by acting in conflict of interest, by engaging in activities for their own benefit and to the detriment of Primedice, by deceiving him, by diverting to themselves commercial opportunities belonging to the partnership, and by misappropriating Primedice's proprietary technology and confidential trade secret information for use in a separate commercial enterprise which enriched them to the exclusion of Freeman.

176.     Defendants Tehrani's and Craven's breaches of their fiduciary duties including their duty of loyalty to Freeman were knowing, intentional, and willful.

177.     By the conduct asserted above, Defendants Tehrani and Craven acted in a manner inconsistent with their agency and trust.

178.     Defendants Tehrani and Craven are still in possession of Primedice's proprietary technology and confidential trade secret information, are able to and continue to access it, and are able to, and do, use this information to benefit themselves and other parties at the expense of Freeman.

179.     As a direct and proximate cause of Defendants Tehrani's and Craven's breaches of their fiduciary duties including their duty of loyalty, Freeman has been and is being harmed.

180.        Freeman is entitled to restitution and disgorgement from Defendants Tehrani and Craven in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF

### Unfair Competition

181.        Freeman realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 180 above.

182.        Freeman invested considerable time and resources developing the Primedice proprietary technology and confidential trade secret information into a valuable asset.

183.        Defendants have taken the Primedice proprietary technology and confidential trade secret information for themselves and have disclosed and/or used the Primedice proprietary technology and confidential trade secret information, all without authorization or permission from Freeman.

184.        Defendants have made unauthorized use of the proprietary technology and confidential trade secret information which they purloined for their own benefit and to the detriment of Freeman.

185.        Tehrani and Craven have used Primedice partnership assets, equity, name value, and reputation to help facilitate the launch of Stake.com.

186.        As a consequence, Freeman has been and continues to be harmed.

187.        Defendants' conduct constitutes common law unfair competition and were carried out willfully, fraudulently, maliciously and with the wanton disregard of Freeman's rights, thereby entitling Freeman to compensatory and punitive damages to be proven at trial.

## FIFTH CLAIM FOR RELIEF

### Idea Misappropriation

188.    Freeman realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 187 above.

189.    Freeman made significant, concrete, and novel efforts to expand Primedice into further gambling avenues.

190.    As common law partners in Primedice, Freeman, Tehrani, and Craven owe each other the fiduciary obligations of partners.

191.    Freeman proposed the idea to his partners of expanding Primedice into a cryptocurrency casino which covered additional gambling opportunities including online cryptocurrency slot machines and online cryptocurrency poker games.

192.    Freeman's ideas for Primedice to expand into these areas were novel not just among the partners, but in the industry.

193.    Freeman's concrete ideas for Primedice to expand into these areas were supported by design materials including mock-ups of proposed slot machines for a new Primeslots service.

194.    Tehrani and Craven stole Freeman's novel and concrete ideas, and then deployed partnership assets to develop them to create Stake.com.

195.    Accordingly, Tehrani and Craven are liable for misappropriation of ideas and liable to Freeman for continuing damages to be proven at trial.

## SIXTH CLAIM FOR RELIEF

Tortious Interference with Prospective Economic Advantage

196.    Freeman realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 195 above.

197.    Freeman is a partner in Primedice with Tehrani and Craven.

198.    Freeman proposed ideas to evolve Primedice, then exclusively an online cryptocurrency gambling dice game, into a broader online cryptocurrency casino.

199.    Freeman proposed and designed mock-ups of a potential online cryptocurrency slot game for the new service.

200.    Freeman proposed a potential online cryptocurrency poker game for the new service.

201.    Tehrani and Craven stole the ideas and plans proposed by Freeman and used them to help create Stake.com.

202.    Tehrani and Craven lied to Freeman when they told him they intended to create a fiat money casino, and did so for the sole purpose of convincing him unwittingly to waive his partnership rights in Primedice's successor entity to his detriment and harm.

203.    Additionally, Tehrani and Craven's conduct was wrong and improper as they engaged in acts of dishonesty in violation of their fiduciary obligations to Freeman and to Primedice.

204.    Finally, Tehrani and Craven purloined Primedice partnership assets for the purpose of developing Stake.com with the intention of taking advantage of Freeman and of

wrongfully seizing his rights and interests in Stake.com, in Primedice, and in future partnership opportunities.

205.    Accordingly, Defendants are liable for tortious interference with prospective economic advantage for damages to be proven at trial.

### SEVENTH CLAIM FOR RELIEF

### Unjust Enrichment

206.    Freeman realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 205 above.

207.    Originating the idea, and devoting time, talent, and resources to the development, launch, and operation of Primedice, Freeman conferred a valuable benefit on Defendants.

208.    Defendants have, in bad faith, taken that benefit for themselves by asserting control over the Primedice assets and excluding Freeman from sharing in its financial performance and denying him access.

209.    Freeman also contributed to the creation and development of games and designs for a virtual casino which Defendants, through deceit, have taken for their exclusive benefit.

210.    Additionally, Defendants have retained control over alternative cryptocurrency assets they have already conceded belong to Freeman.

211.    Defendants have failed to pay Freeman his rightful 20% partnership share of any payments to which the partners were entitled, and have kept those sums for themselves.

212.     In each of these ways, Defendants have been unjustly enriched.

213.     It is against equity and good conscience to allow Defendants to retain the benefits conferred upon them by Freeman.

214.     As a direct and proximate result of Defendants' conduct, Freeman is entitled to disgorgement of the sums by which Defendants have been and continue to be unjustly enriched in an amount to be determined at trial, plus interest, attorneys' fees, and costs.

215.     Finally, by virtue of the purposeful and malevolent nature of the conduct of Defendants Tehrani and Craven, they are liable to Freeman for punitive damages in an amount to be determined at trial.

**EIGHTH CLAIM FOR RELIEF**

Conversion (as to Primedice Equity)

216.     Freeman realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 215 above.

217.     In 2013, Freeman, Tehrani, and Craven agreed to form a common law partnership.

218.     Based on investments in the site they purported to make, Tehrani and Craven dictated that each would have a 40% interest in Primedice, and Freeman would have a 20% interest.

219.     Neither Tehrani nor Craven has ever disclosed to Freeman the actual amounts they invested or otherwise verified that their investments were each twice his own.

220.     Freeman invested thousands of coins in the early days of the site and

was responsible for filling site reserves to cover player wins from his own bitcoins.

221.     In early 2014, Craven unilaterally stated he was redistributing 6% of Freeman's equity in the company to himself and to the programmer, Coldridge, who *actually* did the coding work Craven had represented himself as capable of completing.

222.     Craven was not authorized to usurp Freeman's interest in or share of the partnership.

223.     Freeman is entitled to no less than 20% of the value of Primedice and any successor entities.

224.     Furthermore, if Tehrani and Craven did not make equity investments in amount twice the amount invested by Freeman then the shares of the partners should be one-third each or, at a minimum,  based on the actual amounts each invested when the company became active.

225.     Tehrani and Craven have both failed to account for their initial capital investments.

226.     As a result of Defendants' conversion of Freeman's equity interest in Primedice and its successor entities, Freeman has been and continues to be damaged in an amount to be determined at trial, plus attorney fees, court costs, and collection costs.

## NINTH CLAIM FOR RELIEF

### Conversion (as to altcoins)

227.     Freeman realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 226 above.

228.        In August 2020, Defendants Craven and Tehrani provided Freeman with an accounting spreadsheet listing alternative cryptocurrencies (i.e., cryptocurrencies other than Bitcoin also known as "altcoins") that they conceded were owed to Freeman.

229.        Specifically, in that spreadsheet, Tehrani admits that Freeman is owed the following:

- 1451.18900920651 Ethereum

- 2405.6168321878 Litecoin

- 121166148.734008 Dogecoin

- 33.7237144899342 Bitcoin Cash

- 108993.752100078 Ripple

- 25940.8679331054 Tron

230.        To date, neither Tehrani nor Craven have paid Freeman any of these amounts.

231.        These cryptocurrencies fluctuate in value rapidly.

232.        Defendants Tehrani's and Craven's refusal to timely convey to Freeman these crypto assets belonging to him has caused Freeman substantial financial damage.

233.        As a result of Defendants' conversion of Freeman's alternative cryptocurrencies, Freeman has been damaged in an amount to be determined at trial, plus attorney fees, court costs, and collection costs.

### TENTH CLAIM FOR RELIEF

Accounting

234.        Freeman realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 233 above.

235.        Freeman, Tehrani, and Craven are partners in Primedice.

236.        As partners, Defendants Tehrani and Craven owe fiduciary duties including a duty of loyalty to Freeman.

237.        Defendants Tehrani and Craven have breached their fiduciary duties to Freeman which has caused Freeman to suffer financial damage.

238.        As fiduciaries, Defendants Tehrani and Craven can and should be compelled to account for their conduct.

239.        Freeman has attempted to access records, documents, financial data, and cryptocurrency accounting from Tehrani, Craven, and the Business Defendants.

240.        Defendants have resisted Freeman's efforts to access, analyze, and understand complete corporate records of Primedice along with any and all successor entities to Primedice.

241.        The precise amount of damage to Freeman includes partnership assets owed to him, cryptocurrencies including Bitcoin and altcoins owed to him, and rights and amounts owed to him derived from successor entities such as Stake.com and Stakedice are impossible to determine with a thorough judicial accounting of Primedice, Stake.com, and other related entities.

242.     An accounting is the most efficient legal remedy to ascertain the extent of the financial damage to Freeman and to determine what ill-gotten gains should be disgorged by Defendants and the amounts needed in restitution to make Freeman whole.

## Prayer For Relief

WHEREFORE, Plaintiff Freeman prays for judgment in his favor as follows:

(a)     On the first cause of action under the Defense of Trade Secrets Act against Defendants in an amount to be determined at trial, but not less than $200 million USD, exclusive of interest and costs;

(b)     On the second cause of action for fraud, damages against Defendants in an amount to be determined at trial, but not less than $200 million USD, exclusive of interest and costs;

(c)     On the third cause of action for breach of fiduciary duty and duty of loyalty, restitution and disgorgement against Defendants in an amount to be determined at trial, but not less than $200 million USD, exclusive of interest and costs;

(d)     On the fourth cause of action for unfair competition, damages against Defendants in an amount to be determined at trial, but not less than $200 million USD, exclusive of interest and costs;

(e)     On the fifth cause of action for idea misappropriation, damages against Defendants in an amount to be determined at trial, but not less than $200 million USD, exclusive of interest and costs;

(f)     On the sixth cause of action for tortious interference with prospective economic advantage, damages against Defendants in an amount to be determined at trial, but not less than $200 million USD, exclusive of interest and costs;

  (g)  On the seventh cause of action for unjust enrichment, damages against Defendants in an amount to be determined at trial, but not less than $200 million USD, exclusive of interest and costs;

  (h)  On the eighth cause of action for conversion as to Primedice equity, damages against Defendants in an amount to be determined at trial, but not less than $200 million USD, exclusive of interest and costs;

  (i)  On the ninth cause of action for conversion as to altcoins, damages against Defendants in an amount to be determined at trial, but not less than $200 million USD, exclusive of interest and costs;

  (j)  On the tenth cause of action for an accounting, an order for an accounting to determine the amounts due in restitution and disgorgement, exclusive of interest and costs;

  (k)  Interest on the funds owed to but not paid to Freeman by Defendants;

  (l)  Attorneys' fees and costs incurred in prosecuting this action;

  (m)  A jury trial; and

  (n)  For such other and further relief as the Court deems just and proper.

A. Awarding damages during the period of disloyalty as described in each of the above claims, in favor of Freeman and against Defendants, in amounts to be determined at trial, but not less than $200 million USD;

B. Awarding punitive damages in favor of Freeman and against Defendant in an amount to be determined at trial, but not less than $200 million USD;

D. Awarding Freeman pre-judgment and post-judgment interest, its attorneys' fees, and costs and other expenses incurred in this action;

E. Granting Freeman such other and further relief as this Court deems just and proper.

## JURY DEMAND

Freeman demands a jury trial for all issues so triable.


Dated:        New York, New York
              August 17, 2022

                                    GAGE SPENCER & FLEMING LLP


                                       /s/ William B. Fleming
                                    _____

                                    William B. Fleming
                                    410 Park Avenue, Suite 810
                                    New York, New York 10022
                                    Tel. (212) 768-4900
                                    Email: wfleming@gagespencer.com

                                    *Attorneys for Plaintiff Christopher Freeman*