UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CHRISTOPHER FREEMAN,

                Plaintiff,

    -against-

STAKE.COM, PRIMEDICE, EDWARD CRAVEN, BIJAN TEHRANI, SLICEMEDIA B.V., MEDIUM RARE N.V., EASYGO SOLUTIONS PTY LTD, MEBIT.IO, AND MLADEN VUČKOVIĆ.

                Defendants.

Civil Action

22-cv-7002 (RA)

**First Amended Complaint**

Jury Trial Demanded

---

## FIRST AMENDED COMPLAINT

Plaintiff Christopher Freeman ("Freeman"), by his attorneys Gage Spencer & Fleming LLP, for his Amended Complaint against defendants Stake.com ("Stake" or "Stake.com"), Primedice ("Primedice" or "Primedice.com"), Edward Craven a/k/a Edward Miroslav ("Craven"), Bijan Tehrani a/k/a/ Stunna ("Tehrani"), Slicemedia B.V. ("Slicemedia"), Medium Rare N.V. ("Medium Rare"), Easygo Solution Pty Ltd ("Easygo"), MeBit.io a/k/a MEBIT.d.o.o ("MeBit" or "MeBit.io"), and Mladen Vučković (a/k/a Mladen Vukotic or Mladen Vukovic or Mladen Vuckovic) ("Vučković") (collectively, "Defendants"), alleges as follows:

### INTRODUCTION

1.         Christopher Freeman founded Primedice, a common law partnership, with two partners, Bijan Tehrani and Edward Craven.

2.    Primedice, which launched in 2013, is an online cryptocurrency-funded dice game that allows global users to gamble via bitcoins, or percentages thereof, on a game of chance.

3.    At inception, Primedice was a simple operation, consisting of three partners not more than 20 years old, a domain, servers, software, cryptocurrency wallets, a website, and a single dice game.

4.    After the site's initial success, in 2016, Freeman suggested and pushed the partnership towards expansion into other online cryptocurrency gambling games.

5.    Cryptocurrency, or "coin-based" systems rely on cryptocurrency as a means of exchange for winnings and losings, as compared to fiat-based systems which rely on traditional government issued currencies (enabled to be used online by credit card or other electronic means of currency payments) for winnings and losings.

6.    In 2016, Tehrani and Craven unilaterally hypothecated Primedice's commercial opportunities by enlarging the Primedice concept into a broader online cryptocurrency, coin-based, casino called Stake.com, which now offers numerous online gambling options (in the nature of an online, virtual "casino"), including a dice game which directly competes with, and siphons value away from, Primedice.

7.    Freeman had previously advocated, for their partnership, the idea of a cryptocurrency, coin-based casino.

8.    In August 2016, Tehrani and Craven, claiming that such a virtual casino was too expensive to build, falsely announced to Freeman that they were devoting their

2

energies to building a fiat money casino in Australia, and that it was necessary that he relocate to Australia in order to participate.

9.          Though committed to and comfortable with online gambling concepts, Freeman declined to join them, believing, among other things, that a fiat money casino presented too many competitors, too many personal risks, and too much regulatory scrutiny given the partnership's poor history of record-keeping, compliance, and accounting at Primedice.

10.         As secretly planned all along though, Tehrani and Craven intended to continue the partnership's development of an online cryptocurrency casino, and launched Stake.com as a virtual casino which included a competing online dice game and many other features Freeman had proposed and helped design.

11.         Defendants' deceit excluded Freeman from the endeavor towards which he had been working on behalf of the partnership, and further liberated Defendants to jettison the compliance measures Freeman had imposed on the partnership, including the use of geoblocking technologies to prevent gambling in prohibited jurisdictions like the United States, and Defendants began directly targeting the United States market.

12.         To assist them in this illicit approach, Tehrani and Craven have morphed the partnership into a complex and opaque enterprise.

13.         Despite assurances that Freeman retained his partnership share in Primedice, Tehrani and Craven ultimately blocked Freeman's access to the Primedice account and never returned it.

14.        Tehrani and Craven have acted to freeze out Freeman from the partnership entirely.

15.        As a result, Freeman has been blocked from any payments owed to him as a partner in Primedice, as well as deprived of any interest in the Stake.com enterprise which was based on his own idea for a cryptocurrency-based casino and which incorporated a version of the Primedice game.

16.        Beginning in 2016 and continuing through the present, the Defendant partners Tehrani and Craven violated their duties to Freeman by (i) making material misstatements and failing to disclose material facts to him concerning the nature of the Stake.com concept in a successful effort to conceal his rights in its central technology; (ii) failing to disclose to Freeman information about profits generated by Primedice, Stake.com, and other derivative and related ventures, and compensation owed to him as a partner, beginning in August 2016 and continuing through this date, and (iii) as part of their ongoing scheme to deny Freeman his partnership rights, on information and belief, hiding from the public the existence of Freeman's rights and partnership share when required to show changes to the investor/shareholder capital table in connection with their planned initial public offering or similar major financing or liquidity events of Stake.com.

17.        Accordingly, Freeman seeks a judgment compensating for the damages caused to him by Defendants' (i) multiple instances of fraud, (ii) repeated breaches of their fiduciary duties and duties of loyalty, (iii) unfair competition using proprietary technology and confidential trade secret information, (iv) idea misappropriation of Freeman's novel and concrete plans for a cryptocurrency casino, (v) tortious interference with prospective economic advantage, as well as (vi) disgorgement of sums by which Defendants have been

unjustly enriched, (vii) conversion of Freeman's equity interest in Primedice and its successors, (viii) conversion of various alternative cryptocurrencies to which Freeman is due, (ix) an accounting of partnership and corporate assets, and (x) fraud arising from Craven and Tehrani's creation of and conveyance of Primedice assets to Slicemedia B.V.

## PARTIES AND PARTICIPANTS

18.　　　　Plaintiff Christopher Freeman was a resident of Connecticut until 2015, and a founding partner in Primedice during that time.  He was a resident of Washington D.C. from 2015 until 2017, and a resident of New York from 2017 until 2021. Freeman is currently a resident of the State of Florida.

19.　　　　Defendant Bijan Tehrani was a resident of Connecticut through at least 2015. He was a founding partner in Primedice during that time.  Tehrani was a resident of New York from 2015 until 2017 through the growth of Primedice and the creation, development, launch, and early operation of Stake.com.  Upon information and belief, he is currently a resident of Australia.

20.　　　　Defendant Edward Craven is a resident of Southbank, Victoria, Australia and, upon information and belief, was a resident of Australia through the founding of Primedice and Stake.com.

21.　　　　Defendant Primedice is a New York common law partnership which operated out of New York from at least 2015 through 2021, and currently avails itself of New York.　As of August 17, 2022 and through at least January 3, 2023, the website https://www.primedice.com is accessible in the state of New York.  Upon accessing the site, New York users are prompted to register for an account.  Primedice describes itself to New

York users as "Provably Fair," that it has the "Lowest House Edge, 1%," that it offers "Instant Deposits & Withdrawals," and that it is the "Longest Running Crypto Casino."

22.     Defendant Stake.com is both a domain through which players located all over the world wager cryptocurrency in games of chance, and a partnership on which has, over time, been superimposed an opaque and intentionally disparate collection of constituent parts and facilitating mechanisms which include people, companies, and relationships, gathered to enable illegal gambling activities under the name "Stake.com" (the "Partnership Enterprise" or the "Partnership Enterprise Defendants").

23.     Stake.com originated as a continuation of the Primedice partnership, from which Freeman has been improperly excluded.

24.     On information and belief, Stake.com launched its online casino on or about June 29, 2017, using the online gaming license issued to Primedice, and later obtained its own online gaming license issued to Medium Rare N.V., a company it only formed five months later, in November 2017.

25.     Despite a prohibition on cryptocurrency gaming in the United States, Defendants currently target customers in the United States and New York State by marketing Stake.com through its Stake.us subsidiary website and through various direct outreach efforts.

26.     Previously, such targeting of prohibited jurisdictions had been blocked by Freeman's greater fidelity to proper compliance than his partners, and Tehrani and Craven's effort to block Freeman from the partnership and its business was a way of ridding themselves of that nuisance.

27.        United States consumers are encouraged via Stake.com, through social media platforms such as Instagram, Reddit, Kick, and Twitter, and by promoters or salesmen located in the United States and New York State who are incentivized by commission compensation to recruit new players to gamble on the site.  Upon information and belief, U.S. bettors are further prompted to participate through Stake.us as a method by which they can circumvent legal prohibitions on such activity.

28.        As of August 17, 2022 (and through at least January 3, 2023), the website https://www.stake.us became accessible in the State of New York.

29.        The Partnership Enterprise Defendants include the following persons and entities:

a.        Defendant Mladen Vučković is a resident of Trstenik, Serbia, and has publicly stated that he is the Chief Executive Officer of Stake.com, Primedice, and MeBit.io, and Tehrani and Craven's company Provably Fair.

b.        Defendant Slicemedia B.V. is located at Fransche Bloemweg 4, Willemstad, Curaçao, and lists "Xecutive Corporate Management B.V." as its "Statutory director."   Upon information and belief, Slicemedia B.V. is currently the entity that improperly and illegally holds the hypothecated Primedice gaming license.  As of January 3, 2023, in its own anti-money laundering disclosure page, Primedice lists as its owner the fictitious but similarly-named Slice Media N.V., a purported corporate entity that is not registered anywhere in the world.

c.        Defendant Medium Rare N.V. is also located at Fransche Bloemweg 4, Willemstad, Curaçao, and also lists "Xecutive Corporate Management B.V." as its "Statutory

director."  Medium Rare N.V. is the current holder of the Stake.com gaming license, having obtained it at or about the time of its formation on November 13, 2017, approximately five months after Stake.com launched and began operations.

       d.      Defendant MeBit.io (a/k/a MeBit d.o.o.), a Serbian company, located in Svetog Save, Trstenik, where Defendant Vučković lives.  According to its website, MeBit has been "[o]utsourcing software from Easygo Gaming [sic] with the most played and respected games since 2013."  MeBit lists its "Partners" as Provably Fair, Primedice, and Stake.com.  Upon information and belief, MeBit was initially founded in order to outsource customer service issues to Serbia.

       e.      Defendant Easygo Solutions Pty Ltd ("Easygo"), an Australian company, is located at the physical home of Stake.com: 287-293 Collins Street, Melbourne, Australia.  Upon information and belief, Easygo is the corporate entity that hires employees, including direct client interface VIP concierges, to help operate Stake.com.  On its corporate website, Easygo lists Stake.com and Primedice as "clients."  Nevertheless, upon information and belief, EasyGo employees are actually Stake.com employees.

       30.      The Partnership Enterprise also consists of an opaque association of additional constituent entities and individuals and facilitating mechanisms including:

       a.      Individual Defendants Tehrani, Craven, and Vučković;

       b.      Corporate Defendants Primedice, Medium Rare N.V., Slicemedia B.V., Easygo, and MeBit.

       c.      Aubrey Drake Graham, known popularly as the rapper and singer Drake. Drake is also known by the names Champagne Papi, Drizzy, and 6 God. Drake

is listed as a "Partner" on Stake.com's own page stake.com/drake (accessible via VPN). The site describes Drake's "Journey from a Player to a Partner" through a series of video essays.  Subsequent to the filing of our Initial Disclosures which named Drake as a potential witness, Stake.com's official verified Instagram page removed the line "@champagnepapi Approved" from their bio.  @champagnepapi is Drake's official, verified Instagram account;

      d.    Other athletes and sports teams are listed as "partners" in various announcements made by Stake.com including Ultimate Fighting Championship ("UFC") mixed martial arts ("MMA") fighters Israel Adesanya, Jose Aldo, Francis Ngannou, and Alexa Grasso, football/soccer teams like Everton FC, Watford FC, and Mumbai City FC, footballers such as Sergio Aguero, boxers like Gennedy Golovkin, and Formula 1 and Formula 2 drivers like Pietro Fittipaldi and Enzo Fittipaldi;

      e.    A United Kingdom company called TGP Europe, which operates Stake's fiat money gaming business;

      f.    Various other individuals and corporate entities around the world including, among others:

            i.    James "Jamie" Ashley Woodford Craven, an Australian citizen convicted of criminal fraud and banned from the financial services industry for five years, the father of defendant Edward Craven, and the sole listed director of Easygo,

            ii.    Stake.us, a United States-based game that misleadingly promotes itself as a "social casino" on which games of chance are played for fake

prizes but which in fact is currently and surreptitiously being played for real money in the United States,

iii.    Stake.ca, an in-development Canadian-focused version of Stake, that, upon information and belief, will service as an Ontario-based additional online crypto gambling entity

iv.    Medium Well (Cyprus) Ltd., the listed owner of Stake.ca in the source code located on Stake.ca's website,

v.    Medium Rare (Cyprus) Limited, a Cyprus-based company which is 100% owned by Medium Rare N.V. and is listed as the payment agent representative of Medium Rare N.V.,

vi.    Provably Fair, a website owned by the Partnership Enterprise, which purportedly determines which online gambling websites are the most "fair" and self-servingly concludes that Stake.com is the most fair site.

vii.    Kick, a streaming platform similar to the popular Amazon-owned platform Twitch where consumers watch "influencer" users play various video games while commentating on the feed of play. Kick is, upon information and belief, owned by Craven, Tehrani, and Stake. Kick is regularly used to sell users on Stake.com.  Craven regularly broadcasts himself playing Stake games on Kick.

viii.    Drop Holdings Pty Ltd., an Australian based company registered using Tehrani's name, which, upon information and belief, is part of the corporate structure of Kick,

ix.    Stake.com, a website URL domain, which was purchased directly by Craven from a prior owner,

x.    Sweepsteaks Limited, a Cyprus-based company which, upon information and belief, is the owner and operator of Stake.us,

xi.    Well Done Stk Ltd, a Cyprus-based company which shares an address with Sweepsteaks Limited and Medium Rare (Cyprus) Ltd., which is listed as the owner of Sweepsteaks Limited.   Tehrani and Ashwood Holdings Pty Ltd are the two listed owners of the company, and

xii.    Ashwood Holdings Pty Ltd, which, upon information and belief, is an Australian corporate structure utilized by Craven to purchase interests pseudonymously.   Craven is the company's director and sole shareholder.

31.    We have endeavored diligently to comprehend the structure of the Stake Partnership Enterprise.  Nevertheless, as is the case especially with crypto-based ventures who choose opacity to transparency and compliance including, most recently, FTX, we anticipate

11

that discovery will reveal other corporate structures Craven, Tehrani, and their facilitating partners have concocted throughout the world to structure the Partnership Enterprise.[1]

## JURISDICTION AND VENUE

32.     This court has jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity between the plaintiff and all defendants and the amount in controversy is over $75,000 USD.

33.     Venue is proper pursuant to 28 U.S.C. § 1391 (b) (2) because a substantial part of the events or omissions giving rise to the claims herein occurred within the Southern District of New York.   To wit, Tehrani owned and helped to operate Primedice and Stake.com from his apartment in New York, New York from 2015 to 2017.   Tehrani resided in New York, New York in August 2016 when he and Craven communicated to Freeman their materially false "decision" not to proceed with plans to construct and operate a virtual casino discussed at length *infra*.   Freeman owned and helped to operate Primedice from his apartment in New York, New York from 2017 to 2021.

## STATEMENT OF FACTS

**Primedice Formation**

---

[1] When users access electronic documents most computers, email servers, chat services, and websites adjust time zones and dates to reflect the location of the user.  Parties and participants in the Partnership Enterprise are located around the world, many of whom in Melbourne, Australia.  Melbourne is 16 hours ahead of the US.  Accordingly, specific dates may appear different to a party based on that party's physical location.  Accordingly, and for the avoidance of ambiguity, all specific dates in this First Amended Complaint should be considered to encompass both the day before and the day after the actual date listed.

34.      Freeman and Tehrani have known one another most of their lives, including attending grade and high school together in Connecticut.

35.      In or around 2012, as a freshman in college, Freeman conceived of an idea for a Bitcoin gambling website which would improve upon and compete with "Satoshi Dice," a blockchain-based gambling concept inspired by the founder of Bitcoin.

36.      At that time, Tehrani was participating in an endeavor arising from the sale of monetized in-game exclusive electronic currency and in-game content in the online video game *RuneScape*.

37.      Freeman introduced the idea of a Bitcoin gambling website to Tehrani in 2012, prior to Tehrani's ceasing his efforts to monetize the video game *RuneScape*.

38.      Tehrani expressed enthusiasm for the idea, and Freeman and Tehrani agreed to form a partnership to develop the website that would become Primedice.

39.      At the time of the initial discussions to form the partnership, Freeman was a student at Southern Methodist University in Dallas Texas, and Tehrani was a student at Babson College in Wellesley, Massachusetts. At the time that Primedice was launched and as the business was being developed and operated, Tehrani and Freeman each held permanent residences at their parents' homes in New Canaan, Connecticut.

**Primedice Launches**

40.      Primedice began formal operation in 2013.

41.      The website URL https://www.primedice.com was registered by Freeman on or about February 14, 2013.

42.        Primedice launched for public access and play on or about May 18, 2013.

43.        In reliance upon the site's early success, and his established role in the enterprise, Freeman dropped out of Southern Methodist University during the 2013-14 Winter Break to focus his energies full time on the growth of the site.

44.        Presented with that same option at that time, Tehrani elected not to devote his full energies to Primedice and returned to college.

45.        Primedice initially operated through the use of a "hot wallet," an online account which was and is used to hold and trade cryptocurrency.  The "hot wallet" would allow each partner to access the site's funds to facilitate paying winners or resolving site expenses.  At the time that Primedice was launched, the entire cryptocurrency space was far less developed than it is today.

46.        At the time of the formation and launch of Primedice, there was a great deal of concern, widely-expressed, about the legality of cryptocurrency, its dependability as a form of currency, the taxability of cryptocurrency transactions, using cryptocurrency as a means of exchange, and the legality of online gambling that crossed various geopolitical borders (where the various enterprises running such "games" should be considered domiciled, how and if they could actually control in an effective manner those who were able to "play" on these online cites).  Many regulators in the US and around the world were in a state of development and evolution in their reactions to the oversight and regulation of both cryptocurrency and online gaming. For these reasons, it was the widespread, standard, and accepted practice (among those engaged in these businesses) to minimize structure,

recordkeeping, accounting, written documentation, etc., and to depend upon informal means of organization and control.  At the time, as well, the plaintiff and the individual defendants were all around 20 years old, without significant business experience.

47.         In 2015, after graduating from college, Tehrani helped run the site from his residence in New York.

48.         Also in or about 2015, Tehrani met with a New York law firm on behalf of the partnership to discuss potential regulatory issues arising from the site and the "Wild West" nature of the early cryptocurrency era.

49.         The partners each had access to the Primedice hot wallet and had the authority to make deposits and withdrawals.

50.         Primedice's net profits were – theoretically – determined after the withdrawals and expenses were deducted from the gross profits, with the remaining profits distributed to the partners based on their equity share. While this was the theory of "accounting," there were no books and records or ledgers of any sort maintained concurrently with the early years of the operation.

51.         Primedice never utilized a professional or independent accountant.

52.         There were no capitalization tables and no operating agreements.

53.         All agreements were verbal "handshake agreements."

54.         Further, due to coding issues owing to Craven's failures in that regard, the Primedice wallet experienced "leaking" in the form of frequent post-transaction miscalculations and occasional double-counting of withdrawals which depleted the

partnership's funds.

### Tehrani Continues a Campaign of Bullying Freeman

55.     Immediately upon entering the partnership, Tehrani began to exhibit the bullying behavior towards Freeman that had colored their relationship since childhood.

56.     Tehrani brought into Primedice his associate in the *RuneScape* venture, Ed Craven.

57.     Both Tehrani and Craven told Freeman that Craven had expertise and would code the new site.

58.     The three partners discussed a division of responsibility according to their different skill sets.

59.     As a result, Freeman brought his expertise in cryptocurrency, his history designing micro blogs for affiliate marketing endeavors, experience setting up DNS records and domains and in dealing with site encryption, and his work as a web designer for, among others, a restaurateur and a music group to the partnership. These were all areas with which Tehrani and Craven had had no prior experience. Tehrani contributed his knowledge in online gaming and business development in the sphere from his exposure to *RuneScape*. Craven was supposed to bring his purported programming and coding acumen to the partnership to code the site.

60.     This distribution reflected the bullying relationship between Tehrani and Freeman.  Since childhood, Tehrani had shown an ability to push and compel Freeman to acquiesce to his demands.  Though Freeman brought talent, skills, and industry knowledge

to that table that was equal or better than his partners, Tehrani believed that he could take advantage of Freeman's abilities without treating him as an equal.

61.     In reality, Craven had insufficient programming skill to build out the site.

62.     When Craven proved unable to program Primedice.com, Craven hired an individual named Samuel Bort Coldridge (a/k/a "Lacrimas") to code the site.

63.     Neither Tehrani nor Freeman approved Craven's choice to hire Lacrimas.

64.      Freeman had entered into the partnership with Craven based on a false understanding, based upon Tehrani's and Craven's false representations, that Craven would bring substantial technical skill to the project.

65.     Craven had no such technical skill.

66.     In fact, it has come to light, that Craven was struggling with serious substance abuse problems which periodically impacted the partnership's operations and necessitated long distance interventions by the partners.

67.     In an effort to address Craven's failures, the partnership would eventually keep Craven's authorized signature on file in case any unexpected site issues arose and Craven was indisposed.

68.      With Lacrimas providing the coding, the Primedice website was constructed.

69.     At the time of its launch, Freeman made a capital investment into the

partnership via cryptocurrency, but was told by Tehrani and Craven that it was less than their own and that his partnership share would therefore be lower than their own.

70.        Tehrani and Craven insisted that ownership be based on financial contribution only, and that there be no "sweat" equity offered.

71.        Based on their purported investments, the partnership shares of each were divided into 40% for Tehrani, 40% for Craven, and 20% for Freeman.

72.        Freeman invested thousands of coins into the early days of the site and was responsible for helping to "fill" the site's reserves to cover player wins in the early days of the site.

73.        Neither Tehrani nor Craven ever disclosed to Freeman the actual amounts they invested or otherwise verified that their investments were each twice his own. Once again, Tehrani took advantage of Freeman's fundamental decency and trust.

**An Unlawful Breach of the Partnership Agreement**

74.        In February 2014, approximately nine months into the lifespan of the site, during a phone call between the partners, Craven unilaterally claimed the right to redistribute 6% of the partnership, sourced entirely from Freeman's partnership share, taking 1% for himself and giving 5% to Lacrimas as a reward for Lacrimas' programming work.

75.        Craven had no authority to do this:  Freeman never agreed to any usurpation of his equity interest and the parties never signed any written agreement or otherwise modified their partnership to allow for this sort of conveyance. There was never any partnership documentation, decision, vote, payment, transfer, deed, or recordation of a

change in Freeman's partnership interest.

76.　　　Thus, pursuant to the original unverified share allocation, Freeman's partnership share remains at least 20%, the minimum equity stake he rightfully acquired and paid for in 2013, as all parties agreed.

77.　　　The purported unilateral redistribution of Freeman's equity stake by the other partners is illegal, and a breach of the partners' fiduciary duties to Freeman.

78.　　　Tehrani and Craven began to behave as though Freeman had merely a 14% share in the company.  This was a continuation of Tehrani's bullying behavior towards Freeman which had been ongoing for years. The bullying had taken on the dimension as an intentional interference with Freeman's economic advantages, both existent and future, and was joined in by Craven, who used Tehrani as his role model in bullying Freeman.

79.　　　The distribution in early 2014, according to Craven's impermissible calculation, was 40% Craven, 40% Tehrani, 14% Freeman, 5% Coolridge, and 1% to yet another individual who Craven had sold a partnership interest without permission or consent of Freeman, and who later ended up stealing money from the partnership.  As with the purported change of Freeman's stake, this second Craven transfer was totally undocumented and without partnership process or recordation.

**The Genesis of Stake.com and the Defrauding of Freeman**

80.　　　As Primedice grew in stability and success, Freeman pressed his partners Tehrani and Craven to direct the partnership towards the development of expanded online cryptocurrency, coin-based, gambling games.

81.      Freeman was a core force in establishing Primedice's stability, compliance, and success in these early years.  To wit, Freeman was integral to the design, creation, and launch of various revised version of Primedice aimed to improve the end user experience and site security.  Internally, each revision was referred to with an ordinal number.  For example, Primedice 2 launched in or about September 2013 and Primedice 3 launched in or about August 2014.

82.      Critically, on numerous occasions prior to the formation of Stake, Freeman had been a leader of specific planning discussions about such an expansion of Primedice, helping design a form of an online slot machine and poker game, evaluating artist mock-ups of a new site, and suggesting and discussing potential names for a successor entity, among them "Whale Day," "All-In.com," and "FreemanSports.com."

83.      In fact, the "FreemanSports.com" concept was Craven's idea as he liked the sound of the name.

84.      In an August 25, 2013, Primedice public blog post, Tehrani noted that Primedice was looking to add roulette and blackjack cryptocurrency games to the Primedice family alongside "team gambling" and a player vs player version of the existing dice game.

85.      Freeman specifically designed mock-ups for potential future games at the behest of and for evaluation by the partnership.

86.      It was entirely clear to the members of the Primedice partnership in this phase that the long term overarching goal of the partnership was to see Primedice evolve from just a dice game into a more full service online casino.

87.      This evolution of Primedice would be effectuated through the addition

of more games, more features, and various efforts to improve the user experience.

88.     In fact, Craven and Tehrani regularly made public statements between August 2013 and June 2016 describing all the additional online cryptocurrency games and features that Primedice intended to launch in the future.

89.     On January 9, 2015, in a Primedice blog post, Tehrani expressed confidence that later in 2015 Primedice would launch additional cryptocurrency gambling games of chance and highlighted slot machines as the next game likely to be included.

90.     Accordingly, in or about March 1, 2015, at the behest of and with the support of his partners Freeman designed and shared a mock-up for "Primeslots" with Craven and Tehrani.

91.     Primeslots would have served as a simple online cryptocurrency slot game either added to Primedice or launches as a separate, related entity on a site such as https://www.primeslots.com.  Primeslots would have allowed users to gamble on web-based slot machines using cryptocurrency.

92.     Primeslots was never launched.

93.     Unbeknownst to Freeman and subsequent to the launch of Stake, upon information and belief, Craven and Tehrani registered the domain address "primeslots.com" and "primeslots.co.uk."   These registrations indicated that Craven and Tehrani have considered further stealing Freeman's ideas and, at the least, are an effort by Craven and Tehrani to attempt to block Freeman from pursuing his original designs.

94.     Stake.com currently has numerous cryptocurrency slot games.

95.      In fact, Freeman also worked on the pitch, design, and development of a potential poker game for deployment under the Primedice umbrella, similar to his work on Primeslots.   The design for the Primedice version of poker was shared with Craven and Tehrani in the Spring of 2015.

96.      The proposed poker game would have allowed users to play online poker with cryptocurrency.

97.      A Primedice version of poker was never launched.

98.      However, Stake.com currently has numerous cryptocurrency poker games.

99.      On November 11, 2015, Tehrani and Craven even announced on a public forum that Primedice was indeed headed in this direction.

100.      Using his username "Stunna" in a public online bitcoin.com forum, Tehrani confirmed that "the [Primedice] site runs super smoothly and requires minimum work on mine or Ed's part. Our effort has been shifted to the development of our new website."

101.      This "new website" was clearly positioned as the next project from the Primedice partnership, adding new games in which users could gamble cryptocurrency under the same brand umbrella.

102.      Further, other users in the same public online bitcoin.com forum clearly were already aware of Tehrani's future plans, including one user asking Tehrani for updates about his new "project."

22

103.     Tehrani went on to describe the new "project/game" as "a lot more impressive than Primedice or any other gambling offering I've seen. I'm extremely excited for it. It isn't coming out in the near future though."

104.     Again, on November 11, 2015, and again using his "Stunna" username in a public online bitcoin.com forum, Tehrani verified to users of Primedice that Primedice is "working on various games" noting further that building a "provably fair poker game from scratch is an incredibly ambitious project but hopefully we can get around to it at some point."

105.     Craven, likewise, on November 11, 2015, using his "Edward Miroslav" username in a public online bitcoin.com forum, confirmed that Primedice had "a massive project in the pipeline at the moment which we're going to be releasing fairly soon. It pretty much covers all aspects of gambling."

106.     Craven concluded "I can't really discuss much about this though."

107.     On June 29, 2016, Tehrani explains in a Bitcoin Talk forum post that Primedice is "continuing to build our provably fair casino which features games coded and designed from scratch."

108.     Those games arose from the design work completed by Freeman.

109.     Furthermore, upon information and belief, Tehrani and Craven used Primedice funds to pay for third-party and other costs associated with the development and design of the online Bitcoin casino which would become Stake.com.

110.     Those designs, moreover, confirmed that Stake.com was formed and intended to be a Bitcoin casino, not a fiat money casino.

111.     The Primedice partnership would, and should, have evolved as the partners had anticipated for years but for the deceptive acts of Craven and Tehrani.

112.     On August 20, 2016, Tehrani affirmatively reached out to Freeman to explain that he and Craven had decided to direct their focus on creating a fiat money casino, and specifically not a cryptocurrency-based on-line gaming business, in Australia, and that, to participate, Freeman would have to agree to move to Australia.

113.     When Freeman expressed dismay and asked why Tehrani and Craven were abandoning the idea of creating the cryptocurrency casino which the three partners had all been working towards, Tehrani misrepresented to Freeman that "[t]here has been no Bitcoin casino" for six months, that the project was "wayyyy to expensive," and that he "want[ed] to exit the Bitcoin space."

114.     Freeman was upset that his partners were leaving "the Bitcoin space" because the partnership had gained experience and had developed a know-how with respect to crypto-based online gaming and he wanted to continue in that vein.

115.     Faced by Tehrani's unequivocal representation that he and Craven had pivoted their energies out of "the Bitcoin space" in favor of fiat-based gaming business, Freeman was forced to evaluate whether he wished to uproot himself from New York to move to Australia, as demanded, to engage in a fiat money venture.  Concluding that the fiat money concept introduced heightened competition and other risks, including his long-held concern that Craven and Tehrani were too loose on compliance issues, Freeman evaluated that, in consideration of those issues, he would choose not to leave his home to begin a new life halfway around the world.

116.      A short while later, however, Tehrani and Craven launched Stake.com as an online cryptocurrency-based Bitcoin casino, contrary to Tehrani's specific representations to Freeman.

117.      In truth and in fact, Tehrani and Craven always intended to launch a Bitcoin casino and had no intention of establishing a fiat money casino.

118.      Tehrani's representation to Freeman was false and designed further to exclude him from the partnership.

119.      Tehrani and Craven yet again attempted to bully Freeman and to take advantage of his decency and perceived passivity to exclude him from the next iteration of the Primedice partnership.

120.      Though both partners and fiduciaries, Tehrani and Craven took this commercial opportunity belonging to the partnership to establish a competing business using Primedice funds, promoted it as a superior product by reference to Primedice, launched it under the Primedice license, and made affirmative steps contrary to the economic interests of Freeman.

121.      By way of example, on a private message among various site partners using the app Telegram in or about October 2017, Tehrani explained "[we] just need to get every1 onto stakedice 2% edge."

122.      The phrase "2% edge" refers to the percentage the weight the game's odds give to the "house" – in this case, Stake.com

123.      Primedice was run with a 1% edge, making the site less profitable and

more volatile than the new endeavor at Stake.com.

124.     For years, Craven and Tehrani have run promotions giving away free credits and bonuses to induce players to participate in games on Stake.com.  Comparable promotions are not run by Primedice.

125.     Tehrani and Craven copied the business template of Primedice and manipulated it into something potentially more personally profitable than Primedice.

126.     On or about June 14, 2017, regular Primedice users were invited to try the "pre-alpha" version of Stake and were permitted to gamble with cryptocurrency.  Stake had no license for online gambling at this time and was, upon information and belief, using Primedice's license to allow play.

127.     The choice to use Primedice's license for Stake's players makes perfect sense because Craven and Tehrani had always planned for Stake to be a new iteration of Primedice.

128.     Primedice and Stake CEO Mladen Vučković admitted as much in a June 29, 2017 blog post.

129.     On June 29, 2017, Primedice named Vučković as its new CEO, announcing in a corporate blog post that "Mladen (aka Micro's) has been named the CEO of Primedice."

130.     Vučković first worked for Primedice in 2013 promoting their online presence on forums and social media before moving on to a role in customer support.

131.     The Vučković appointment was made without consultation with or

knowledge of Freeman.

132.        In Vučković's own blog post celebrating his appointment as CEO on June 29, 2017, he admitted the reality of the situation.  In a post entitled "Check out our newest addition to the Primedice family!" Vučković explained:

> "I have some extremely exciting news to share.  Over the past two years our team has been working closely with a development company to put together the best of what crypto gambling has to offer.  Today, I would like to formally announce our newest edition [sic] to the Primedice family.  A unique, fair, transparent, and astoundingly surreal Gambling experience for a wide variety of bettors.  Introducing: www.stake.com."

133.        In that post, Vučković – Primedice's newly appointed CEO – admits the two most important realities of the case: (1) the Primedice team, including Freeman, worked for *years* to establish Stake.com and (2) Stake.com is nothing more than a new edition of Primedice, a new addition to an existing gambling partnership.

134.        Eventually, Vučković was named the CEO of Stake.com as well.

135.        Just a few months later, on or about October 24, 2017, Craven and Tehrani formed Slicemedia B.V. a private limited liability company based in Curaçao.  Upon information and belief, Slicemedia B.V. now acts as, or at least presents itself as, the legal owner of Primedice.

136.        Freeman was unaware of the formation of Slicemedia B.V. and unaware of the transfer of any Primedice interest to the Curaçao company.

137.        Freeman did not consent to, and would not have consented to, any transfer of his interests to a new corporate entity, especially one in which he was not a shareholder, director, partner or any other official position.

138.     Craven and Tehrani made this transfer surreptitiously to deprive Freeman of his interests.

139.     In fact, Primedice's current Anti-Money Laundering, Anti-Terrorist Financing statement (available at http://www.primedice.com/policies/aml) lists Slice Media N.V. as the owner of Primedice.

140.     Upon a diligent global search, no such corporate entity exists in Curaçao or elsewhere.

141.     Accordingly, Primedice's own *Anti-Money Laundering, Anti-Terrorist Financing statement* is a deception.

142.     Considering the various other perversions of corporate order Craven and Tehrani have committed, this misstatement is no mere accident but stands as yet another effort to obfuscate a true understanding of (1) the overarching structure of the Partnership Enterprise and (2) how precisely Craven and Tehrani have secreted away the Primedice partnership into Slicemedia B.V.

143.     Tehrani and Craven have sought to conceal the nature of Primedice's true ownership not just from the partner they have acted to exclude, but also from global and American regulators.

144.     Similarly, approximately a five months after the launch of Stake.com, on November 13, 2017, Stake established Medium Rare N.V., a Curaçao private limited liability company located at the same address as Slicemedia B.V., which now holds Stake.com's online gambling license.

145.     On multiple occasions after Craven and Tehrani lied to Freeman about the true nature of Stake.com, Freeman asked Craven and Tehrani about his interest in Primedice to make sure it was secure.  On each occasion, they deceitfully told Freeman he maintained his interest in Primedice.

146.     In truth and in fact, Craven and Tehrani had already clandestinely transferred Freeman's interests into a corporate entity in Curaçao they controlled, and have concealed the fact from Freeman.

147.     Tehrani and Craven have breached their fiduciary duty to Freeman and have continued to act in a manner adverse to his interests and to Primedice's interests and value.  Each action Tehrani and Craven have taken to improve Stake.com's position vis-à-vis Primedice's position or their own position relative to Freeman's constitutes an individual act in a series of continuing wrongs and/or undiscovered frauds against Freeman's interests and in violation of their fiduciary duties.

148.     After the launch of Stake as a Bitcoin casino, Freeman voiced his objection to his partners about having been lied to by Tehrani and sought to establish his rights as a partner to share in the performance of Stake.

149.     Tehrani and Craven disputed Freeman's partnership rights and told him that his rights were limited to Primedice.

150.     However, since on or about that date, Tehrani and Craven have caused Freeman's access to the Primedice hot wallet, from which are withdrawn all partner profits, to be blocked.

151.     Further, the launch of Stake.com included a dozen games including its

own dice game, Stakedice, which immediately began to siphon business, revenues, and profits from Primedice and value from Freeman's share of the Primedice business.

152.     Slots and poker, games Freeman had designed, were also included on Stake.com at launch.

153.     In fact, Tehrani and Craven paid third-party coders, or website programmers, to complete and introduce a "fifth generation" of dice game, derived from the original Primedice technology, which it used on Stake.com for a full year before permitting it to be used on Primedice.

154.     Primedice began using the Primedice 5 version on April 9, 2018, approximately a year after the new technology was deployed on Stake.

155.     Upon information and belief, Tehrani and Craven used Primedice funds to pay those programmers.

156.     Numerous further functions on both Stake and Primedice were programmed in unison in the early days of Stake including a new chat function that was deployed for both sites.

157.     Tehrani and Craven have commingled Primedice's assets for Stake's benefit in this manner and in other ways, including refreshing the wallet used for payment of player wins.

158.     Tehrani and Craven have denied each of Freeman's claims to his partnership share in Stake.com and have denied Freeman any profit share from Stake's dice game, which competes with Primedice using Primedice-derived technology.

159.      Stake.com has evolved since launch into a massive online gambling presence that operates overwhelmingly based on cryptocurrency gambling through various online casino games and sports betting.

160.      Upon information and belief, Tehrani and Craven regularly failed to keep the financials of the companies separate.

161.      On numerous occasions, customers were granted credits when moving from one site to the other.

162.      Tehrani, Craven, and other Stake employees or agents have regularly utilized online forums to steer Primedice users to Stake.

163.      Upon information and belief, Tehrani and Craven have also created Defendant Easygo using Primedice assets. Easygo is a "global company" purportedly involved in Stake.com and Primedice which, according to its website, is "looking to revolutionize the online gaming industry by introducing well-designed casino games and platforms based on our 'provably fair' algorithms."

164.      Upon information and belief, Easygo is the corporate entity that hires employees, including direct client interface VIP concierges, to help operate Stake.com. Upon information and belief, Easygo employees are *actually* Stake.com employees and employees think of themselves as such.

165.      Stake.com also has a fiat currency business conducted exclusively in the UK through an entity called TGP Europe.

166.      On June 11, 2021, Stake and a different company called Aspire Global

announced a partnership to launch Stake.co.uk which would allow fiat money gambling in the U.K.

167.     On November 30, 2021, the Great Britain Gambling Commission announced that Aspire Global would be fined $285,167 for violations of anti-money laundering regulations.

168.     A search of the Aspire Global's UK Gambling Commission records reveals that their holding company AG Communications Limited owned *and still owns* the domain names Stake.co.uk, PrimeSlots.com, and Primeslot.co.uk.

169.     Freeman had designed PrimeSlots for deployment as a next phase of Primedice in 2015.  Upon information and belief, Craven and Tehrani entered into a fiat money alliance with Aspire Global not just on behalf of Stake, but also on behalf of the as-yet unrealized entity Primeslots.

170.     Craven and Tehrani have purloined and monetized Freeman's designs and ideas without compensation or recognition.

171.     After the anti-money laundering fine was announced, Stake transitioned their UK partnership to TGP Europe.  A search of TGP Europe's UK Gambling Commission records reveals that they operate the domain name Stake.uk.com.

172.     Stake.uk.com is the current home of Stake in the United Kingdom.

173.     On information and belief, TGP Europe has been the beneficiary of Stake assets and revenue to which Freeman may have been entitled.

174.     Stake.com has become a common sponsor of major events ranging from

top domestic UFC MMA fights and Formula 1 racers to English Premiere League Teams and major e-sports competitions in the online gaming sphere.

175.        Upon information and belief, Stake.com is currently worth over $1 billion USD.

176.        The *Sydney Morning Herald* reported on December 10, 2021, that "[i]ndustry observers conservatively value the [Stake.com] operation at $1 billion."

177.        The Australian Financial Review reported on August 15, 2022 that Craven spent nearly $40 million Australian dollars on a mansion in an affluent Melbourne suburb called Toorak in March 2022 and $80,000,088 Australian dollars on a second mansion in the Toorak suburbs of Melbourne in August 2022.

178.        Upon information and belief, Stake knowingly avails itself to the United States market, including in the State of New York and the County of New York, through sponsorship efforts including branding on UFC Octagons (i.e., fight cages) utilized during events broadcast in the city and state of New York.

179.        Additionally, numerous players have admitted in online forums that they have been readily able to gamble in New York State on Stake.com by using a Virtual Private Network ("VPN"). A VPN is a private network that allows users to mask their geographic identity and appear to websites as though they are located in a different state or country from where they are actually located.

180.        To give just two recent examples, in July 2021 Reddit user respcare89 noted in the r/onlinegambling Reddit group that he was attempting to figure out how to get his winnings from Stake.com earned in New York released to him "without moving to

Canada" and another New York based user, potatoshark43, commented in the same forum in October 2021 that he was "occasionally VPNing to Canada with Stake."

181.        Further, Stake uses United States-based individuals to attempt to lure players into playing games on Stake.com. These individuals are paid commissions to recruit players to gamble on the site. At least one such commission-based representative lived in New York City during the entire time he worked for Stake and regularly recruited American players to Stake.com.

182.        Subsequent to the filing of our Complaint, Stake threw a highly publicized party in New York City hosted by Stake.com partner Drake to celebrate the premiere of the star-studded film, *Amsterdam* (a period drama from director David O. Russell starring Christian Bale, Margot Robbie, John David Washington, Taylor Swift, Anya Taylor-Joy, Chris Rock, Zoe Saldana, and Robert De Niro) in which, upon information and belief, Drake was an investor. Guests included *Amsterdam* stars Margot Robbie and Rami Malek, and actor Leonardo DiCaprio alongside numerous music stars and social media influencers, were invited to play Stake branded poker at the event and were given Stake branded gift bags.

183.        Tehrani and Craven were aware that United States players made efforts to access the games. In fact, the first time any effort was made to block U.S. players from accessing Primedice in May 2015, the site lost half its daily revenue.

184.        Stake runs and operates community forums on "stakecommunity.com."

185.        These forums allows users, moderators, and Stake employees to discuss various aspects of Stake.com's games as well as other more salacious topics. The forums are regularly used to discuss accessing Stake from the United States and other prohibited locations

via VPN and mirror sites.

186.        A mirror site is an identical copy of an original site that is placed under a different URL.   Mirror sites are commonly used to circumvent geoblocking or local government restrictions.

187.        For example, an October 19-20, 2019 thread on Stake's own community forums featured US players discussing the lack of consequences in accessing Stake.com using a VPN.

188.        Likewise, a thread on Stake's own community forums dated June 13-14, 2020, featured a US player asking if "Stake condone[s] the use of there [sic] gambling through VPN?" to which four users quickly reply in the affirmative and a fifth suggests deploying the mirror site "stake.games" if the VPN is having any issues.

189.        Soon, a cottage industry developed – with Tehrani and Craven's knowledge and support – for Stake.com to continue accessing the U.S. market. Numerous explanations for how to use VPNs to access Stake.com are available on Reddit and other cryptocurrency or gambling focused online sites and forums. Additionally, numerous YouTube videos – many with tens of thousands of views – describe specifically how to access Stake.com from inside the U.S. market and from the state of New York. One video by user Danny Oleksy titled "How to GAMBLE ONLINE in the US (Gamble online safely in the United States on STAKE or ROOBET!)" has over 80,000 views since October 2021 and another by user Comparatif VPN titled "PLAY STAKE LEGALLY IN THE UNITED STATES: Here's How to Play Stake in the US [LEGALLY]" has over 65,000 views since October 2021.

190.        On May 4, 2021, in a message from Stake's own Telegram account titled "New Mirror Site", users were told "Political views sometimes get in the way of accessing websites.  As you might have realised Turkish ISP's [sic] are no longer able to access any Stake mirrors. Please use Staketr2.com, our newest official mirror of Stake."

191.        On a September 10, 2021, Bitcoin Talk forum post, Tehrani addresses the complaints of a user who claims he is receiving incorrect cash out values from Stake. Tehrani notes that the Stake logs indicate the user is "using a popular VPN" to access Stake which may be the cause of the issue.

192.        Tehrani's easy access to logs which indicate a player is attempting to access the site via VPN proves the Partnership Enterprise, Craven, and Tehrani could, but choose not to, track, monitor, and reject users accessing the site via VPN from prohibited jurisdictions.

193.        In fact, Stake.com has recently launched Stake.us, an effort to further establish itself in the U.S. market and in the state of New York.

194.        Despite a prohibition on cryptocurrency gaming in the United States, United States consumers are encouraged both via Stake.com itself and social media platforms such as Reddit and Twitter to participate in games on Stake.us.

195.        Stake.com partners are aware of, and attempt to cultivate, engagement by United States citizens with the site.

196.        Stake.com has a verified Twitter account. A Twitter account can be "verified" by Twitter when the account is able to (1) prove its identity, whether professional or individual, and (2) show that it has a sufficient social media engagement to merit

36

verification.   Verification is denoted by a white check mark in a blue seal next to the user's Twitter handle.[2]

197.      On August 4, 2022, Stake.com's verified Twitter account (@Stake) tweeted:



198.    The Tweet reads:

"American Friends *:smirking emoji:*

In case you missed it…

stake.us is live *:American Flag emoji:*"

199.      The tweet is accompanied by a meme of cartoon character SpongeBob SquarePants burning a piece of paper that says "STAKE.COM IS NOT AVAILABLE IN

---

[2] Twitter's verification policy has since been changed.

THE US" and warming himself with the subsequent flames with the site address "STAKE.US" above him.

200.     Called a "social" casino game, the United States-based Stake.us in fact permits players in the U.S. to play for real money.

201.     The Stake.us site allows users to play games using two different types of site-based currency called Gold Coins and Stake Cash.  Upon information and belief, users are able to purchase Gold Coins using fiat U.S. currency and are rewarded with "Stake Cash" that can be exchanged for cryptocurrency winnings if they win games while using purchased Gold Coins.

202.     Despite illusory language suggesting otherwise, Stake is effectively allowing American users to gamble on Stake.us using fiat money and paying out their winnings in cryptocurrency.

203.     Not only is Stake.com availing itself to the markets in the U.S. and New York, but in its effort to penetrate those markets, it is apparently unconcerned with taunting regulators who want to prevent illegal online gambling in the United States.[3]

204.     Stake.us also stands as yet another example of the clandestine corporate structures Craven and Tehrani habitually deploy.

205.     Stake.us describes itself as owned and operated by Sweepsteaks

---

[3]     Subsequent to the filing of the initial Complaint in this case, Stake.US changed its Twitter account to add language, not previously included, that Stake.com is "[u]navailable in NY, WA, NV & ID."

Limited, a company based in Cyprus.  The sole shareholder in Sweepsteaks Limited is another company based in Cyprus called Well Done Stk Ltd.  A diligent search of Cyprus records have revealed that Well Done Stk Ltd has two shareholders in a 50/50 proportion: Bijan Tehrani and Ashwood Holdings Pty Ltd.  Ashwood Holdings Pty Ltd., an Autralian holding company, lists its sole officer, director, and shareholder as Edward Craven.

206.	Freeman stood as the last bulwark against Craven and Tehrani's illegal schemes for Primedice, and eventually Stake, which helps explain why the defendants chose to impermissibly attempt to exile Freeman from the Partnership Enterprise.

**Primedice's Accounting Failures**

207.	In or around September 2016, the partners agreed to institute a more formal accounting system.  As the parties could not track past withdrawals, they each agreed to a "baseline" figure representing the total amount of Bitcoins each of them had withdrawn from Primedice up to that point.

208.	Yet, Tehrani and Craven continued to fail to provide sufficiently reliable data to the accounting exercise in abrogation of their partnership duties.  Each assumed they could continue to take advantage of Freeman.

209.	Tehrani and Craven have failed to show even their initial investments of capital into Primedice, let alone a proper tracking of the coins they took from the site for personal use especially in the pre-2016 period.

**Calculating Freeman's Value and Equity in Primedice, Stake, and Other Entities**

210.	In the time since the Stake.com breach, Freeman has been a net

depositor, not withdrawer, of Bitcoins according to Primedice's own accounting records.

211.     By contrast, Tehrani withdrew approximately 1,500 Bitcoins not including 1,000 sent to him by Freeman from the Cold Storage Wallet.

212.     Similarly, Craven withdrew approximately 2,500 (on top of approximately 3,200 he had previously withdrawn).

213.     In August 2020, moreover, Craven and Tehrani provided Freeman with an accounting spreadsheet listing alternative cryptocurrencies (i.e., cryptocurrencies other than Bitcoin) that they conceded were owed to Freeman.  Specifically, in that spreadsheet, Tehrani admits that Freeman is owed the following:

- 1451.18900920651 Ethereum

- 2405.6168321878 Litecoin

- 121166148.734008 Dogecoin

- 33.7237144899342 Bitcoin Cash

- 108993.752100078 Ripple

- 25940.8679331054 Tron

214.     To date, neither Tehrani nor Craven have paid Freeman any of these amounts.

215.     Considering the rapid fluctuations in cryptocurrency value, Tehrani's and Craven's refusal to timely convey crypto assets belonging to Freeman has caused many millions of dollars in damage to Freeman.

216.     Efforts by Freeman to ascertain precisely how many Bitcoins are

currently owed to him from the partnership and from Primedice revenues have been stymied by Tehrani.

217.        Freeman has not received *any* revenue for his stake in Primedice since in or about August 2020.

218.        In fact, Tehrani has on numerous occasions and on behalf of both Primedice and Stake attempted to engage in dishonest double counting to minimize the amounts due Freeman. By way of example, Tehrani has chosen to count appropriate site expenses incurred by Freeman and reimbursed via bitcoin such as a substantial payment made to a programmer by Freeman as personal gains.  Once again, Tehrani attempted to bully Freeman into accepting an unfair and disadvantageous position.

219.        Accordingly, Freeman will petition this Court for an accounting needed to understand the financial picture of Primedice, Stake, Easygo, Provably Fair, Medium Rare N.V., TGP Europe, Slicemedia B.V., Sweepsteaks Limited, and all the other constituent parts and facilitating entities of Stake, and precisely what amounts and equities are now due to Freeman.

220.        Finally, upon information and belief, Stake.com is currently worth more than $1 billion USD.  Stake.com has arisen from the Primedice partnership and Freeman has been improperly, and dishonestly, excluded from the chance to participate in Primedice's successor partnership Stake.com.  Accordingly, Freeman is entitled to no less than a 20% share in Stake.com in addition to the amounts past due to him from Primedice and in various alternative cryptocurrencies, which total an amount not less than $200 million USD.

221.        Further, if Tehrani and Craven are unable to account for the sums they

have represented they made into the partnership, Freeman should be declared to possess a share of the partnership in Primedice and all successor entities, including Stake.com, of not less than one-third, and should be made whole after nearly a decade of backhanded and injurious dealing by Tehrani and Craven.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
Fraud
(All Defendants)

222.    Freeman realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 221 above.

223.    In August 2016, Defendants Tehrani and Craven, among others, concealed from Freeman the material fact that Stake was intended to be a virtual cryptocurrency casino.

224.    Defendants Tehrani and Craven further affirmatively misrepresented to Freeman that "Easygo" – an entity which would go on to become Stake.com – was going to operate exclusively as a fiat money casino and that it would *not* operate as a virtual cryptocurrency casino.

225.    When Freeman further specifically inquired about the appearance of cryptocurrency markers on a website mock-up, Tehrani again misrepresented the nature of the site.

226.    In these and other ways, directly or indirectly, Defendants Tehrani and Craven, acting with scienter, thus made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

227.     Defendants Tehrani and Craven knew the statements were material and false.

228.     Among their other objectives, Defendants Tehrani and Craven made these false statements and material omissions with the intent of convincing Freeman not to participate in the next iteration of Primedice and, thus, deprive him of his equity interest and partnership rights in Stake.com, Stakedice, and other entities derived from the success of Primedice, including the entire Partnership Enterprise.

229.     Trusting in the integrity of his partners, Freeman reasonably relied on Defendants' misrepresentations and fraudulent omissions.

230.      As a direct and proximate result of Defendants' conduct, Freeman has been substantially damaged, including by being deprived of his rightful opportunity to participate in the success of Stake.com., but overall in an amount to be determined at trial, plus interest, attorneys' fees, and costs.

231.     Defendants' purposeful and wanton deceit further warrants the imposition of exemplary or punitive damages against them in an amount to be determined at trial.

### SECOND CLAIM FOR RELIEF
Breach of Fiduciary Duty and Duty of Loyalty
(All Defendants)

232.     Freeman realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 221 above.

233.     Defendants Tehrani and Craven were partners of Freeman in Primedice.

234.     As partners in Primedice, Defendants Tehrani and Craven owed Freeman fiduciary duties including a duty of loyalty, and were obligated to act with the utmost good faith towards, and with regard to the best interests of, Freeman.

235.     Freeman was entitled to place his trust and confidence in his partners Tehrani and Craven and fairly expected them to act with the utmost good faith towards him in carrying out the business of Primedice.

236.     Freeman relied on their loyalty, integrity, and faithful performance of their responsibilities.

237.     Defendants Tehrani and Craven breached their fiduciary duties owed to Freeman by failing to comply with their obligations to him, by acting in conflict of interest, by engaging in activities for their own benefit and to the detriment of Primedice, by deceiving him, by diverting to themselves commercial opportunities belonging to the partnership, and by misappropriating Primedice's proprietary technology and confidential trade secret information for use in a separate commercial enterprise which enriched them to the exclusion of Freeman.

238.     Defendants Tehrani's and Craven's breaches of their fiduciary duties including their duty of loyalty to Freeman were knowing, intentional, and willful.

239.     Tehrani and Craven utilized the Byzantine structure of the Partnership Enterprise and intermediaries such as Vučković to further conceal their deceptions.

240.     By the conduct asserted above, Defendants Tehrani and Craven acted in a manner inconsistent with their agency and trust.

241.     Defendants Tehrani and Craven are still in possession of Primedice's proprietary technology and confidential trade secret information, are able to and continue to

access it, and are able to, and do, use this information to benefit themselves and other parties at the expense of Freeman.

242.     As a direct and proximate cause of Defendants Tehrani's and Craven's breaches of their fiduciary duties including their duty of loyalty, Freeman has been and is being harmed.

243.     Freeman is entitled to restitution and disgorgement from Defendants Tehrani and Craven in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF
Unfair Competition
(All Defendants)

244.     Freeman realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 221 above.

245.     Freeman invested considerable time and resources developing the Primedice proprietary technology and confidential trade secret information into a valuable asset.

246.     Defendants have taken the Primedice proprietary technology and confidential trade secret information for themselves and have disclosed and/or used the Primedice proprietary technology and confidential trade secret information, all without authorization or permission from Freeman.

247.     They have perpetuated their unfair competition through a series of increasingly opaque corporate structural changes and through the use of intermediaries such as Vučković.

248.        Defendants have made unauthorized use of the proprietary technology and confidential trade secret information which they purloined for their own benefit and to the detriment of Freeman.

249.        Tehrani and Craven have used Primedice partnership assets, equity, name value, and reputation to help facilitate the launch of Stake.com.

250.        As a consequence, Freeman has been harmed in an amount to be determined at trial.

251.        Defendants' conduct constitutes common law unfair competition and were carried out willfully, fraudulently, maliciously and with the wanton disregard of Freeman's rights, thereby entitling Freeman to compensatory and punitive damages to be proven at trial.

**FOURTH CLAIM FOR RELIEF**
Idea Misappropriation
(All Defendants)

252.    Freeman realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 221 above.

253.    Freeman made significant, concrete, and novel efforts to expand Primedice into further gambling avenues.

254.    As common law partners in Primedice, Freeman, Tehrani, and Craven owe each other the fiduciary obligations of partners.

255.    Freeman proposed the idea to his partners of expanding Primedice into a cryptocurrency casino which covered additional gambling opportunities including online cryptocurrency slot machines and online cryptocurrency poker games.

256.    Freeman's ideas for Primedice to expand into these areas were novel not just among the partners, but in the industry.

257.    Freeman's concrete ideas for Primedice to expand into these areas were supported by design materials including mock-ups of proposed slot machines for a new Primeslots service.

258.    Tehrani and Craven even registered the web domains "primeslots.com" and "primeslots.co.uk" unbeknownst to Freeman.

259.    Tehrani and Craven stole Freeman's novel and concrete ideas, and then deployed partnership assets to develop them to create Stake.com.

260.    Accordingly, Tehrani and Craven are liable for misappropriation of ideas and liable to Freeman for damages to be proven at trial.

**FIFTH CLAIM FOR RELIEF**
Tortious Interference with Prospective Economic Advantage
(All Defendants)

261.    Freeman realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 221 above.

262.    Freeman is a partner in Primedice with Tehrani and Craven.

263.    Freeman proposed ideas to evolve Primedice, then exclusively an online cryptocurrency gambling dice game, into a broader online cryptocurrency casino.

264.    Freeman proposed and designed mock-ups of a potential online cryptocurrency slot game for the new service.

265.     Freeman proposed a potential online cryptocurrency poker game for the new service.

266.     Tehrani and Craven stole the ideas and plans proposed by Freeman and used them to help create Stake.com, a new edition of Primedice.

267.     Tehrani and Craven lied to Freeman when they told him they intended to create a fiat money casino, and did so for the sole purpose of convincing him unwittingly to waive his partnership rights in Primedice's successor entity to his detriment and harm.

268.     Additionally, Tehrani and Craven's conduct was wrong and improper as they engaged in acts of dishonesty in violation of their fiduciary obligations to Freeman and to Primedice.

269.     Finally, Tehrani and Craven purloined Primedice partnership assets for the purpose of developing Stake.com with the intention of taking advantage of Freeman and of wrongfully seizing his rights and interests in Stake.com, in Primedice, and in future partnership opportunities.

270.     Accordingly, Defendants are liable for tortious interference with prospective economic advantage for damages to be proven at trial.

### SIXTH CLAIM FOR RELIEF
Unjust Enrichment
(All Defendants)

271.     Freeman realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 221 above.

272.     Originating the idea, and devoting time, talent, and resources to the development, launch, and operation of Primedice, Freeman conferred a valuable benefit on Defendants.

273.     Defendants have, in bad faith, taken that benefit for themselves by asserting control over the Primedice assets and excluding Freeman from sharing in its financial performance and denying him access.

274.     Freeman also contributed to the creation and development of games and designs for a virtual casino which Defendants, through deceit, have taken for their exclusive benefit.  These games formed the basis for the "next edition of the Primedice family:" the Stake Partnership Enterprise.  Freeman has also been excluded from sharing in the Partnership Enterprise's financial performance and has been denied access.

275.     Additionally, Defendants have retained control over alternative cryptocurrency assets they have already conceded belong to Freeman.

276.     Defendants have failed to pay Freeman his rightful 20% partnership share of any payments to which the partners were entitled, and have kept those sums for themselves.

277.     In each of these ways, Defendants have been unjustly enriched.

278.     It is against equity and good conscience to allow Defendants to retain the benefits conferred upon them by Freeman.

279.     As a direct and proximate result of Defendants' conduct, Freeman is entitled to disgorgement of the sums by which Defendants have been unjustly enriched in an amount to be determined at trial, plus interest, attorneys' fees, and costs..

280.     Finally, by virtue of the purposeful and malevolent nature of the conduct of Defendants Tehrani and Craven, they are liable to Freeman for punitive damages in an amount to be determined at trial.

## SEVENTH CLAIM FOR RELIEF
Conversion
(Defendants Tehrani and Craven)

281.     Freeman realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 221 above.

282.     In 2013, Freeman, Tehrani, and Craven agreed to form a common law partnership.

283.     Based on investments in the site they purported to make, Tehrani and Craven dictated that each would have a 40% interest in Primedice, and Freeman would have a 20% interest.

284.     Neither Tehrani nor Craven has ever disclosed to Freeman the actual amounts they invested or otherwise verified that their investments were each twice his own.

285.     Freeman invested thousands of coins in the early days of the site and was responsible for filling site reserves to cover player wins from his own bitcoins.

286.     In February 2014, Craven unilaterally stated he was redistributing 6% of Freeman's equity in the company to himself and to the programmer, Coldridge, who did *actually* did the coding work Craven had represented himself as capable of completing.

287.     Craven was not authorized to usurp Freeman's interest in or share of the partnership.

288.         Freeman is entitled to no less than 20% of the value of Primedice and any successor entities including the Partnership Enterprise.

289.         Furthermore, if Tehrani and Craven did not make equity investments in amount twice the amount invested by Freeman then the shares of the partners should be one-third each or, at a minimum, based on the actual amounts each invested when the company became active.

290.         Tehrani and Craven have both failed to account for their initial capital investments.

291.         As a result of Defendants' conversion of Freeman's equity interest in Primedice and its successor entities, Freeman has been damaged in an amount to be determined at trial, plus attorney fees, court costs, and collection costs.

### EIGHTH CLAIM FOR RELIEF
Conversion
(All Defendants)

292.         Freeman realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 221 above.

293.         In August 2020, Defendants Craven and Tehrani provided Freeman with an accounting spreadsheet listing alternative cryptocurrencies (i.e., cryptocurrencies other than Bitcoin also known as "altcoins") that they conceded were owed to Freeman.

294.         Specifically, in that spreadsheet, Tehrani admits that Freeman is owed the following:

- 1451.18900920651 Ethereum

- ▪ 2405.6168321878 Litecoin

- ▪ 121166148.734008 Dogecoin

- ▪ 33.7237144899342 Bitcoin Cash

- ▪ 108993.752100078 Ripple

- ▪ 25940.8679331054 Tron

295.     To date, neither Tehrani nor Craven have paid Freeman any of these amounts.

296.     These cryptocurrencies fluctuate in value rapidly.

297.     In fact, most of the currencies at issue have decreased significantly in value since August 2020, and even further since the filing of our initial Complaint.

298.     Defendants Tehrani's and Craven's refusal to timely convey to Freeman these crypto assets belonging to him has caused Freeman substantial financial damage.

299.     As a result of Defendants' conversion of Freeman's alternative cryptocurrencies, Freeman has been damaged in an amount to be determined at trial, plus attorney fees, court costs, and collection costs.

**NINTH CLAIM FOR RELIEF**
Accounting
(All Defendants)

300.     Freeman realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 221 above.

301.     Freeman, Tehrani, and Craven are partners in Primedice.

302.        As partners, Defendants Tehrani and Craven owe fiduciary duties including a duty of loyalty to Freeman.

303.        Defendants Tehrani and Craven have breached their fiduciary duties to Freeman which has caused Freeman to suffer financial damage.

304.        As fiduciaries, Defendants Tehrani and Craven can and should be compelled to account for their conduct.

305.        Freeman has attempted to access records, documents, financial data, and cryptocurrency accounting from Tehrani, Craven, and the Partnership Enterprise Defendants.

306.        Defendants have resisted Freeman's efforts to access, analyze, and understand complete corporate records of Primedice along with any and all successor entities to Primedice including the Partnership Enterprise.

307.        The precise amount of damage to Freeman includes partnership assets owed to him, cryptocurrencies including Bitcoin and altcoins owed to him, and rights and amounts owed to him derived from successor entities such as Stake.com and Stakedice are impossible to determine with a thorough judicial accounting of Primedice, Stake.com, and other related entities.

308.        An accounting is the most efficient legal remedy to ascertain the extent of the financial damage to Freeman and to determine what ill-gotten gains should be disgorged by Defendants and the amounts needed in restitution to make Freeman whole.

### TENTH CLAIM FOR RELIEF
Fraud

53

(Defendant Slicemedia B.V.)

309.        Freeman realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 221 above.

310.        Slicemedia B.V. was incorporated in Curaçao in October 2017 without Freeman's knowledge.

311.        Slicemedia B.V. has become the legal owner of Primedice without Freeman's knowledge, authorization, or consent.

312.        When Freeman asked about his interest in Primedice he was repeatedly told nothing had changed by Defendants Craven and Tehrani.

313.        In reality, Craven and Tehrani had secretly transferred the Primedice partnership into a corporate entity located in Curaçao, and then repeatedly lied to Freeman about the nature of his interest in Primedice.

314.        Craven and Tehrani spent years lying to Freeman about the nature of his Primedice interest and have sought repeatedly to actively conceal the true nature of the illegal corporate ownership conveyances they have perpetrated.

315.        As a direct and proximate result of Defendants' conduct, Freeman has been substantially damagedin an amount to be determined at trial, plus interest, attorneys' fees, and costs.

316.        Defendants' purposeful and wanton deceit further warrants the imposition of exemplary or punitive damages against them in an amount to be determined at trial.

**Prayer For Relief**

WHEREFORE, Plaintiff Freeman prays for judgment in his favor as follows:

(a)     On the first cause of action for fraud, damages against Defendants in an amount to be determined at trial, but no less than $200 million USD, exclusive of interest and costs;

(b)     On the second cause of action for breach of fiduciary duty and duty of loyalty, restitution and disgorgement against Defendants in an amount to be determined at trial, but no less than $200 million USD, exclusive of interest and costs;

(c)     On the third cause of action for unfair competition, damages against Defendants in an amount to be determined at trial, but no less than $200 million USD, exclusive of interest and costs;

(d)     On the fourth cause of action for idea misappropriation, damages against Defendants in an amount to be determined at trial, but no less than $200 million USD, exclusive of interest and costs;

(e)     On the fifth cause of action for tortious interference with prospective economic advantage, damages against Defendants in an amount to be determined at trial, but no less than $200 million USD, exclusive of interest and costs;

(f)     On the sixth cause of action for unjust enrichment, damages against Defendants in an amount to be determined at trial, but no less than $200 million USD, exclusive of interest and costs;

(g)     On the seventh cause of action for conversion as to Primedice equity, damages against Defendants in an amount to be determined at trial, but no less than $200 million USD, exclusive of interest and costs;

(h)     On the eighth cause of action for conversion as to altcoins, damages against Defendants in an amount to be determined at trial, but no less than $200 million USD, exclusive of interest and costs;

(i)     On the ninth cause of action for an accounting, an order for an accounting to determine the amounts due in restitution and disgorgement, exclusive of interest and costs;

(j)     On the tenth cause of action for fraud, damages against Defendants in an amount to be determined at trial, but no less than $200 million USD, exclusive of interest and costs;

(k)     Interest on the funds owed to but not paid to Freeman by Defendants;

(l)     Attorneys' fees and costs incurred in prosecuting this action;

(m)     A jury trial; and

(n)     For such other and further relief as the Court deems just and proper.

A. Awarding damages during the period of disloyalty as described in each of the above claims, in favor of Freeman and against Defendants, in amounts to be determined at trial, but not less than $200 million USD;

B. Awarding punitive damages in favor of Freeman and against Defendant in an amount to be determined at trial, but not less than $200 million USD;

C. Awarding Freeman pre-judgment and post-judgment interest, its attorneys' fees, and costs and other expenses incurred in this action;

D. Granting Freeman such other and further relief as this Court deems just and proper.

**JURY DEMAND**

Freeman demands a jury trial for all issues so triable.

Dated:      New York, New York
            January 4, 2023

                            GAGE SPENCER & FLEMING LLP

/s/ William B. Fleming

William B. Fleming
410 Park Avenue, Suite 810
New York, New York 10022
Tel. (212) 768-4900
Email: wfleming@gagespencer.com

*Attorneys for Plaintiff Christopher Freeman*