UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

CHRISTOPHER FREEMAN,

                        Plaintiff,

      -against-

STAKE.COM, PRIMEDICE, EDWARD CRAVEN,
BIJAN TEHRANI, SLICEMEDIA B.V., MEDIUM
RARE N.V., EASYGO SOLUTIONS PTY LTD,
MEBIT.IO, AND MLADEN VUCKOVIC.

                       Defendants.

_____

                             Civil Action

                             22-cv-7002 (RA)

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS THE COMPLAINT**

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................... i

TABLE OF AUTHORITIES ........................................................................................ iii

PRELIMINARY STATEMENT ..................................................................................... 1

PROCEDURAL BACKGROUND ................................................................................. 6

BACKGROUND ............................................................................................................ 6

ARGUMENT ............................................................................................................... 10

   I.     This Court Has Subject Matter Jurisdiction Over the Claims ..................... 10

       A.    Tehrani Is Not Legally Domiciled Abroad and Does Not Qualify for Any "Stateless" Exception to Diversity Jurisdiction ....................................... 10

       B.    Freeman's Citizenship Does Not Destroy Diversity with Primedice ................... 15

       C.    Defendants Have Recognized and Treated Stake.com as a Legal Entity ............. 18

   II.    Personal Jurisdiction Over Each of the Defendants Exists ......................... 19

   III.   Jurisdictional Discovery Should Be Permitted as Defendants Exclusively Possess Pertinent Factual Information .......................................................... 24

   IV.   Freeman's Causes of Action Are Timely Asserted ..................................... 27

       A.    Fraud ...................................................................................... 28

       B.    Breach of Fiduciary Duty ....................................................... 29

       C.    Other Causes of Action ........................................................... 33

   V.    The Complaint States Plausible Claims ..................................................... 34

   VI.   Plaintiff's Alternatively Pleaded Claims and Remedies Are Not Duplicative .......... 35

   VII.  Defendants' Contentions That Freeman Fails to State a Claum Under Fed. R. Civ. P. 9(b) and/or 12(b) Are Meritless ...................................................... 36

       A.    Fraud ...................................................................................... 37

       B.    Unfair Competition ................................................................. 39

C.      Idea Misappropriation........................................................................................40

D.      Tortious Interference ........................................................................................41

E.      Conversion of Equity and Altcoins....................................................................42

F.      Accounting ......................................................................................................43

CONCLUSION............................................................................................................................45

## TABLE OF AUTHORITIES

**Cases:**

*Abdullahi v. Pfizer, Inc.*,
    562 F.3d 163 (2d Cir. 2009).......................................................................................6, 10

*Abe's Rooms, Inc. v. Space Hunters, Inc.*,
    38 A.D.3d 690 (2d Dep't 2007).........................................................................................39

*Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*,
    98 F. 2d 25 (2d Cir. 1996).................................................................................................23

*Apfel v. Prudential-Bache Sec.*,
    183 A.D.2d 439 (1st Dep't 1992).....................................................................................41

*APWU v. Potter*,
    343 F.3d 619 (2d Cir. 2003).............................................................................................25

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)....................................................................................................34, 38

*Ball v. Metallurgie Hoboken-Overpelt*,
    902 F.2d 194 (2d Cir. 1990).............................................................................................25

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
    305 F.3d 120 (2d Cir. 2002).............................................................................................20

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)..........................................................................................................34

*Best Van Lines v. Walker*,
    490 F.3d 239 (2d. Cir. 2007)......................................................................................23, 24

*Blockbuster, Inc. v. Galeno*,
    472 F.3d 53 (2d Cir. 2006)...............................................................................................25

*Burnett v. Al Baraka Inv. & Dev. Corp. (In re Terrorist Attacks)*,
    349 F. Supp. 2d 765 (S.D.N.Y. 2005)..............................................................................25

*Carden v. Arkoma Associates*,
    494 U.S. 185 (1990)..........................................................................................................19

*Carvel Corp. v. Noonan*,
    350 F.3d 6 (2d Cir. 2003).................................................................................................42

*Chirag v. MT Marida Marguerite Schiffarhts,*
  604 Fed. Appx. 16 (2d Cir. 2015) ...................................................................25

*Citigroup Inc. v City Holding Co.,*
  97 F. Supp. 2d 549 (S.D.N.Y. 2000) ...............................................................24

*Clark-Fitzpatrick, Inc. v. Long Is. R.R. Co.,*
  70 NY2d 382 (1987) .......................................................................................35

*Cohen v. S.A.C. Trading Corp.,*
  711 F.3d 353 (2d Cir.2013) ............................................................................38

*Cohn v. Lionel Corp.,*
  21 N.Y.2d 559 (1968) .....................................................................................35

*Cornely v. Dyamic HVAC Supply, LLC,*
  44 A.D.3d 986 (2d Dep't 2007) ......................................................................19

*Cresswell v. Sullivan & Cromwell,*
  922 F.2d 60 (2d Cir. 1990) ................................................................13, 14, 15

*Donaldson Interiors, Inc. v. Cauldwell-Wingate Co., LLC,*
  2018 NY Slip Op 50303(U) (Sup. Ct. NY Cty. 2018) ....................................35

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.,*
  722 F.3d 81 (2d Cir. 2013) .............................................................................26

*Ederer v. Gursky,*
  9 N.Y.3d 514 (2007) .......................................................................................31

*Ehrlich-Bober & Co. v. Univ. of Houston,*
  49 N.Y.2d 574 (1980) ...............................................................................24 n. 3

*Electrolux Corp. v. Val-Worth, Inc.,*
  6 N.Y.2d 556 (1959) .......................................................................................40

*Elkins v. Moreno,*
  435 U.S. 647 (1978) ........................................................................................13

*Estate of Calderwood v. ACE Group Intl. LLC,*
  157 A.D.3d 190 (1st Dep't 2017) ...................................................................31

*Filetech S.A. v. France Telecom S.A.,*
  157 F.3d 922 (2d Cir. 1998) ...........................................................................25

iv

*First Nat'l Bank of Cincinnati v. Pepper,*
  454 F.2d 626 (2d Cir. 1972)...................................................................27 n. 6

*Force v. Facebook, Inc.,*
  934 F.3d 53 (2d Cir. 2019).................................................................11, 13, 14

*General Motors Acceptance Corp. v. Richardson,*
  59 Misc. 2d 744 (Sup. Ct. Mnr. Cty. 1969) ............................................21

*Global Financial Corp. v. Triarc Corp.,*
  93 N.Y.2d 525 (1999) ..............................................................................28

*GlobalNet Financial.com, Inc. v.  Frank Crystal & Co.,*
  449 F.3d 377 (2d Cir. 2006)....................................................................43

*Graham v. James,*
  144 F.3d 229 (2d Cir. 1998).....................................................................39

*Grusd v. Arccos Golf LLC,*
  2014 N.Y. Slip. Op. 31471 (Supp. Ct. N.Y. Cty., June 3rd, 2014)....................36

*Hawkins v. Greenfield,*
  797 F. Supp. 30 (D.D.C. 1992) ................................................................29

*Homapour v. Harounian,*
  182 A.D.3d 426 (1st Dep't 2020) ............................................................45

*Houbigant, Inc. v. Deloitte & Touche,*
  303 A.D.2d 92 (1st Dept. 2003)...............................................................32

*IDT Corp. v. Morgan Stanley Dean Witter & Co.,*
  12 N.Y.3d 132 (2009) .........................................................................32, 33

*Interdonato v. Interdonato,*
  521 A.2d 1124 (D.C. Ct. of App. 1987) ...................................................29

*Ingham v. Thompson,*
  88 A.D.3d 607 (1st Dep't 2011) ..........................................................30, 33

*In re Siaosi Fisiimaile Koloamatangi,*
  23 I&N Dec. 548, 551 (BIA 2003) ..........................................................15

*ITC Ltd. v. Punchgini, Inc.,*
  9 N.Y.3d 467 (2007) .................................................................................40

*Jered Contr. Corp. v. New York City Tr. Auth.*,
22 N.Y.2d 187 (1968) ........................................................................32

*JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure Ltd.*,
536 U.S. 88 (2002)......................................................................26 n. 4

*Kaplan v. Michtom*,
17 F.R.D. 228 (S.D.N.Y. 1955) ........................................................41

*Kaufman v. Cohen*,
307 A.D.2d 113 (1st Dep't 2003) ................................................30, 33

*Kermanshah v. Kermanshah*,
580 F. Supp. 2d 247 (S.D.N.Y. 2008) ...............................................33

*Kohan v. Nehmadi*,
130 A.D.3d 429 (1st Dep't 2015) ......................................................33

*Kreutter v. McFadden Oil Corp.*,
71 N.Y.2d 460 (1988) .......................................................................20

*LaMarca v. Pak-Mor Mfg. Co.*,
95 N.Y.2d 210 (2000) .......................................................................21

*LeBlanc v. Cleveland*,
198 F.3d 353 (2d Cir. 1999)..............................................................25

*Lemle v. Lemle*,
2017 NY Slip Op 30811 (N.Y. Sup. Ct. 2017) ............................31, 45

*Lennon v. Seaman*,
63 F.Supp.2d 428 (S.Y. 1999) ..........................................................44

*Leveraged Leasing Admin. Corp. v. PacifiCorp Capital, Inc.*,
87 F.3d 44 (2d Cir. 1996)............................................................27 n. 6

*Lok v. Immigration and Naturalization Service*,
681 F.2d 107 (2d Cir. 1982).........................................................13, 14

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
797 F.3d 160 (2d Cir. 2015).........................................................37, 38

*Marvin v. Brooks*,
94 N.Y. 71 (1883) ........................................................................31, 44

*Matter of A.J. Valdez and S. Valdez,*
    27 I&N Dec. 496 (BIA 2018) ...................................................................................15

*Matter of Renren Inc. Derivative Litig. v. XXX,*
    127 N.Y.S.3d 702 (Sup. Ct. N.Y. Cty. May 20, 2020) ..........................................19, 20, 21

*Meinhard v. Salmon,*
    249 N.Y.458 (1928) ..............................................................................................37

*Nadel v. Play-By-Play Toys & Novelties, Inc.,*
    208 F.3d 368 (2d Cir. 2000) ..................................................................................41

*Nissan Motor Acceptance Corp. v. Scialpi,*
    944 N.Y.S.2d 160 (2d Dep't 2012) .........................................................................43

*On the Level Enters., Inc. v. 49 E. Houston LLC,*
    104 A.D.3d 500 (1st Dep't 2013) ...........................................................................36

*Penato v. George,*
    82 A.D.2d 877 (2d Dep't 1981) ..............................................................................44

*People v. Ben,*
    55 A.D.3d 1306 (4th Dep't 2008) ...........................................................................31

*People v. Trump,*
    62 Misc.3d 500 (N.Y. Sup. Ct. 2018) .....................................................................31

*Pitts Gershon PON-GGK v. Tri-Honda Adv. Assoc.,*
    166 A.D.2d 357 (1st Dep't 1990) ...........................................................................41

*Republic of Turkey v. Christie's Inc.,*
    No. 21-2485, 2023 WL 2395412 (2d Cir., March 8, 2023) ......................................45

*Robinson v. Overseas Military Sales Corp.,*
    21 F.3d 502 (2d Cir. 1994) .....................................................................................25

*Roy Export Co. v. Columbia Broadcasting Sys.,*
    672 F.2d 1095 (2d Cir. 1982) .................................................................................40

*Scott v. Fields,*
    925 N.Y.S.2d 135 (2d Dep't 2011) .........................................................................43

*Sharp v. Kosmalski,*
    40 N.Y.2d 119 (1976) .......................................................................................31 n. 7

*Shear Enters., LLC v. Cohen,*
    189 A.D.3d 423 (1st Dep't 2020) ................................................................35

*Solomon R. Guggenheim Found. v. Lubell,*
    77 N.Y.2d 311 (1991) ...................................................................................45

*Southern New England Telephone Co. v. Global NAPs Inc.,*
    624 F.3d 123 (2d Cir. 2010)..........................................................................26

*Sperry Products v. Assoc. of American Railroads*
    132 F.2d 408 (2d Cir. 1942).........................................................................19

*Spitzer v. Schussel,*
    792 N.Y.S.2d 798 (N.Y. Sup. Ct. 2005) .................................................28, 30

*Strawbridge v. Curtiss,*
    7 U.S. (3 Cranch) 267 (1806).......................................................................19

*Sternberg, Inc. v. Walber,*
    187 A.D.2d 225 (1st Dep't 1993).  ...............................................................35

*Stevens v. St. Joseph's Hospital,*
    52 A.D.2d 722 (4th Dep't 1976) ...................................................................44

*Stewart v. World Wrestling Fed. Entertainment, Inc.,*
    No. O3 CV 2468 (RLC), 2004 U.S. Dist. LEXIS 26533 (S.D.N.Y. Dec. 22, 2004)........41

*Sun Printing and Publishing Assn. v. Edwards,*
    194 U.S. 377 (1904)......................................................................................13

*Toys "R" Us, Inc. v. Step Two, S.A.,*
    318 F.3d 446 (3d Cir. 2003).........................................................................23

*Transp. Workers Union of Am. Local 100 AFL-CIO v. Schwartz,*
    17 A.D.3d 218 (1st Dep't 2005) ..............................................................31, 45

*Volt Sys. Dev. Corp. v. Raytheon Co.,*
    155 A.D.2d 309 (1st Dep't 1989) .................................................................35

*Weitz v. Weitz,*
    85 A.D.3d 1153 (2d Dep't 2011) ..................................................................19

*Williams v. Beemiller, Inc.,*
    33 N.Y.3d 523 (2019) ...................................................................................20

*Williams v. Nat'l Gallery of Art,*
    No. 16-CV-6978 (VEC), 2017 U.S. Dist. LEXIS 154445 (S.D.N.Y. Sep. 21, 2017) .......44

*Zippo Mfg. Co. v. Zippo Dot Com, Inc.,*
    952 F. Supp 1119 (W.D. Pa. 1997)...........................................................................23, 24

**Rules and Statutes:**

8 U.S.C. § 1182.............................................................................................................15

28 U.S.C. § 1332.............................................................................................11, 12, 26

CPLR 202......................................................................................................................28

CPLR 213............................................................................................................. *passim*

CPLR 302.................................................................................................................20, 24

CPLR 3014....................................................................................................................35

CPLR 3017....................................................................................................................35

CPLR 3026....................................................................................................................35

Fed. R. Civ. P. 7.1...................................................................................................27 n. 6

Fed. R. Civ. P. 9(b) ...............................................................................................36*, 37

Fed. R. Civ. P. 12(b)(6).........................................................................................36*, 37

**Other Authorities:**

New York Law Journal, "City Bar Proposes Amending Commercial Code To Take Aim at Crypto," February 23, 2023 ....................................................................................24 n. 3

Plaintiff Christopher Freeman ("Plaintiff" or "Freeman") respectfully submits this memorandum of law in opposition to the motion to dismiss of defendants Stake.com ("Stake" or "Stake.com"), Primedice, Edward Craven, Bijan Tehrani, Slicemedia B.V., Medium Rare N.V., Easygo Solutions Pty Ltd, MeBit.io, and Mladen Vuckovic (collectively "Defendants").  For the reasons which follow, Defendants' motion should be denied.

## Preliminary Statement

Presumed true for purposes of the motion, Plaintiff's First Amended Complaint (the "Complaint") establishes the following facts:  in 2013, Freeman, Tehrani, and Craven partnered to create Primedice.  Compl., ¶ 38.  Primedice is an online, cryptocurrency gambling game.  *Id.*, ¶ 2.  It operated as a New York common law partnership, from at least Summer 2015 through 2019 (*id.*, ¶ 21), at which point, we have recently learned, it was converted by Defendants into a Curacao corporation which, according to them, has no offices or business in New York.  Defs. Mem. at 7.  Freeman invested money and effort into its creation. Compl., ¶¶ 43, 72.  He also devoted efforts to an expansion of the Primedice concept into an online, full service cryptocurrency casino offering additional games of chance, which became Stake.com.  *E.g., id.*, ¶¶ 80-87.  In August 2016, Tehrani and Craven represented to Freeman that they were no longer interested in pursuing an online cryptocurrency casino but would instead pursue a fiat casino.  *Id.*, ¶¶ 112-14.  They knew Freeman was committed to developing the partners' cryptocurrency idea.  *Id.*  Then, having so induced Freeman to withdraw from participation in that fiat effort (which they knew he disfavored), Tehrani and Craven moved to finalize and ultimately launch Stake.com in June 2017, as the fulfillment of that very idea.  *Id.*, ¶¶ 115-17.  They even incorporated Freeman's work and funds in the process.  *Id.*, ¶¶ 108-09.

Stake's links to Primedice were overt.  Originated and launched as a continuation of the Primedice partnership and built with Primedice funds, Stake.com was characterized by Defendants as the "newest edition to [sic] the Primedice family," and Defendants permitted Stake to use the Primedice gaming license to operate.  *Id.*, ¶¶ 23-24, 132.  Defendants also assumed control over Primedice's technology, even using it to enhance Stake's competing game Stakedice to Freeman's and Primedice's detriment.  *Id.*, ¶ 153.

After the August 2016 misrepresentations, Tehrani and Craven eventually acted to exclude Freeman from any access to Primedice.  They hired defendant Vuckovic as Primedice's CEO, after which they caused it to be transferred to Defendant Medium Rare N.V. ("Medium Rare") (whose sole member is Vuckovic (Defs. Mem. at 7)), and then re-transferred to defendant Slicemedia B. V. ("Slicemedia") (whose sole member, again, is Vuckovic) – thus converting what was Freeman's partnership interest into a Curacao corporate entity.  *Id.*; *see also* Compl., ¶ 135.

From late 2014 and into 2016, Freeman worked with an attorney for the partners named Stuart Hoegner to structure the Primedice business in a manner to effectuate compliance with US law.  See Affidavit of Christopher Freeman sworn to March 23, 2023 ("Freeman Aff."), ¶ 16.  In 2016, perceiving a conflict of interest between the partners, Hoegner resigned and referred a new attorney, Daniel Friedberg, who thereafter worked with Defendants Tehrani and Craven to effectuate the transfers of Primedice and Stake and create a structured enterprise of constituent entities not held in their name.  *Id.*, ¶¶ 26, 29-30.

Prior to September 27, 2019, it appears that no representation was made to the public about the ownership and operation of Primedice.  Freeman Aff., ¶ 64.  On or about that date, a new notation was added to the website explaining that Primedice was owned and

operated by Medium Rare, the same company that purportedly owns and operates Stake.com. *Id*. This transfer effectuated the conversion of Primedice assets into a Curacao corporation in 2019. By February 20, 2020, the website had again been updated to reflect that Primedice was owned by Slice Media N.V. *Id*. As detailed in the Amended Complaint, though, no such entity exists, and N.V. corporations and B.V. corporations are governed by different rules in Curacao. In fact, Primedice's ownership and operation information was not updated to reflect Slice Media B.V. until after the filing of the Amended Complaint. And, even still, "Slice Media B.V." is not an entity that exists – the only Curacaon entity that does exist is "Slicemedia B.V."

Thus, Defendants' superficial attempt to style Primedice as a simple New York partnership which destroys complete diversity with Freeman misses the mark. The argument ignores their own purposeful and shady structuring and Primedice's torturous bus ride, starting in Connecticut, with stops in New York (where Freeman's claims arose), Australia, and Cyprus, among other possible places, before parking, for now, in Curacao. *Id*., ¶ 64. Even so, while they no longer appear officially associated, and have preserved distance from legal and/or regulatory problems, Tehrani and Craven, now billionaires, orchestrated a willingness within the enterprise to permit them to reap for themselves the enormous financial upside from the enterprise's operations and associations.

Similarly, for nearly seven years now, Tehrani has maximized his disconnection from the United States and purposefully manufactured an ability to allege that he is floating "stateless" like a boat adrift at sea avoiding all ports. He claims an Australian domicile, but is resident based upon a visa issued under false pretenses due, among other things, to his awareness of Stake's criminal targeting of customers in nations which prohibit

3

online cryptocurrency gambling, and so is not lawfully domiciled there.  Visas required for residence in Australia require that applicants attest they are not aware of the existence of criminal activity in connection with any groups with which they have ever been associated. In a business largely condemned around the world, where evidence suggests if not establishes that the enterprise (and Tehrani) have authorized the use of persons, entities, mechanisms and technologies to avoid sovereign prohibitions, including the employment of agents to target customers in these banned places, such a declaration is untrue.

But, defendants go too far when they mockingly insist that "even a basic online search would have revealed" Stake's corporate structure.  Memorandum of Law in Support of Defendants' Motion to Dismiss the Complaint ("Defs. Mem."), at 5.  To be sure, defendants do not submit any organization chart or other evidence to dispel allegations of opacity.  Tehrani and Craven make no efforts to clarify how, as has been widely reported, they have managed to become billionaires despite the transfers of Primedice and Stake.com to companies in which they hold no clear interest.  *See* Defs. Mem. at 2 ("[t]he business operating Stake.com is now worth 'over $1 billion'").  The ultimate beneficial owners ("UBOs") of Stake.com and Primedice, though without any indicia of ownership, Tehrani and Craven have carefully structured a web of "constituent parts and facilitating mechanisms" (*see* Compl., ¶ 22) which leads to the reasonable conclusion, unresolvable at this stage, that Stake.com, like Primedice, was and is a jural enterprise or partnership.

Yet, having admitted that Primedice *was* a partnership when Freeman was actively involved, even though, like Stake.com, it was "a website" (Defs. Mem. at 6), Defendants now deny the allegations that Stake.com is or was a similar sort of enterprise or partnership.  Defs. Mem. at 7 ("Stake.com is not a legal entity, but rather a website . . . .").

The denial conflicts not only with the unresolved questions above, but also the fact that, in 2017, Defendants obviously felt the need – incongruously with its position that Stake was only a domain – to appoint for Stake.com a Chief Executive Officer in Vuckovic well prior to its transfer to a corporate entity.   Compl., ¶ 134.   Defendants' other articulated factual defenses – for instance, that the Complaint's assertions of betrayal and deceit are "fantasy," that Freeman contributed nothing to Primedice in the window between the fraud and Defendants' appointment of Vuckovic as CEO without any prior consultation, or that Freeman did nothing to advance compliance at Primedice – present unresolvable questions of fact.   That they also conflict with the allegations of the Complaint, they are by definition inappropriate for resolution here.   Compare Defs. Mem. at 1, 2, and 4 with Complaint, ¶¶ 9-12, 22, 55, 129. *See also* Freeman Aff., ¶¶ 45-46.

To avoid these thorny factual questions, as well as the full weight of the law's imposition on partners of the highest and most sensitive obligations to each other, Defendants fire a barrage of different legal defenses to avoid having to answer for their deceitful and bullying conduct.   Their efforts betray their transparent hope of extinguishing once and for all Freeman's rights in what he entrusted to them in reliance on their partnership.   Contending that the Complaint lacks subject matter jurisdiction, lacks personal jurisdiction, and even that it is not timely or sufficiently pleaded, Defendants seek to hit on something to bludgeon this case out of existence.   Yet, among other things, Defendants ignore the specific connection of their contacts with New York, their continuous targeting of the jurisdiction through the use of agents and otherwise, and Tehrani's fraudulent creation, and (unavailing) insistence of, his statelessness to deflect from his exposure to the troublesome legal environment he has knowingly and purposefully cultivated.   Defendants' further challenges to subject matter and

personal jurisdiction are meritless as explained below.  As Plaintiff's claims have also been timely brought under the laws of all jurisdictions pressed by Defendants, and satisfy all pleading requirements to establish sufficient legal claims, Defendants' motion should be denied and Plaintiff permitted to pursue these legitimate claims.

## Procedural Background

On August 17, 2022 Freeman filed his Complaint against Stake.com, Primedice, Edward Craven, and Bijan Tehrani.  On January 4, 2023, at Defendants' suggestion, Freeman amended his Complaint to add Slicemedia B.V., Medium Rare N.V., EasyGo Solutions Pty Ltd., MeBit.io, and Mladen Vuckovic as entities and individuals comprising the Stake.com enterprise.  The First Amended Complaint also includes additional facts pertaining to damage Defendants caused to Freeman's interest in Primedice and Stake, as well as Defendants' efforts to avail themselves of the United States market, including the State of New York.  On February 9, 2023, defendants moved to dismiss the Complaint.

## Background

On a motion to dismiss, the Court must afford the pleadings a liberal construction and accept that the facts alleged in the Complaint are true.  *See Abdullahi v. Pfizer, Inc.,* 562 F.3d 163, 169 (2d Cir. 2009).  The Plaintiff must be given the benefit of every reasonable inference that can be derived from the Complaint.  *Id.*  For the Court's convenience, we have endeavored to distill the necessary factual background of the case into a succinct timeline of events pertinent to the claims.  The chart below catalogues the relevant facts and occurrences for each of the Primedice and Stake businesses (the numbers in the parentheses refer to the numbered paragraphs in the operative Complaint, "CF" refers to the Affidavit of Christopher Freeman, and "MV" refers to the Declaration of Mladen Vuckovic).

6

| Primedice | Stake |
|---|---|
| 2012: Freeman conceives of the bitcoin gambling site that would become Primedice (34) | |
| Feburary 14, 2013: Freeman registers the domain Primedice.com (42) | |
| May 28, 2013: Primedice launches for public play (43). Freeman and Tehrani are Connecticut residents and Freeman is attending SMU in Dallas, Texas; and, Tehrani is attending college at Babson in Wellesley, Massachusetts; Craven resided in Australia. (CF 6) | |
| | August 25, 2013: Tehrani announces intentions by Primedice to launch roulette and blackjack cryptocurrency games along side "team gambling" and player vs player dice games. (84) |
| 2013-2014 Holiday: Freeman drops out of SMU and returns to Connecticut to focus all his energies on Primedice (CF 7) | |
| February 2014: Craven unilaterally redistributes 6% of Primedice away from Freeman (74, 75) | |
| October 2014: Tehrani meets with a New York law firm regarding a potential Primedice representation (CF 12). The law firm suggests shutting down the site. | |
| October 24, 2014: Attorney Stuart Hoegner is retained by the Primedice Partners. He is retained by all three partners. The retainer letter reflects Freeman's parents' address in Connecticut. Tehrani chooses to use Freeman's parents' address in Connecticut as his own. Craven's address is in Australia. (CF 14) | |
| | January 9, 2015: Tehrani announces that Primedice will add additional cryptocurrency games later in 2015 and notes Slots would be among the next games included. (89) |
| | March 1, 2015: Freeman shares PrimeSlots mock-up designs with Craven and Tehrani (90) |
| | Spring 2015: Freeman shares mock-up designs for Primedice Poker with Craven and Tehrani (95). Freeman, Tehrani and Craven discuss various names for the new venture including Freeman Sports, Whale Day, All-In and variants of Prime. (CF 18) |
| Summer 2015: Basic U.S. geoblocking is first activated and Primedice immediately loses half of its daily player revenue. They discuss increasing KYC of gamblers but do not institute. Craven's and | |

7

| | |
|---|---|
| Freeman's relationship is frayed by their opposing views on controls and other matters. (CF 16) | |
| August 2015: Tehrani moves to New York City (Tehrani Aff., 47) | |
| | July 30, 2015: Tehrani, through Freeman, asks questions of Hoegner about the full-service online casino project. (CF 20) |
| August 7, 2015: Primedice receives Cease and Desist letter from U.K. Gambling Commission which describes that the continued operation of the site constitutes a crime under U.K. law. (CF 22) | |
| | November 11, 2015: Tehrani announces that "Our effort has been shifted to the development of a new website" that will add various cryptocurrency games including poker. (100-104). Craven announces that the new site will cover "all aspects of gambling." (105) |
| December 6, 2015: Freeman moves to Washington, DC. Tehrani is still in New York and it continues to be a hub for PrimeDice activities, as well as the work Tehrani is doing on developing the new casino platform. (CF 23) | December 6, 2015: Freeman moves to Washington, DC. Tehrani is still in New York and it continues to be a hub for PrimeDice activities, as well as the work Tehrani is doing on developing the new casino platform. (CF 23) |
| | January 6, 2016: Freeman emails Hoegner questions about the developers on the bigger casino project. (CF 24) |
| April 11, 2016: Hoegner announced to Freeman that he believes a conflict has arisen between the three partners and he must quit the representation.  (CF 25) | April 11, 2016: Hoegner announced to Freeman that he believes a conflict has arisen between the three partners and he must quit the representation.  (CF 25) |
| April 24, 2016: Freeman and Tehrani meet with lawyer Daniel Friedberg in New York City about replacing Hoegner. Friedberg is retained. (CF 26-27) | April 24, 2016: Freeman and Tehrani meet with lawyer Daniel Friedberg in New York City about replacing Hoegner. Friedberg is retained.  Friedberg would continue to work with Stake. (CF 26-27, 29) |
| | June 29, 2016: Tehrani, from New York,  announces that Primedice is continuing to build a provably fair online casino. (107) |
| June-July 2016: Freeman and Tehrani discuss that Tehrani thinks perhaps they should sell the Primedice plarform and focus all efforts on the new casino gaming platform, and that he has not been satisfied with Craven and perhaps they should separate from him. (CF 38) | June-July 2016: Freeman and Tehrani discuss that Tehrani thinks perhaps they should sell the Primedice plarform and focus all efforts on the new casino gaming platform, and that he has not been satisfied with Craven and perhaps they should separate from him. (CF 38) |
| August 2016: Tehrani says he will go on a business trip to Australia. (CF 31) | August 2016: Tehrani says he will go on a business trip to Australia. (CF 31) |
| | August 20, 2016: Tehrani and Craven tell Freeman they intend to launch a *fiat* money casino and state there has been *no bitcoin casino* in development for at least 6 months. (112-115)   These statements were demonstrably false. Freeman is told he will have to |

|  |  |
|---|---|
|  | move to Australia to continue to work on the new projects. He refuses to move to work on a fiat-based project. (CF 35) |
| September 2016: The first efforts to formally account for Primedice begin. (207) |  |
| December 15, 2016: Freeman moves to New York City. (CF 42) |  |
|  | June 4, 2017: Users of Primedice are invited to try a pre-alpha version of Stake. (126) Freeman first learns that Stake is a cryptocurrency casino, similar to the prior designs he had worked on, and that it deployed an identical dice game to the one on Primedice, now called Stake Dice. (CF 43-44) |
| June 29, 2017: Mladen Vuckovic is named the CEO of Primedice. Vuckovic announces the "newest edition to [sic] the Primedice family" Stake.com. At launch, Stake.com is using Primedice's gambling license. (128-129, 131-133) | June 29, 2017: Mladen Vuckovic is named the CEO of Primedice. Vuckovic announces the "newest edition to [sic] the Primedice family" Stake.com. At launch, Stake.com is using Primedice's gambling license. (128-129, 131-133) |
|  | August 7, 2017: Stake becomes fully accessible to the public. (MV 11) |
|  | August 17, 2017: Vuckovic texts Freeman explaining that "stake has lots of us players that cant play on pd." (CF 53) |
|  | October 2017: Tehrani texts Primedice and Stake employees stating that players need to be moved to Stake because of the preferable house edge. (121) |
| October 24, 2017: Craven and Tehrani form Slicemedia B.V., a Curacao limited liability company, which now presents itself as the legal owner of Primedice. (135) | October 24, 2017: Craven and Tehrani form Slicemedia B.V., a Curacao limited liability company, which now presents itself as the legal owner of Primedice. (135) |
| November 13, 2017: Medium Rare N.V., a Curacao limited liability company, is formed, which presents itself as the legal owner of Stake.com. (144) At some point before the litigation is commenced, Defendants also convert PrimeDice into an entity owned by Medium Rare and then by Slicemedia. (CF 64) | November 13, 2017: Medium Rare N.V., a Curacao limited liability company, is formed, which presents itself as the legal owner of Stake.com. (144) At some point before the litigation is commenced, Defendants also convert PrimeDice into an entity owned by Medium Rare and then by Slicemedia. (CF 64) |
|  | October 19-20, 2019: Thread on Stake's own forum describing the lack of consequences for U.S. players accessing Stake via VPN. (187) |
|  | June 13-14, 2020: Thread on Stake's own forum where numerous users state that Stake "condones" U.S. players accessing the site via VPN. (188) |
| August 2020: Craven and Tehrani admit they are withholding from Freeman millions of dollars in altcoins. (213) |  |
|  | June 11, 2021: Stake announces a partnership with Aspire Global to begin fiat money gambling in the U.K. (166). Among the sites they registered for |

| | |
|---|---|
| | gambling are "Primeslots.com" and "Primeslots.co.uk." (168) |
| | May 4, 2021: Stake's own Telegram states "Political views sometimes get in the way of accessing websites" and advocates the use of mirror sites to access Stake. (190) |
| | July 2021: Reddit user respcare89 describes using a VPN to Canada to access Stake.com from New York. (180) |
| | September 10, 2021: Tehrani directly responds to a forum user explaining that his cashout values are incorrect because the user is utilizing a VPN. (191) |
| | October 2021: Reddit user potatoshark43 describes using a VPN to Canada to access Stake.com from New York. (180) |
| | November 30, 2021: Great Britain Gambling Commission fines Aspire Global for violations of anti-money laundering regulations. (167) |
| | December 16, 2021: Stake goes live with fiat money gambling in the U.K. through new partner TGP Europe. (171) |
| | August 4, 2022: Stake launches Stake.us, purportedly a "social gaming casino," which is announced thanks to a meme of Spongebob SquarePants burning a note that says "Stake.com is not available in the US." (197-199) |
| | September 19, 2022: Stake and partner Drake host a premiere party for the film Amsterdam in New York City. (182) |

Each of the facts above from the Complaint and affidavits, must be treated as true at this stage of the litigation. *Abdullahi*, 562 F.3d at 169. The others are supported by the documents attached to the Affidavits submitted in Support of Plaintiff's Response.

## Argument

### I.   This Court Has Subject Matter Jurisdiction Over the Claims

A. Tehrani Is Not Legally Domiciled Abroad and Does Not Qualify For Any "Stateless" Exception to Diversity Jurisdiction

Defendants first argue that the Court lacks subject matter jurisdiction over claims against Tehrani and Primedice because Tehrani, though an American citizen, is not a

citizen of any state because he is domiciled in Australia.  Defs. Mem. at 11.  Defendants contend that that circumstance means that Tehrani is "stateless" which qualifies as a jurisdictional exception to 28 U.S.C. § 1332 requiring his dismissal.  *Id.* (citing *Force v. Facebook, Inc.*, 934 F.3d 53, 74 (2d Cir. 2019)).  Defendants argue that the same is true for partnerships in which Tehrani is a partner, including Primedice, because partnerships take the citizenship of all of its partners for diversity jurisdiction purposes.  *Id.*

    The pleaded (and evidentiary) facts are that Tehrani left the United States, over six years ago in 2016, solely to pursue in a foreign country activity which is illegal in the U.S. and in most countries around the world.  Indeed, Tehrani is aware of orders issued to Primedice and to Stake.com that they cease and desist from gambling activity in England and France, and that online cryptocurrency gambling activities are outlawed even in Tehrani's purported domicile in Australia.  *See* Affidavit of Simon Lachere sworn to March 22, 2023 ("Lachere Aff."), ¶¶ 2-5; Affidavit of Glenn Ferguson sworn to March 23, 2023 ("Ferguson Aff."), ¶¶ 51-60, 62 Freeman Aff ¶ 22.  The U.K. Gambling Commission wrote Tehrani directly to provide notice of what "appears a criminal offence" under Section 33 of the U.K. Gambling Act of 2005.  Ferguson Aff., ¶ 52.  A French criminal statute subjects "organized groups" who offer online gambling to the public to penalties of seven years imprisonment, and in 2021 a French civil court issued a ruling against Medium Rare in favor of the French Gambling Authority for offering online gambling services to the French public which injunction Medium Rare continues to avoid.  Lachere Aff., ¶¶ 10-11.  Despite these legal prohibitions, as established in the Complaint, Stake.com continues to target customers in those jurisdictions, using agents recruited to push gambling activity in prohibited jurisdictions, authorizing the public dissemination of information describing to customers

how to get around Stake's own blocking technologies, and establishing "mirror" sites to accomplish the same purpose of permitting gambling in jurisdictions where it is legally prohibited, including the United States. *See* Compl., ¶¶ 181, 184-186. Plaintiff's Complaint even establishes, for pleading purposes, that Stake's attempt to position itself as innocently offering only a "social" casino – that is, a site offering games of chance wagering only fake currencies merely for social purposes – is belied by its own "end around" techniques whereby those fake "Stake dollars" can be exchanged for real cryptocurrency. *See* Compl., ¶¶ 200-202.

Notably, these carefully designed methods, by which Stake affirmatively reaches out to and engages a vast audience to gamble online in contravention of laws against it in the United States and other countries, have jettisoned compliance features Freeman had helped install into the Primedice game. *See* Freeman Aff. ¶¶ 53-54. Stake's illegal approach is the very method which has permitted its largely outlawed technological gaming enterprise to flourish to the extent it has. In this way, Stake has reaped a windfall. Its intricately orchestrated efforts have substantially enriched Tehrani (and Craven), turning them both into 30 year old billionaires even though, inexplicably, they no longer have any indicia of ownership. Nevertheless, the effect of Stake's illegality, unfortunately for Tehrani, is that it renders his claimed domicile in Australia unlawful.

Under 28 U.S.C. § 1332, "United States citizens who are domiciled abroad are neither citizens of any state of the United States nor citizens or subjects of a foreign state, and § 1332(a) does not provide that the courts have jurisdiction over a suit to which such persons are parties." *Force v. Facebook*, 934 F.3d at 74 (quoting *Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 68 (2d Cir. 1990)). The linchpin of this rule is that a United States citizen be "domiciled abroad." It is well established that one establishes a new legal domicile when he

or she (i) takes up residence in a new jurisdiction, and (ii) has the intention to remain there. *See Sun Printing and Publishing Assn. v. Edwards*, 194 U.S. 377, 383 (1904). But, one cannot establish an intention to stay where he or she is not permitted to be. *See Lok v. Immigration and Naturalization Service*, 681 F.2d 107, 109-10 (2d Cir. 1982) ("Lok established *lawful* domicile only when his intent to remain was legal under the immigration laws") (emphasis in original) (citing *Elkins v. Moreno*, 435 U.S. 647, 665-68 (1978)). Put another way, as a matter of law and fact, one cannot establish a personal intention to stay – required to effectuate a change in legal domicile – where staying would contravene that jurisdiction's laws.

In October 2022, Tehrani declared publicly that he hopes to be an Australian citizen before Fall 2023. *See* Ferguson Aff., ¶ 23 (in an article featuring the richest young Australians, Tehrani was quoted as saying that he "hopes to gain Australian citizenship" in time to be included in the 2023 list of young, rich Australians). The article confirms the near certainty that, if not already an Australian citizen, Tehrani resides in Australia by grace of a visa issued by the Australian government. Ferguson Aff., ¶¶ 16, 21, 23 (non-citizens can stay in Australia under temporary or permanent visas). If found to be residing in Australia without a valid visa, a non-citizen will be asked immediately to depart the country voluntarily or be detained pending an arranged departure. *Id.*, ¶¶ 74-75. The same deportation effect will transpire if one is found to possess a visa obtained through fraud or misrepresentation. *Id.*

In Australia, visas are issued after the government's approval of an application which includes an applicant's responses to a series of written questions. *Id.*, ¶ 38. These questions include an inquiry requiring the applicant to certify that he has not been "associated with a person, group or organisation" that has been involved in criminal conduct. *Id.*, ¶ 39 ("Has any applicant ever been associated with a person, group or organisation that has been

13

or is involved in criminal conduct?").  Applicants are also required to declare that they have read and understood the application, have provided complete and correct information in the application, and are under a continuing obligation to update the information provided in the application.  *Id.*, ¶ 41.  Having received directly the notice of criminality sent to him by the U.K. Gambling Commission referenced above, if not of the French court's decision and applicable French criminal statute, Tehrani has been in no position to deny an association with an organization that has been involved in criminal conduct.  Further, attorneys retained to assist the partnership affirmatively notified Tehrani and Craven that online cryptocurrency gambling was not legal in the United States and elsewhere.  Freeman Aff., ¶¶ 13, 16.  Based on these facts, as well as having authorized the circumvention and avoidance of technologies implemented for compliance with sovereign laws to his own enrichment, Tehrani could not have truthfully answered questions on his visa application.  *See* Ferguson Aff., ¶ 71.

    In such circumstances, Tehrani is not lawfully domiciled in Australia.  *See Lok v. Immigration and Naturalization Service*, 681 F.2d at 109-10 (distinguishing between lawful and unlawful domicile).  Possibly an issue of first impression, as we have not found cases addressing the precise issue, it remains true as a matter of logic and coherence that, if not lawfully domiciled in Australia, Tehrani cannot be said to be a "stateless" American citizen who is "domiciled abroad."  *Force*, 934 F.3d at 74-75 (quoting *Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 68 (2d Cir. 1990)).  Tehrani would have no basis to make such a claim.  *Cf.* 8 U.S.C. § 1182(a)(6)(C)(i) (defining among those deemed "inadmissible" into the United States anyone "who, by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa . . . or admission . . . ."); Affirmation of William B. Fleming dated March 23, 2023 ("Fleming Aff."), Exs. C, D (annexing decisions in *Matter*

*of A.J. Valdez and S. Valdez*, 27 I&N Dec. 496 (BIA 2018) (same); *In re Siaosi Fisiimaile Koloamatangi*, 23 I&N Dec. 548, 551 (BIA 2003) ("alien is deemed, *ab initio*, never to have obtained lawful permanent resident status once his original ineligibility therefor is determined in proceedings") (emphasis added)).

    B.  <u>Freeman's Citizenship Does Not Destroy Diversity With Primedice</u>

        Defendants next contend that Freeman's status as a Primedice partner destroys complete diversity because a partnership takes on the residences of its constituent partners. Their argument is without merit and overlooks critical pleaded facts.

        The Complaint alleges, and Defendants appear to concede, the partnership between Freeman, Tehrani, and Craven to create Primedice. Defs. Mem. at 1-2. Information contained in a website controlled by Defendants now reveals its entity Medium Rare assumed control over Primedice and its gaming license in or around September 2019. *See* Freeman Aff., Ex. C. Later, Defendants transferred Primedice and its license to Slicemedia. Compl., ¶¶ 309-316. Primedice is thus no longer a partnership but an asset of Defendant Slicemedia. Indeed, since September 2019, Defendants' conduct has been wholly inconsistent with a partnership – asserting dominion and control over Primedice, excluding Freeman from any aspects of it, stripping him of his partnership share, withholding and blocking him from information about Primedice's financial performance, and denying him any distributions from its profits.

        Primedice's current status as part of a Curacao corporation also masks the earlier efforts to remove it from both the US and the control of its US founding partners. In 2014, to address risks presented by the illegalities of Primedice's activities in the US and US tax laws governing their tax obligations, Tehrani consulted with a New York law firm which

15

concluded that Primedice needed to shut down.  Freeman Aff. ¶ 12.  On October 24, 2014, the three partners retained a different counsel, Stuart Hoegner, who subsequently worked with Freeman and the others to reduce their exposure.  *Id.*, ¶ 14.  From late 2014 through April 2016, Hoegner worked with them to establish US "geoblocking," which Freeman worked on and succeded in effectuating in the Summer of 2015.[1]  *Id.*, ¶ 16.  However, immediately upon Freeman's installation of geoblocking, Primedice's revenues decreased by 50% -- showing the importance of the US gambler base to the operation.  *Id*.  Freeman also sought to implement know-your-customer ("KYC") controls which created a tension with his partners because of their concerns that KYC controls might cause further loss of gambler-customers and profits. *Id*.  Freeman remained an advocate of controls, while Craven was opposed, and this proved to be part of the continuing adversarial relations between the two.  *Id.*

When Hoegner resigned based on a perceived conflict of interest between the three partners, they met with and hired an attorney referred by Hoegner named Daniel Friedberg.[2]  *Id.*, ¶¶ 25-27.  Their initial meeting with Friedberg was at the Bowery Hotel in Manhattan on April 24, 2016.  *Id.*, ¶ 26.  While Freeman had been very involved in the

---

[1]    By this time, Tehrani had finished university in Massachusetts and moved to New York City – where he operated Primedice – until the end of August 2016 when he paid a friend, Nick Howard, to move his belongings out of the City.  Freeman Aff., ¶ 39.  By December 2016, Freeman had also moved to New York and continued to do his work on Primedice from there, through the time he became aware that Stake.com had been launched in June 2017.  *Id.*, ¶ 42.

[2]    Incidentally, that attorney, Daniel Friedberg, has become well known because of his association with other cryptocurrency frauds including FTX and Ultimate Bet, and is currently under indictment for his legal work in connection with FTX.  On August 3, 2016, at precisely the time when Tehrani and Craven, who he was advising, affirmatively misled Freeman as to their intentions not to continue the partners' joint work on an online cryptocurrency casino, Friedberg joined the law firm Fenwick & West LLP which has offices in San Francisco and at 902 Broadway in New York City.  Fleming Aff., Ex. E.

consultations with Hoegner, it was Craven and Tehrani who directed and interacted with Friedberg and formulated structuring plans for what would become Stake.com.  *Id.*, ¶ 29. Friedberg initially was retained for Primedice, but continued to be counsel for Stake.com as it emerged from Primedice.  Freeman Aff. ¶ 30.

Shortly after Friedberg was retained, Tehrani left New York for Australia in August 2016 – from where he and Craven together perpetrated their deception of Freeman, communicating with him on August 20 that they had no intent to continue to pursue the full-scale online crypto-based casino gaming business, but instead planned to dedicate themselves to building a fiat-based business.  *Id.*, ¶ 35.  It was not until on or about June 4, 2017, when he saw the pre-alpha version of what became Stake.com, that Freeman first discovered his partners' misrepresentations and deceit about shelving their joint work developing the crypto-based casino.  *Id.*, ¶¶ 43-44.  On June 29, 2017, the Defendants did not simply announce the launch of "Stake.com," rather they announced the launch of the "newest edition to [*sic*] the Primedice family."  *Id.*, ¶¶ 45-46.  Then in 2019, despite having previously given Freeman further assurances they were still operating and supporting Primedice, Craven and Tehrani hid from Freeman that they had converted Primedice and his interests in it into the Curacao-based Medium Rare and then into Slicemedia.  *Id.*, ¶ 64.

As set forth in the Complaint, Defendants have wrested Primedice from Freeman and folded it into a new enterprise of constituent entities and facilitating mechanisms, including Medium Rare and Slicemedia which now own Primedice and Stake.com.  In the fullness of these and other facts, Primedice is no longer a simple New York partnership.  While it was indeed one at one point, Defendants have subjected Primedice to a complex journey.  Defendants intentionally jettisoned Freeman from the Primedice bus,

17

and then  proceeded to create a complex enterprise that is nearly indescribable today because of its opaqueness.  With the partnership extinguished, and Freeman severed from the new enterprise, Freeman does not destroy the complete diversity needed for diversity jurisdiction.

     C.  <u>Defendants Have Recognized and Treated Stake.com As A Legal Entity</u>

Defendants next contend that Stake.com is not a juridical entity.  Defs. Mem. at 13.  Here, to strategically position itself as not even an unincorporated entity, Stake.com characterizes itself as a mere "trade name" and "domain."  Defs. Mem. at 13.  But, as the Complaint plainly alleges, Stake.com is, and has held itself out publicly, as far more than that.  The Complaint alleges that Stake.com operated as an "association of constituent entities and individuals and facilitating mechanisms."  *See* Compl., ¶ 30.  Whether a partnership, an association in fact, or an enterprise, Stake.com has a separate jural existence, notwithstanding Stake.com's conclusory declarations to the contrary.

The facts alleged in the Complaint support this conclusion.  Stake.com has, at various times, had a CEO, entered into partnership agreements with celebrities, signed sponsorship agreements with individual athletes, professional sports teams, and international sports leagues, among numerous other active engagements.  On these facts, there is no basis at this preliminary stage to dismiss Stake.com as being "incapable of being sued."  Defs. Mem. at 13 (citation omitted). Since its enactment, the diversity statute has required complete diversity of citizenship to ground federal subject matter jurisdiction.  *See Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267 (1806).  Under decisional precedent, courts have considered artificial entities existing under state law in evaluating the threshold question of subject matter jurisdiction.  While courts now recognize corporations as the one form of artificial person which are citizens in their own right, other artificial entities are subjected to a subject matter

18

jurisdiction analysis which evaluates the citizenship of each of its members. *Carden v. Arkoma Associates*, 494 U.S. 185, 188-90 (1990) (citations omitted) (distinguishing "incorporated groups" from "common-law entities" and treating the latter, for purposes of subject matter jurisdiction, as akin to partnerships); *Sperry Products v. Association of American Railroads*, 132 F.2d 408, 410-11 (2d Cir. 1942) (Hand, J.) (for the purpose of lawsuits, the law regards partnerships and unincorporated associations as jural entities). But, other than the differences in how incorporated and unincorporated entities are evaluated for subject matter jurisdiction purposes, there is no doubt that the latter are considered jural entities.

## II.   Personal Jurisdiction Over Each of the Defendants Exists

While bearing the ultimate burden of proof on the issue, to defeat a motion to dismiss on personal jurisdiction grounds, "the plaintiff need only make a *prima facie* showing that the defendant is subject to the personal jurisdiction of the Court." *Weitz v. Weitz,* 85 A.D.3d 1153, 1154 (2d Dep't 2011); *Cornely v. Dyamic HVAC Supply, LLC,* 44 A.D.3d 986, 986 (2d Dep't 2007); *Matter of Renren Inc. Derivative Litig. v. XXX,* 2020 NY Slip Op 50588(U), ¶ 9, 67 Misc. 3d 1219(A), 127 N.Y.S.3d 702 (Sup. Ct. N.Y. Cty. May 20, 2020) (citations omitted) (cleaned up)).

As Defendants properly acknowledge, in a diversity case the Court may exercise personal jurisdiction to the same extent as the courts of general jurisdiction in the same state. *See*, *e.g.*, *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 124 (2d Cir. 2002). Where general jurisdiction cannot be established based on a defendant's continuous and systematic contacts with the state, New York's long-arm statute permits a court to exercise specific jurisdiction. "[A] court in New York may exercise personal jurisdiction over a non-domiciliary defendant where (i) the court has long-arm jurisdiction

over the defendant under CPLR 302, and (ii) the exercise of such jurisdiction comports with due process." *Williams v. Beemiller, Inc.*, 33 N.Y.3d 523, 528 (2019). The statute applies to any individual or corporate entity "who in person or through an agent . . . transacts any business within the state." CPLR § 302(a)(1). This is a "single act statute," meaning that "proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467 (1988) (citing cases); *accord Matter of Renren Inc. Derivative Litig.*, 67 Misc 3d 1219[A], 2020 NY Slip Op 50588[U] at *10.

      Here, Tehrani's and Craven's affirmative misrepresentations and omissions to Freeman in New York that they were terminating pursuit of the online casino on which they had been working served as a "single act" giving rise to Plaintiff's fraud and breach of fiduciary duty claims and their related claims for unjust enrichment and for an accounting. Also, Vuckovic nominally controlled Primedice as CEO when he transferred Primedice and its assets to a Curacaoan company, Slicemedia, which he also controlled when Freeman (a New York domiciliary) was stripped of any remaining access to Primedice's information and partnership profits, which facts ground claims against those two defendants. Vuckovic, Medium Rare, and Stake.com too, by causing Stake Dice to misappropriate and "palm off" Primedice's technology and unfairly compete against Primedice, damaged Freeman a New York resident. In light of the facts discussed above, viewed in the light most favorable to Plaintiff, there is a colorable basis, and indeed a substantial one, to conclude that Craven and Tehrani are subject to personal jurisdiction for their role in directing the conduct, as UBOs and controlling persons, against a known New York resident. Moreover, since Freeman was

a New York resident from December 2016 through December 2021, the conversion of his altcoins by Craven and Tehrani in August 2020 is an act by non-domiciliaries which caused injury to a New York resident which they should have reasonably expected to have consequences in the State. *See General Motors Acceptance Corp. v. Richardson*, 59 Misc. 2d 744, 749 (Sup. Ct. Mnr. Cty 1969) (applying CPLR 302(a)(3) to ground personal jurisdiction for a conversion claim).

Personal jurisdiction must also comport with due process. Due process requires that the defendant (1) have sufficient minimum contacts with New York such that a defendant should reasonably expect to be called into Court in the state and (2) that requiring a non-domiciliary to defend the action comports with traditional notions of fair play and substantial justice. *Matter of Renren*, at *10 (citing *LaMarca v. Pak-Mor Mfg. Co.*, 95 N.Y.2d 210, 216 (2000)). Minimum contacts are satisfied when a corporate defendant has purposely availed itself of the privilege of conducting activities in the forum state. *Id.* at *11.

The case is thick with New York contacts. Tehrani was a New York resident at the time of the first actionable conduct. Craven and Tehrani solicited and engaged in New York and continuously consulted with a lawyer, Daniel Friedberg, regarding the instant businesses, including, on information and belief, each of the entity defendants. Freeman Aff., ¶ 30. Tehrani (with Freeman) met with Friedberg at the Bowery Hotel in Manhattan. *Id.*, ¶ 26. Craven assumed the lead role on the legal consultations with him on corporate structuring of Primedice and Stake to distance them from the reach of US law. *Id.*, ¶ 30. As a function of that structuring, moreover, Vuckovic now owns Stake.com through his company Medium Rare and, though without any public ownership stake, Craven and Tehrani have made their fortune through it. *Id.*, ¶ 55. Defendants now derive revenue from players in New York,

including many who openly speak about their play in online forums.  *Id.*, ¶ 54.  The allegations establish that Stake targeted the US and New York markets as the most lucrative for its business.  *Id.*, ¶ .  Written co53mmunications from Vuckovic confirm his knowledge of Stake's lax blocking of US players compared with the vigor of blocking on Primedice.  *Id.*  In view of each defendant's clear connection to the Stake.com business, their substantial targeting of the New York market is germane to each.

　　　　　The pleaded facts and supporting materials also establish defendants' unremitting saturation of New York.  They have engaged in numerous acts within New York State to further projects including (1) the work of Tehrani and Freeman while they were New York residents, (2) hosting events that glamorize the brand in New York such as the Drake premiere afterpart, (3) having athletes support play on Stake.com while physically present in New York to promote events in New York, and (4) hiring a video designer named Nicola Scandiffio to perform work for Stake's benefit while in New York.  *Id.*, ¶¶ 65-68.  Defendants further solicit business and engage in persistent courses of conduct in New York through regular marketing via social media directed to New York, cross promotion with sports leagues, authorized directions on how to avoid Stake's blocking technologies, and boots-on-the-ground player recruiters.  *Id.*, ¶¶ 60-63.  These New York recruiters, who are paid agents, are directly supervised by Craven and paid to the level they are successful at develop customers, including New York where the market is most lucrative.  *See Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F. 2d 25, 29 (2d Cir. 1996) (one critical consideration for jurisdictional contacts is whether a defendant sends "payments [to an agent] into the forum state or subjects [the agent] to supervision by the corporation in the forum state").  There is little question that, through its agents, Stake and its various constituent entities have availed

themselves to business in New York through the hiring and payment of New York residents

and their deployment to recruit additional American players, including those in New York,

to play on Stake in subversion of New York laws.

This Court regularly applies the standard established in *Zippo Mfg. Co. v. Zippo

Dot Com, Inc.*, 952 F. Supp 1119 (W.D. Pa. 1997), when determining personal jurisdiction in

the internet context and, specifically, where a website is interactive.   *See Best Van Lines v.

Walker*, 490 F.3d 239, 251 (2d. Cir. 2007) (calling *Zippo* the "seminal authority regarding

personal jurisdiction based upon the operation of an internet site") (quoting *Toys "R" Us, Inc.

v. Step Two, S.A.*, 318 F.3d 446, 452 (3d Cir. 2003)).   The *Zippo* Court describes the following

standard for determing personal jurisdiction over the internet:

> At one end of the spectrum are situations where a defendant
> clearly does business over the Internet. If the defendant enters
> into contracts with residents of a foreign jurisdiction that involve
> the knowing and repeated transmission of computer files over the
> Internet, personal jurisdiction is proper. At the opposite end are
> situations where a defendant has simply posted information on
> an Internet Web site which is accessible to users in foreign
> jurisdictions. A passive Web site that does little more than make
> information available to those who are interested in it is not
> grounds for the exercise [of] personal jurisdiction. The middle
> ground is occupied by interactive Web sites where a user can
> exchange information with the host computer. In these cases, the
> exercise of jurisdiction is determined by examining the level of
> interactivity and commercial nature of the exchange of
> information that occurs on the Web site.

*Zippo,* 952 F. Supp at 1124.

This standard has been regularly applied by New York Courts.   *See*, *e.g.*,

*Citigroup Inc. v City Holding Co.*, 97 F. Supp.2d 549, 565 (S.D.N.Y. 2000).   The hinge point of

the standard is the level of interactivity of the website.  "At the very least, the interactivity of

the [defendant's] site brings this case within the middle category of internet commercial

activity. Moreover, the interaction is both significant and unqualifiedly commercial in nature
and thus rises to the level of transacting business required under CPLR § 302(a)(1)." *Best Van
Lines*, 490 F.3d at 252.  Here, Stake.com has chosen both through its targeting of the US via
Stake.com and additionally through its deployment of Stake.us – which accepts fiat currency
in exchange for "Stake Cash" that can be used to play on the site and eventually exchanged
for cryptocurrency winnings – are unquestionably interactive and commercial.[3]  Accordingly,
New York can properly exercise jurisdiction over Tehrani, Craven, and the various other
defendants for the actions taken by Stake and Primedice to avail themselves of New York.

## III.   Jurisdictional Discovery Should Be Permitted as Defendants Exclusively Possess Pertinent Factual Information

On questions concerning the existence of subject matter and personal
jurisdiction, it is appropriate for courts to consider both pleaded facts and supporting
materials.  *See Blockbuster, Inc. v. Galeno*, 472 F.3d 53, 56-57 (2d Cir. 2006) (subject matter
jurisdiction); *Ball v. Metallurgie Hoboken-Overpelt*, 902 F.2d 194, 197 (2d Cir. 1990) (personal
jurisdiction).  "Where . . . the district court relies solely on the pleadings and supporting

---

[3]     There are broader policy considerations to consider here as well.  New York
has long held a strong "interest in maintaining and fostering its undisputed status as the
preeminent commercial and financial nerve center of the Nation and the world."  *Ehrlich-
Bober & Co. v. Univ. of Houston*, 49 N.Y.2d 574, 581 (1980) (citations omitted).  This interest
includes Cryptocurrency.  The New York City Bar Association recently commissioned a task
force to propose amendments to New York's Uniform Commercial Code in order to
"effectively govern" digital asset trading such as those involving cryptocurrencies, crypto-
tokens, electronic money, electronic promissory notes, and bills of exchange.  *See* New York
Law Journal, "City Bar Proposes Amending Commercial Code To Take Aim at Crypto,"
February 23, 2023.  This matters because defendants are attempting to avoid the usual streams
of commerce both in their obfuscatory corporate structure and also in their near-exclusive
reliance on cryptocurrency.  New York State's increasing concern about cryptocurrency
transactions and intended effort to rewrite the State's laws to better "govern" cryptocurrency
reflect the intensified interest of this jurisdiction in such matters.

affidavits, the plaintiff need only make a prima facie showing of jurisdiction." *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994); *Blockbuster*, 472 F.3d at 57. A prima facie case of personal jurisdiction requires nonconclusory fact-specific allegations or evidence showing that activity sufficient to confer jurisdiction has taken place. *Chirag v. MT Marida Marguerite Schiffarhts*, 604 Fed. Appx. 16, 19 (2d Cir. 2015).

To the extent that the Complaint's assertions and the supporting materials submitted in opposition to the instant motion are not already sufficient to establish both subject matter and personal jurisdiction, the Court should allow jurisdictional discovery to permit Plaintiff access to the full set of information needed to meet his burden of establishing the existence of that jurisdiction. "[W]here jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits." *LeBlanc v. Cleveland*, 198 F.3d 353, 356 (2d Cir. 1999); *Filetech S.A. v. France Telecom S.A.*, 157 F.3d 922, 932 (2d Cir. 1998). The discretion vested with courts to permit jurisdictional discovery towards that end is broad. *See Burnett v. Al Baraka Inv. & Dev. Corp. (In re Terrorist Attacks)*, 349 F. Supp. 2d 765, 811 (S.D.N.Y. 2005) (citing *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003) (when a defendant challenges the factual basis of a court's subject matter jurisdiction, the court must "go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon a motion to dismiss") (citations omitted)). For personal jurisdiction questions too, the Court has "considerable procedural leeway" and "may determine the motion on the basis of affidavits alone, or it may permit discovery in aide of the motion, or it may conduct an evidentiary hearing on the merits of the motions." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013). The pleadings and affidavits are construed in the light most favorable to

25

plaintiff, with all doubts resolved in plaintiff's favor. *Southern New England Telephone Co. v. Global NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010).

In addition to questions surrounding his visa application(s), it is unclear, as a factual matter, whether Tehrani has yet been granted citizenship in Australia, whether he has taken steps to renounce his U.S citizenship, whether he is subject to a foreign state,[4] or whether and to what extent he has travelled outside of Australia.[5]  Ferguson Aff., ¶¶ 6, 9, 15; *see also* 28 U.S.C. § 1332 (authorizing federal court jurisdiction over cases between citizens of a State and "citizens or subjects" of a foreign state).  All information pertinent to answering those questions is known exclusively by him, and the answer to that question cannot be discovered by outsiders absent his personal consent.  Ferguson Aff., ¶¶ 10, 15, 17.  Thus, to the extent that the factual circumstances described above do not suffice to establish subject matter jurisdiction, jurisdictional discovery on these and other relevant questions should be permitted.

Accordingly, if needed, Freeman requests sufficient jurisdictional discovery that includes, without limitation:

1. Interrogatories to Tehrani aimed at discovering the extent and nature of his residence in Australia;

2. Discovery requests to ascertain the status of any citizenship application(s), visa application(s), Australian tax status and filings, resident or citizenship status, licenses and ownership of assets, renunciation of American

---

[4]      A subject of a foreign state has been defined as "one who owes allegiance to a sovereign and is governed by that sovereign's laws." *JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure Ltd.*, 536 U.S. 88, 99 (2002).

[5]      This last point is significant because, to the extent any visa had been discovered to have been obtained due to Tehrani's material misrepresentations and/or omissions, he would not have been permitted re-entry into Australia following any international travels. Ferguson Aff., ¶ 16.

citizenship, and passport information, all of which is in Tehrani's exclusive possession (*see* Ferguson Aff., ¶¶ 10, 15, 17).

3. Document and deposition subpoenas to Tehrani's family, friends, and other relevant personal and institutional contacts to determine information relating to passports, driver's licenses, bank accounts and other financial institution relationships, immigration filings and status, payments for services, tax status and filings, lease or mortgage information, and representations made in connection with his personal and business taxes, among other relevant information;

4. Document production and an oral deposition from Tehrani directly regarding those same issues and his citizenship generally;

5. Third-party discovery to the United States and Australian governments concerning information relating to Tehrani's citizenship, tax status and filings, licenses, visas, and existing investigations into such matters;[6]

6. Discovery pertaining to Tehrani and Craven's relationships with the other Defendants, including their corporate formation, ownership, and distributions of their profits.

## IV.   Freeman's Causes of Action Are Timely Asserted

Under New York law, the statute of limitations for fraud is six years. *See* CPLR 213(8) ("an action based upon fraud;  the time within which the action must be commenced shall be *the greater of* six years from the date the cause of action accrued or two years from the time the plaintiff or the person under whom the plaintiff claims discovered the fraud, or could with reasonable diligence have discovered it") (emphasis added).  Further, the Complaint alleges that Defendants' deceit was central to each of the other causes of action.  In such cases

---

[6]     Defendants' last argument on subject matter jurisdiction – that the Complaint fails to allege all of Defendants' citizenship – does not request dismissal.  Nor would they have a basis to request dismissal.  Defendants have filed a Statement pursuant to Fed. R. Civ. P. 7.1 that certifies the citizenship of each Defendant. *See* ECF Doc. No. 30.  The Court thus has this information for purposes of evaluating Defendants' motion to dismiss on subject matter jurisdiction grounds.  In any event, such shortcomings can be cured even as late as on appeal by amending the Complaint (*see First Nat'l Bank of Cincinnati v. Pepper*, 454 F.2d 626, 636 (2d Cir. 1972)), or by removal of nondiverse parties.  *See Leveraged Leasing Admin. Corp. v. PacifiCorp Capital, Inc.*, 87 F.3d 44, 47 (2d Cir. 1996).  Plaintiff is willing to amend the Complaint to provide this detail if deemed necessary.

the statute of limitations for those causes of action are also six years. *See Spitzer v. Schussel*, 792 N.Y.S.2d 798, 803 (N.Y. Sup. Ct. 2005).

    A.  <u>Fraud</u>

        Loose with the facts alleged, Defendants seek to construct a false scenario to harvest a benefit (to them) from an application of CPLR 202. Pertaining to any "[c]ause of action accruing without the state[,]" CPLR 202 imposes upon a plaintiff the requirement to bring his claims prior to the expiration of the statute of limitations in the jurisdiction where the claims "accrued." *See* CPLR 202. Under New York law, a cause of action accrues where a plaintiff resides when he sustains his injury. *See, e.g., Global Financial Corp. v. Triarc Corp.*, 93 N.Y.2d 525, 529-30 (1999). Here, the claims indisputably accrued within the state. The first possible moment when Freeman sustained his injuries from Defendants' fraud occurred on June 29, 2017. On that date, Defendants soft launched Stake.com as an internet cryptocurrency gambling site and announced, publicly and as an undisclosed surprise to Freeman, the appointment of non-partner Vuckovic as CEO of Primedice. Freeman was a resident of New York by then, having moved to New York on December 16, 2016, following the expiration of his one-year lease and residency in Washington, D.C. *See* Freeman Aff., Ex. A.

        Further, it is likely that that harm was not fully sustained until a date later than June 29, 2017. Discovery of facts currently in Defendants' exclusive possession will be necessary to establish the precise date(s) of the harm caused to Freeman. However, for present purposes of this motion, that factual issue need not be resolved. Freeman was a New York resident at the time Defendants acted to change the structure and control over Primedice to Freeman's exclusion, and when they revealed their deception of Freeman regarding

28

Stake.com.  Defendants' insistence that Washington, D.C. is the jurisdiction supplying the law to be applied for this statute of limitations analysis is thus in error.

Even if not an error, the three-year period within which to bring a claim for fraud runs from the date on which the fraud "was or should have been discovered" through a plaintiff's due diligence.  *Hawkins v. Greenfield*, 797 F. Supp. 30, 33 (D.D.C. 1992).  This is an issue which is not appropriate for resolution at this preliminary stage of the case for two reasons.  First, *Hawkins*, cited by Defendants, clarifies that, under District of Columbia law, Defendants would bear the burden of proof on that issue, and Defendants' instant motion makes no attempt to do so.  *Id.*  Second, as *Hawkins* dispositively establishes, the issue would be one "for the jury to resolve" after trial.  *Id.*  (the question of "[w]hen the alleged fraud was or should have been discovered depends on the facts of the particular situation . . .and is an issue for the jury to resolve") (citations omitted); *see also Interdonato v. Interdonato*, 521 A.2d 1124, 1135-36 (D.C. Ct. of App. 1987) (reversing grant of summary judgment where the presence of questions of fact on the issue of discovery of fraud precluded summary applicability of the statute of limitations).

B.  Breach of Fiduciary Duty

Further, Plaintiff's breach of fiduciary duty claim is itself subject to a six-year statute of limitations because it is significantly predicated on Defendants' misrepresentations and omissions.  *See Ingham v. Thompson*, 88 A.D.3d 607, 608 (1ˢᵗ Dep't 2011) (applying six year statute where fraud claim was "not merely 'incidental' to the breach of fiduciary duty cause of action"); *Spitzer v. Schussel*, 792 N.Y.S.2d at 803.  The claim is independently subject to a six-year statute of limitation because it seeks equitable relief.  *See Kaufman v. Cohen*, 307 A.D.2d 113, 118 (1ˢᵗ Dep't 2003); CPLR 213(1); *see also Ingham*, 88 A.D.3d at 608 (noting that

29

equitable estoppel might apply to toll the statute of limitations where, as is the case here, defendants have "made any affirmative representations or had a fiduciary duty to plaintiff"). Plaintiff's first two causes of action – for fraud and breach of fiduciary duty – seek remedies designed to recover his rightful share of partnership profits.  *See* Complaint, ¶ 230 (relief relating to the denial of his participation), ¶ 243 (restitution and disgorgement).  Defendants' motion acknowledges that the relief of restitution and disgorgement sought on Plaintiff's claim for breach of fiduciary duty and duty of loyalty are equitable remedies.  *See* Defs. Mem. at 28 (restitution and disgorgement are "technically equitable remedies").  Plaintiff has also brought equitable causes of action for unjust enrichment and for an accounting, the latter of which is needed to quantify the restitution and disgorgement sought and is particularly applicable to partnership disputes, as here.

Indeed, concepts of an equitable accounting lie at the very heart of Plaintiff's claims.  In violating their obligations of loyalty and fidelity as Freeman's partners, in their alleged deceit and in other ways, Tehrani and Craven, and the other Defendants who have acted with knowledge of the transgressions of Plaintiff's rights as a partner and fiduciary, have shrouded in uncertainty the harms caused to those rights.  An obligation to account flows directly from such breaches of partnership obligations. *Marvin v. Brooks*, 94 N.Y. 71, 81 (1883) ("[a]n accounting is always proper in cases of partnership . . .").  An accounting is an equitable claim (*Estate of Calderwood v. ACE Group Intl. LLC*, 157 A.D.3d 190, 199 (1st Dep't 2017)), which is not changed by the fact that, ultimately, an accounting leads to the payment of money. *See Ederer v. Gursky*, 9 N.Y.3d 514, 525 (2007) (following an accounting, "the plaintiff

then gets an order directing payment of the sum of money found due"). [7]  In that circumstance,

New York's equitable tolling doctrines operate to toll the statute of limitations for a breach of

fiduciary duty claim which seeks either equitable relief or a mix of equitable and legal relief,

until Defendants openly repudiate or otherwise terminate the fiduciary relationship with

Plaintiff.  *See Lemle v. Lemle*, 2017 NY Slip Op 30811 (N.Y. Sup. Ct. 2017) (citing *Transp.

Workers Union of Am. Local 100 AFL-CIO v Schwartz,* 17 A.D.3d 218 (1st Dep't 2005) (applying

this special tolling rule to equitable claims, as well as to claims for monetary damages);  *People

v. Ben,* 55 A.D.3d 1306, 1308 (4th Dep't 2008) (same));  *see also People v. Trump*, 62 Misc.3d

500, 507-08 (N.Y. Sup. Ct. 2018) (tolling for the period until the fiduciary has terminated or

repudiated the relationship available where "a mix of equitable relief and monetary damages

are sought").

       To avoid New York's equitable tolling doctrines, Defendants request that the

Court make a determination that the restitution and disgorgement remedies sought here are

only "technically" equitable and are legal in "reality," and that Plaintiff's further equitable

claims for unjust enrichment and an accounting are duplicative of legal claims.  Defs. Mem.

at 28 (citing *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 139-40 (2009)).

---

[7]       Further, the instant case presents a solid example of a scenario where the
equitable remedy of a constructive trust might be appropriate against Defendants, and
especially Medium Rare and/or Slicemedia, as the transferees and beneficiaries of Primedice.
Where, as is present in this case, Tehrani and Craven expressed to Freeman that they were
still supporting his rights in Primedice while hiding the fact that they had caused Primedice
to be transferred to Vuckovic's Medium Rare before it was transferred again to Vuckovic's
Slicemedia, Tehrani, Craven, and presumably Vuckovic, have been unjustly enriched in
violation of fiduciary obligations owed to Freeman, which is paradigm conduct warranting
the imposition of an equitable constructive trust.  *See, e.g., Sharp v. Kosmalski*, 40 N.Y.2d 119,
121 (1976).  All of this underscores the equitable dimension of the relief sought on Plaintiff's
claims.

The Court in *IDT,* which addressed claims that defendant had presented false evidence in the parties' pre-existing full arbitration proceeding which "affect[ed] the panel's assessment of IDT's damages," not surprisingly determined that its equitable claims were "incidental" to the legal relief sought. *IDT Corp.*, 12 N.Y.3d at 138-39. Here, though, Plaintiff's fiduciary duty claim seeks restitution and disgorgement, not compensatory damages, and Plaintiff has brought an unjust enrichment claim which also seeks disgorgement. Further, the claim for an equitable accounting is inextricably addressed to the parties' relationship as fiduciaries. *See* Complaint, ¶ 304 ("[a]s fiduciaries, Defendants Tehrani and Craven can and should be compelled to account for their conduct"). As previously discussed, the claim seeks to get Defendants to account for information in their exclusive possession which will reveal the sums they are holding belonging to Freeman generated from the financial performance of the parties' partnership. *Houbigant, Inc. v. Deloitte & Touche*, 303 A.D.2d 92, 97–98 (1ˢᵗ Dept. 2003) (denying motion to dismiss where circumstances of the claim "are peculiarly within the knowledge of the party against whom the [claim] is being asserted") (quoting *Jered Contr. Corp. v. New York City Tr. Auth.*, 22 N.Y.2d 187, 194 (1968)).[8]

In any event, as stated above, even if equitable tolling were deemed not available, the statute of limitations is six years on these particular facts where Defendants'

---

[8]   Defendants' suggestion that Plaintiff knows all this information because he "is in charge of the accounting" ignores that that "accounting" (i) predates 2020 when he was cut off from access, and (ii) is based on a partnership practice where the partners were free to withdraw cryptocurrency, without advance permission, knowledge, or documentation, at their own discretion. For years, the partners had *no* bookkeeping whatsoever and tried to reconcile the books years later. Complaint, ¶¶ 207-209. It also does not include any aspect of the partnership's financial performance after August 2020, including especially the time frame after Defendants severed Plaintiff's access to Primedice records. Furthermore, it obviously does not include any information regarding the billions of accretion due to Stake.com's financial performance, to which Plaintiff was never given any access.

misrepresentations and omissions served as different breaches of their fiduciary relationship with Freeman.  As here, where an allegation of fraud is "not merely 'incidental'" to a breach of fiduciary duty claim, courts have applied a six-year statute of limitations under CPLR 213(8).  *Ingham*, 88 A.D.3d at 608; *IDT Corp.*, 12 N.Y.3d at 139 (citing *Kaufman v. Cohen*, 307 A.D.2d 113, 119 (1st Dep't 2003)).

      C.  <u>Other Causes of Action</u>

            For the same reason, Plaintiff's other causes of action are all timely filed under New York law because they, too, are based on Defendants' fraud.  *See* CPLR 213(8); *Ingham*, 88 A.D.3d at 608; *IDT Corp.*, 12 N.Y.3d at 139; *Kaufman v. Cohen*, 307 A.D.2d at 119.  The Complaint's allegations of misrepresentations, omissions, and general deceit exhibited by Defendants towards Plaintiff establish that a six-year statute of limitations is properly applied to Plaintiff's claims.[9]  *See also Kermanshah v. Kermanshah*, 580 F. Supp. 2d 247, 263 (S.D.N.Y. 2008) (New York's statute of limitations for unjust enrichment is six years, and begins to run "upon the occurrence of the wrongful act giving rise to a duty of restitution"); *Kohan v. Nehmadi*, 130 A.D.3d 429, 429 (1st Dep't 2015) (the statute of limitations for a cause of action for an accounting is six years) (citing CPLR 213(1)); *IDT Corp.,* 12 N.Y.3d at 139 (where "the relief sought is equitable in nature, the six-year limitations period of CPLR 213 (1) applies. [W]here an allegation of fraud is essential to a breach of fiduciary duty claim, courts have applied a six-year statute of limitations under CPLR 213 (8))") (citations omitted).

---

      [9]     Also, Plaintiff's claim of conversion of cryptocurrency is timely because it was brought only two years after discovery in August 2020 when Defendants admitted dominion over, withholding of, and refusal to return, Plaintiff's altcoins.

**V.    The Complaint States Plausible Claims**

The well-established rule for a pleading is that it "raise a right to relief above the speculative level" by asserting factual allegations "plausibly suggesting" entitlement to relief.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Here, the Complaint sets forth that Freeman's partners have unlawfully denied his benefits of the partnership for years until the point, in August 2020, when they severed him completely.  Defendants' conduct included acting without consultation or consent when transferring ownership of Primedice and its gaming license and other assets first to Medium Rare on or after September 2019, and subsequently to Slicemedia.  Complaint, ¶¶ 135-38. These successive acquisitions were accomplished under the executive leadership of Defendant Vuckovic who was publicly announced, on June 29, 2017, as the Chief Executive Officer of both Primedice and, later, of Stake.com as well, and who exclusively owns Medium Rare and Slicemedia.  Compl., ¶¶ 29(a), 129, 134; Declaration of Mladen Vuckovic sworn to February 9, 2023 ("Vuckovic Decl."), ¶¶ 3, 7.  Vuckovic also serves as CEO of defendant MeBit.io and affiliated entity Provably Fair.  Compl., ¶ 29(a).  Vuckovic's own statements that same day confirmed that Stake.com was created and being launched as a new member of "the Primedice family."  *Id.*, ¶ 132. Vuckovic (who has been associated with Primedice since 2013 and so is fully aware of Freeman's status as a partner), and Tehrani and Craven (who appear to be Primedice's and Stake.com's ultimate beneficial owners, having personally reaped billions of dollars from the operation despite having no indicia of ownership), each acted with

34

knowledge they were transgressing Freeman's partnership rights.  *Id.*, ¶ 130.  Defendant Easygo, which services both Primedice and Stake.com by hiring the employees for both among other contributing actions, was created with Primedice assets.  *Id.*, ¶¶ 163-64. Plaintiff's claims all plausibly arise out of, and are predicated upon, these facts.

## VI.    Plaintiff's Alternatively Pleaded Claims And Remedies Are Not Duplicative

Defendants next seek dismissal of Plaintiff's claims as improperly duplicative. Defs. Mem. at 34-36.  Under the liberal pleading standards applicable to New York legal claims (*see* CPLR 3026), it is well established that pleadings can assert claims in the alternative, even if inconsistent.  *Cohn v. Lionel Corp.*, 21 N.Y.2d 559, 563 (1968) ("[u]ndeniably, a plaintiff is entitled to advance inconsistent theories in alleging a right to recovery"); *see also* CPLR 3014 ("causes of action or defenses may be stated alternatively or hypothetically"), 3017 ("[r]elief in the alternative or of several different types may be demanded").  While claims may be dismissed as duplicative where the failure or success of one will necessarily result in the failure or success of the others (*see, e.g., Clark-Fitzpatrick, Inc. v. Long Is. R.R. Co.,* 70 NY2d 382, 388-389 (1987)), no such dismissal is appropriate where, as here, the outcome of one claim does not have a concomitant effect on the other claims.  *See, e.g., Shear Enters., LLC v. Cohen,* 189 A.D.3d 423 (1st Dep't 2020); *Sternberg, Inc. v. Walber*, 187 A.D.2d 225, 227-28 (1st Dep't 1993).  This is so for alternative legal and equitable remedies at the pleading stage as well.  *See Volt Sys. Dev. Corp. v. Raytheon Co.*, 155 A.D.2d 309, 309 (1st Dep't 1989); *Donaldson Interiors, Inc. v. Cauldwell-Wingate Co.*, LLC, 2018 NY Slip Op 50303(U) (Sup. Ct. NY Cty. 2018) (citing *On the Level Enters., Inc. v. 49 E. Houston LLC*, 104 A.D.3d 500 (1st Dep't 2013)).

Defendants citation to *Grusd v. Arccos Golf LLC*, 2014 N.Y. Slip. Op. 31471 (Sup. Ct. N.Y. Cty., June 3, 2014), does not establish to the contrary.  *See* Defs. Mem. at 34. In *Grusd*, the court deemed claims to be duplicative because the causes of action each rose or fell on the claim that a partner's equity in a partnership was stolen from him.  Thus, in the particulars of that case, if plaintiff prevailed on the question of theft of his equity interest, the other causes of action would be duplicative.  Conversely, if he lost on the question of theft of his equity, the other causes of action would fail as well.

Here, similar to *Grusd*, Defendants stole Plaintiff's equity in the business which became Stake.com.  But, in contrast to *Grusd*, they also unfairly competed with Primedice, undercutting its financial performance by hypothecating and enhancing Primedice's technology for use in a competing online crypto dice game (Stake Dice).  Specifically, Tehrani texted numerous Primedice partners and employees and instructed that they should get Primedice players on Stake.com because of the increased house edge.  Compl., ¶¶ 121-123. Further, Stake regularly provides incentives and bonuses to players, including those using the dice games, that are not offered to Primedice players.  *Id.*, ¶ 124.  Thus, whether or not Freeman is able to prove to a factfinder that Defendants stole his equity in the business which became Stake.com, the fraud, unfair competition, idea misappropriation, tortious interference, and unjust enrichment claims touch on different aspects of the history between the parties beyond Stake.com.  *Grusd* is thus clearly distinguishable and inapposite.

## VII. Defendants' Contentions That Freeman Fails to State a Claim Under Fed. R. Civ. P. 9(b) and/or 12(b) Are Meritless

Justice Cardozo's famous holding that partners owe to each other the duty of the finest loyalty urges denial of Defendants' motion.  *Meinhard v. Salmon*, 249 N.Y.458, 463-64 (1928) ("[n]ot honesty alone, but the punctilio of an honor the most sensitive, is then the

standard of behavior"). That celebrated injunction, emphasizing partners' fulsome obligations to each other, establishes the pertinent standard which Craven and Tehrani plainly have not met, and they should not be permitted to summarily avoid responsibility for their concerted actions to wrest from Freeman equity in an enterprise he paid for and earned. That behavioral standard colors all the claims asserted and, in this context especially, Defendants' arguments that Plaintiff has failed to assert colorable claims are meritless.

A. Fraud

Defendants contend that Plaintiff's fraud or fraud-based claims fail the particularity requirements of Fed. R. Civ. P. 9(b). Citing to *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 171 (2d Cir. 2015), Defendants urge as necessary an identification of (i) detail of the fraudulent statements or omissions, (ii) speaker, (iii) location and timing, and (iv) explanation of why they are fraudulent. Defs. Mem. at 37. Specifically, Defendants complain that the Complaint fails to identify location and timing. *Id.* To the contrary, the Complaint plainly identifies the particular false statements and omissions (the detail) made in writing from Tehrani from Australia while domiciled in New York (location) to Freeman in August 2016 (timing) that two of the three partners (Tehrani and Craven) "want[ed] to exit the Bitcoin space" and were therefore rejecting the idea of pursuing and creating the online casino on which Freeman had been working. Compl., ¶¶ 112-13. Tehrani further explained that he and Craven were instead devoting their attention to a fiat casino. *Id.* These statements were untrue at the time they were made. Compare *id.*, ¶¶ 82-110 (referencing development of an online casino and Tehrani and Craven's public statements of same) with *id.*, ¶¶ 116-120 (describing the launch, soon thereafter, of an online casino contrary

to representations and including Tehrani and Craven's motivation to exclude him from their partnership).

These facts also give rise to the requisite strong inference of fraudulent intent. *Loreley Financing No. 3*, 797 F.3d at 171.  As the Court in *Loreley* wrote in reversing the dismissal of plaintiffs' fraud claim, it was obliged at the Rule 12(b)(6) stage to "credit all non-conclusory factual allegations in the complaint and draw all reasonable inferences" in Freeman's favor, and that the question for this Court is whether those allegations and their fair inferences "plausibly indicate [Freeman's] entitlement to relief."  *Id.* at 171 (citations omitted); *see also Cohen v. S.A.C. Trading Corp.,* 711 F.3d 353, 360 (2d Cir.2013) (("*Iqbal* ... requires assertions of facts supporting a *plausible* inference of fraud—not of facts which can have no conceivable other explanation") (emphasis in original).  We respectfully submit they clearly do.

As respects the Tenth Cause of Action for fraud against Slicemedia, the allegations of the Complaint are that Tehrani and Craven founded it in 2017 without the knowledge or consent of Freeman (Compl., ¶ 135), that it now acts, or at leasts presents itself, as the legal owner and operator of Primedice (*id.*), and that it secretly assumed ownership of Primedice without the knowledge, authorization, or consent of Freeman, in violation of duties of disclosure owed to Freeman by Tehrani and Craven acting as Slicemedia's possible principals.  *Id.*, ¶¶ 311-314.  Further, though Craven and Tehrani have transferred both Primedice and Stake.com to companies in which they have no legal interest either has dared put on paper, they appear to have a continuing mechanism by which they have reaped enormous financial benefits from the performance of both.  Though their motion papers reveal their belief they have jettisoned their personal legal duties, which they suggest are shouldered

only by Slicemedia, this mysterious personal tether to the financial performance of Slicemedia (and Medium Rare) raises complicated fact questions.[10]  While discovery of documents addressing those transactions and the taxes paid thereon will ultimately reveal the true realities and effects of the corporate structuring they have undertaken, courts have made clear that partners cannot so easily dispatch their obligations.  *See Graham v. James*, 144 F.3d 229, 240 (2d Cir. 1998) (rule of corporate successor liability applies regardless of whether the predecessor or successor organization was a corporation "or some other form of business organization").[11]

B. Unfair Competition

As Defendants concede, a claim of common-law unfair competition requires a showing that Defendants misappropriated Freeman's labors, skills, expenditures, or good will with some demonstration of bad faith.  *See Abe's Rooms, Inc. v. Space Hunters, Inc.*, 38 A.D.3d 690, 692-93 (2d Dep't 2007); Defs. Mem. at 38.  Defendants contend that the Complaint fails to satisfy this test because it asserts that Defendants misappropriated "*Primedice* partnership assets, equity, name value, and reputation," not Freeman's.  Defs. Mem. at 38 (emphasis in original).  But the specific allegations of the Complaint, and indeed its gravamen, is that a

---

[10]     For instance, Tehrani and Craven, reported to have spent more than $100 million on personal residences and who are publicly regarded as the owners of Stake.com, are in fact not owners of either Primedice or Stake.com.  Nevertheless, both have been greatly enriched by Primedice and Stake.

[11]     To the extent that Vuckovic, and not Craven and Tehrani, truly controlled Slicemedia, then it was he who caused Slicemedia to act in derogation of Freeman's rights.  Vuckovic was fully aware from working at Primedice since 2013 that Freeman was a Primedice partner with rights in the partnership and its assets, yet chose never to inform him about these material events.  Not only actionable omissions, but Vuckovic has never caused Medium Rare (when it owned Primedice) nor Slicemedia (its current owner) to provide any accounting to Freeman, including, among other things, Primedice's financial performance or Stake's use of Primedice assets.

portion of Primedice partnership assets, equity, name value, and reputation are Freeman's. Beyond mere allegations, these are irrefutable facts supported by evidence. Defendants acted contrary to those interests. As the Complaint makes clear, Defendants initially operated Stake.com's gambling site under Primedice's Curacaoan gaming license and using Primedice's technology to operate Stake.com's Stakedice game. Compl., ¶¶ 120, 151, 153-54; *Electrolux Corp. v. Val-Worth, Inc.*, 6 N.Y.2d 556, 567-68 (1959) (endorsing theory of unfair competition involving "palming off," or the sale of goods of one manufacturer as those of another). Defendants even excluded Primedice from using updated versions of *its own technology* as they allowed Stakedice to enjoy it and the competitive advantages it yielded. *Id.*, ¶ 154. Defendants also used Primedice's funds to create and develop Stake.com's games. *Id.*, ¶ 120. These games, and especially Stakedice, were not only a corporate opportunity which Defendants' took for themselves, but competed directly with Primedice using advantages unfairly obtained and used to benefit Defendants to Primedice's detriment. *ITC Ltd. v. Punchgini, Inc.*, 9 N.Y.3d 467, 478 (2007) (holding that commercial unfairness should be restrained where there has been a misappropriation which, for an unfair competition claim, "usually concerns the taking and use of the plaintiffs property to compete against the plaintiffs own use of the same property") (quoting *Roy Export Co. v. Columbia Broadcasting Sys.*, 672 F.2d 1095, 1105 (2d Cir. 1982)).

### C. Idea Misappropriation

Defendants attack Plaintiff's idea misappropriation claim on grounds of novelty, arguing it must involve the taking of an original or novel idea. Defs. Mem. at 39-40 (citations omitted). Determining novelty is generally a question of fact and dismissal at the pleading stage is generally inappropriate. *Apfel v. Prudential-Bache Sec.*, 183 A.D.2d 439, 439

(1ˢᵗ Dep't 1992), *aff'd as modified on other grounds*, 81 N.Y.2d 470 (1993); *Stewart v. World Wrestling Fed. Entertainment, Inc.*, No. 3 CV 2468, 2005 WL 66890, *5 (S.D.N.Y. 2005); *Kaplan v. Michtom*, 17 F.R.D. 228, 229 (S.D.N.Y. 1955)).  Further, where, as here, Defendants do not challenge the Complaint's assertion that they misappropriated the Primedice license, technology, and funds for the purposes of developing and launching Stake.com, the basis for pleading (and, indeed, trial of) a claim of idea misappropriation is established.  *See Pitts Gershon PON/GGK v. Tri-Honda Adv. Assoc.*, 166 A.D.2d 357, 358 (1ˢᵗ Dep't 1990) ("the similarity between plaintiff's proposed advertising campaign and the one developed by [defendants] and the unusual circumstance that the second campaign was developed . . . just three years after plaintiff's campaign . . . constitute circumstantial evidence sufficient to raise a factual issue for trial . . . .  Whether the [idea] is novel and original, or a mere variation on a common phrase, is a question which must also be decided by the trier of fact"); *see also Nadel v. Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368, 380 (2d Cir. 2000) (cited by Defendants - "we believe that there remains a genuine issue of fact on this point [i.e., whether the idea lacked originality and novelty]").  As the Complaint articulates that Freeman worked for the partnership on the ideas and the creation of games which were not generally available to the public and were themselves eventually included in those offered to the public by Stake.com, the claim for idea misappropriation is further strengthened.  Compl., ¶ 170.

D. <u>Tortious Interference</u>

Under New York law, to state a claim for tortious interference with prospective economic advantage, the plaintiff must allege that "(1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and

(4) the defendant's interference caused injury to the relationship." *Carvel Corp. v. Noonan,* 350 F.3d 6, 17 (2d Cir.2003).  The conduct alleged in the Complaint, presumed true, establishes intentional interference by Defendants using not only dishonest but fraudulent means to cause injury to Freeman undisputed financial interests in the Primedice partnership.  All of the conduct discussed above – including (i) fraudulent representations and material omissions, (ii) hiding Defendants' corporate structuring, and (iii) subjecting Primedice to inferior technology and odds algorithms which hampered its ability to compete with Stakedice – was intentionally directed towards Freeman's relationship with Primedice.  *See* Compl., ¶¶ 122-23, 135-36, 229.  One consequence (and motivation) is that it alienated Freeman from continuing with the compliance efforts which had proven to retard Defendants' financial performance.  Compl., ¶ 183.  The facts alleged provide the independent tort to satisfy the "more culpable" or "wrongful means" standard of conduct establishing the tortious interference.  *See Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 190-91 (2004) ("'[w]rongful means' include . . . fraud or misrepresentation . . .").  This is especially so where, as here, Freeman was not a competitor with Tehrani and Craven, which might otherwise have provided a legitimate motive for the interference.  *Id*. at 191.

   E.  <u>Conversion of Equity and Altcoins</u>

       Under New York law, "to establish a cause of action to recover damages for conversion,  the plaintiff must show [1] legal ownership or an immediate superior right of possession to a  specific identifiable thing and must show [2] that the defendant exercised an unauthorized  dominion over the thing in question . . . [3] to the exclusion of the plaintiff's rights."  *Nissan Motor Acceptance Corp. v. Scialpi*, 944 N.Y.S.2d 160, 161-62 (2d Dep't 2012) (quoting *Scott v. Fields*, 925 N.Y.S.2d 135, 137 (2d Dep't 2011)).  Defendants fail to articulate

an adequate basis to dismiss Freeman's conversion claims.  Citing to an Australian precedent, Defendants make no effort to establish how, if at all, it conflicts with or even differs from with New York law.  *See GlobalNet Financial.com, Inc. v.  Frank Crystal & Co.*, 449 F.3d 377, 382 (2d Cir. 2006) ("The New York Court of Appeals has  held that the first step in any case presenting a potential choice of law issue is to determine  whether there is an actual conflict between the laws of the jurisdictions involved").  Freeman has alleged that he has a superior right to possession of specifically identifiable things – paid-in equity in the Primedice partnership and millions of dollars worth of cryptocurrency, both of which Defendants, conspicuously, have not disputed he owned.  Rather, Defendants argue that one of those properties – Freeman's Primedice equity – is not a "certain sum."  Yet, as alleged in the Complaint, Defendants have rendered it impossible to know the precise quantum of equity Freeman rightly has in the partnership because they know, but have never provided proof, of their own paid-in capital to justify the share allotments.  In sum, his equity is undisputed; the requested partnership accounting will affix the rightful share.

With respect to Freeman's altcoins, Defendants admit Freeman owns them, but argue that they cannot be held accountable because the Court lacks personal jurisdiction. Yet, Defendants' continuous, indeed targeted, contacts with New York, which included defrauding their partner and elevating their own interests over his (including by confiscating these coins of very high value), establish otherwise.  Defendants' motion should be denied.

F.  Accounting

An equitable action for an accounting arises from the existence of a fiduciary relationship respecting the subject matter of the controversy.  *Stevens v. St. Joseph's Hospital*, 52 A.D.2d 722, 723 (4th Dep't 1976).  Such a relationship can be established where the parties

43

are not partners, but a partnership will always establish that relationship. *Marvin v. Brooks*, 94 N.Y. 71, 81 (1883) ("[a]n accounting is always proper in cases of partnership . . ."). Where, as here, the subject matter of the controversy is the financial performance of a partnership in which Freeman was an investor of both funds and effort, the fiduciary relationship formed thereby created obligations which yield a right to an accounting. *Penato v. George*, 82 A.D.2d 877, 878-79 (2d Dep't 1981) (reversing trial court and determining that a fiduciary relationship between lifelong friends was created obligating defendant to account as a trustee for payments earned under an investment agreement).

   With access to no statute of limitations defense, Defendants claim that the face of the Complaint establishes a dispositive laches defense. Defendants contend that the particular circumstances presented by the Complaint's allegations are sufficient to overcome the general rule that a laches defense does not lend itself to resolution on a motion to dismiss. *See Williams v. Nat'l Gallery of Art*, No. 16-CV-6978 (VEC), 2017 U.S. Dist. LEXIS 154445, at *35 (S.D.N.Y. Sep. 21, 2017) ("[t]he affirmative defense of laches is generally not appropriately raised on a motion to dismiss . . .") (citing *Lennon v. Seaman*, 63 F. Supp.2d 428, 439 (S.D.N.Y. 1999)). Here, the parties tried to resolve their partnership accounting starting in September 2016, after Tehrani and Craven's misrepresentations, and continued until 2021 when the efforts had to be referred to lawyers for negotiation. *See* Freeman Aff., ¶ __. Only after those discussions appeared to break down did it become necessary to seek judicial intervention to secure the necessary accounting.

   These circumstances do not establish any unwarranted delay justifying the extraordinary remedy of dismissal on laches grounds, and the prejudice which Tehrani and Craven now tout is a false one. They were aware that the accounting had not been reduced

to an "agreement."  Especially applicable to partnership disputes and to quantify appropriate restitution and disgorgement, the time to bring an accounting claim does not begin until the partnership is openly repudiated or otherwise terminated.  *See, e.g., Homapour v. Harounian*, 182 A.D.3d 426, 427 (1ˢᵗ Dep't 2020); *Lemle v. Lemle*, 2017 NY Slip Op 30811 (N.Y. Sup. Ct. 2017) (citing *Transp. Workers Union of Am. Local 100 AFL-CIO v. Schwartz,* 17 A.D.3d 218 (1st Dep't 2005)).   There is no basis to ground a laches defense worthy of dismissal at this preliminary stage.  *See Republic of Turkey v. Christie's Inc.*, No. 21-2485, 2023 WL 2395412, *7 (2d Cir., March 8, 2023) (any determination of laches would require a "fact-intensive inquiry into the reasonable diligence of both parties") (citing *Solomon R. Guggenheim Found. v. Lubell*, 77 N.Y.2d 311, 321 (1991)).

Conclusion

For the foregoing reasons, Defendants' motion to dismiss should be denied.

Dated:   New York, New York
         March 23, 2023

GAGE SPENCER & FLEMING LLP

   */s/ William B. Fleming*

William B. Fleming
410 Park Avenue, Suite 810
New York, New York 10022
Tel. (212) 768-4900
Email: wfleming@gagespencer.com

*Attorneys for Plaintiff Christopher Freeman*